## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:20-cv-001470

MONARCH CASINO & RESORT, INC.,

      Plaintiff,

v.

AFFILIATED FM INSURANCE COMPANY,

      Defendant.

## COMPLAINT AND JURY DEMAND

Plaintiff, Monarch Casino & Resort, Inc., through its attorneys, Bradley A. Levin and Nelson A. Waneka of the law firm LEVIN SITCOFF PC, states and alleges as follows for its Complaint and Jury Demand:

## PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff Monarch Casino & Resort, Inc., is a Nevada corporation with its principal place of business in Reno, Nevada.

2.    Monarch owns and operates the Atlantis Casino Resort in Reno, Nevada.

3.    Monarch also owns and operates the Black Hawk Casino in Black Hawk, Colorado.

4.    Defendant Affiliated FM Insurance Company ("AFM") is a Rhode Island corporation with its principal place of business in Johnston, Rhode Island.

5.    At all times pertinent hereto, AFM was conducting the business of insurance in Nevada by insuring the real property and business operations of the Atlantis Casino Resort.

6.      At all times pertinent hereto, AFM was conducting the business of insurance in Colorado by insuring the real property and business operations of the Black Hawk Casino.

7.      Diversity jurisdiction is appropriate under 28 U.S.C. § 1332 because there is complete diversity of citizenship between Monarch and AFM, and the amount in controversy exceeds $75,000.

8.      Venue in this District is appropriate under 28 U.S.C. § 1391(b)(2) because a substantial part of the property at issue in this action is situated in Colorado, and a substantial portion of the errors and omissions at issue occurred in Colorado.

## THE COVID-19 PANDEMIC

9.      COVID-19 is a communicable disease that is highly infectious.

10.     On March 11, 2020, the World Health Organization declared that COVID-19 constituted a global pandemic.

11.     When a person infected with COVID-19 coughs or sneezes (symptoms the disease can cause), droplets containing the virus can be dispersed into the air and/or deposited on surfaces.

12.     The virus can likewise spread when an infected person touches his or her mouth, nose, or eyes and thereafter touches another person or surface.

13.     When deposited in this manner, the COVID-19 virus physically infects and can stay alive on surfaces for up to 17 days.

14.     According to a study published in The New England Journal of Medicine, COVID-19 was detectable in aerosols for up to three hours, up to four hours on copper, up to 24 hours on cardboard, and up to two to three days on stainless steel.

15.     All of these materials are present in casinos.

16.     The results of the study suggest that individuals could get COVID-19 through indirect contact with surfaces or objects used by an infected person (such as a casino gaming machine) whether or not they were symptomatic.

17.     Moreover, a recent research article published in the Journal of the American Medical Association "suggests small, virus-laden droplets may be displaced by airflows and deposited on equipment such as vents."

18.     This makes property exposed to COVID-19 unsafe and dangerous.

19.     The secondary exposure of surfaces to humans is particularly concerning in places where people gather to gamble, socialize, eat, drink, and be entertained.

20.     This is why numerous governmental authorities across the United States and the world have ordered social distancing and prohibited large public gatherings.

21.     Any person who touches a surface containing the COVID-19 virus—who then touches his or her face—can become infected with the virus and spread it to other people.

22.     The average person touches his or her face approximately 2,000 times a day.

23.     The clinical features of COVID-19 vary from asymptomatic forms to fatal conditions of severe respiratory failure that requires ventilation and support in an intensive care unit.

24.     Pneumonia has been the most frequent severe manifestation of COVID-19, with symptoms of fever, cough, dyspnea, and bilateral infiltrates on chest imaging.

25.     There are no specific treatments for COVID-19, and no vaccine is currently available.

26.     It has now been discovered by scientists that COVID-19 has several modes of transmission.

27.     Pursuant to a "Situation Report" issued by the World Health Organization, the virus can be transmitted through symptomatic transmission, pre-symptomatic transmission, or asymptomatic transmission.

28.     Symptomatic transmission refers to transmission by an individual who is experiencing symptoms associated with the virus who then transfers COVID-19 to another person, object, or surface.

29.     The incubation period for COVID-19, which is the time between exposure to the virus (becoming infected) and symptom onset, averages 5-6 days, however, it can be up to 14 days.

30.     During this period, also known as the "pre-symptomatic period," some infected persons can be contagious.

31.     For this reason, transmission of COVID-19 from a pre-symptomatic person can occur before symptom onset.

32.     An individual who does not develop symptoms, an asymptomatic case of COVID-19, can still transmit the disease to another.

33.     As more and more people are infected by COVID-19, the number of infected persons rises exponentially.

34.     As the number of infected persons rises, the number of people killed by the disease rises.

35.     As of the date of this filing, there have been more than 5,150,000 confirmed cases of COVID-19 worldwide.

36.     335,000 of those people have died from the disease.

37.     As of the date of this filing, there have been more than 1,610,000 confirmed cases of COVID-19 in the United States—more than any other country.

38.     95,213 of those Americans have died from the disease.

39.     As of the date of this filing, 7,255 people have been infected with COVID-19 in Nevada.

40.     381 of those Nevadans have died from the disease.

41.     As of the date of this filing, 23,191 people have been infected with COVID-19 in Colorado.

42.     1,310 of those Coloradans have died from the disease.

### THE COLORADO CLOSURE ORDERS

43.     On March 10, 2020, Colorado Governor Jared Polis verbally declared a state of disaster emergency in Colorado due to the presence of COVID-19 within the State.

44.     On March 11, 2020, Governor Polis memorialized this state of disaster emergency in Executive Order D 2020 003.

45.     Executive Order D 2020 003 explained that Colorado law defines a "disaster" as "the occurrence or imminent threat of widespread or severe damage, injury, or loss of life or property resulting from any natural cause or cause of human origin, including but not limited to . . . epidemic." (Emphasis added.)

46.     Executive Order D 2020 003 stated that "[t]he threat currently posed by COVID-19, a respiratory illness that can spread from person to person, constitutes a disaster for purposes of the [Colorado Disaster Emergency] Act."

47.     Executive Order D 2020 003 stated that presumptive positive cases of COVID-19 had been confirmed in Colorado.

48.     Executive Order D 2020 003 directed the Department of Labor and Employment to engage in emergency rulemaking to ensure that certain workers (including those in the hospitality and food services industries present in casinos) received paid sick leave if they exhibited flu-like symptoms—regardless of whether testing confirmed they had COVID-19.

49.     On March 13, 2020, the President of the United States declared a National Emergency due to COVID-19.

50.     On March 16, 2020, following Executive Order D 2020 003, the Executive Director of the Colorado Department of Public Health and Environment ("CDPHE") issued Public Health Order 20-22.

51.     Public Health Order 20-22 was implemented to stop the spread of COVID-19.

52.     In Public Health Order 20-22, the Executive Director of the CDPHE made the following findings:

- COVID-19 was first detected in Wuhan, China in late 2019;

- Since its detection, COVID-19 had spread to over 60 countries, including the United States;

- As of March 16, 2020, there were 131 presumptive positive cases of COVID-19 in Colorado;

- COVID-19 is a respiratory illness that is transmitted through person-to-person contact "or by contact with surfaces contaminated with the virus,";

- "A significant number of Coloradans are at risk of serious health complications, including death, from COVID-19"; and

- "Colorado is experiencing a rapid increase in COVID-19 transmission that threatens the health of residents and risks overwhelming the healthcare system in the State of Colorado."

53.    As a result of these findings, Public Health Order 20-22 in part "close[d] bars, restaurants, gyms, theaters, casinos, nonessential personal services facilities and horse track and off-track betting facilities to slow the spread of the COVID-19 virus."

54.    Public Health Order 20-22 specifically closed casinos and the other identified businesses to "ingress, egress, use, and occupancy by members of the public." (Emphasis added.)

55.    Public Health Order 20-22 was issued pursuant to the CDPHE's authority "to exercise such physical control over property and the persons of the people within this state as the department may find necessary for the protection of public health."  (Emphasis added.)

56.    Consistent with Public Health Order 20-22, Monarch immediately ceased nonessential operations at the Black Hawk Casino and closed the property to the public.

57.    On March 25, 2020, Governor Polis issued Executive Order D 2020 017.

58.    Executive Order D 2020 017 stated that the number of confirmed COVID-19 cases in Colorado "continued to climb."

59.    Executive Order D 2020 017 stated that Colorado had "evidence of community spread throughout the State."

60.     Executive Order D 2020 017 stated that "[t]he actions we have undertaken to date are not yet doing enough to reduce the spread of the virus, and we must take additional action to minimize the duration of this epidemic and of the disruption to our daily lives."

61.     Executive Order D 2020 017 required Coloradans to stay at home, subject to certain exceptions.

62.     Executive Order D 2020 017 likewise directed "all businesses other than those qualified as 'Critical Businesses' under Public Health Order 20-24 or any Public Health Order issued pursuant to this Executive Order, to close temporarily, except as necessary to engage in minimum basic operations needed to protect assets and maintain personnel functions, as of the effective date of this Executive Order."

63.     Casinos were not designated as Critical Businesses.

64.     On March 27, 2020, the Executive Director of the CDPHE issued its second updated Public Health Order 20-24 in response to the existence of hundreds of confirmed and presumptive cases of COVID-19 and related deaths across the State of Colorado.

65.     Among other things, Public Health Order 20-24 imposed social distancing requirements on persons within the State of Colorado.

66.     It also prohibited all public and private gatherings of people outside a residence, with limited exceptions not applicable to this case.

67.     Public Health Order 20-24 stated, "There is clear evidence that some individuals who contract the COVID-19 virus have no symptoms or have mild symptoms, which means they may not be aware they carry the virus. Because even people without symptoms can transmit the

disease, and because evidence shows the disease is easily spread, gatherings promote transmission of COVID-19."

68.     Casinos like the Black Hawk Casino have expansive gaming facilities, together with attached restaurants and bars, where large gatherings of people necessarily interact in close contact.

69.     Casinos therefore promote transmission of COVID-19.

70.     Public Health Order 20-24 stated that "<u>COVID-19 also physically contributes to property loss, contamination, and damage due to its propensity to attach to surfaces for prolonged periods of time.</u>"  (Emphasis added.)

71.     By imposing social distancing requirements on all persons in the State of Colorado and prohibiting gatherings outside a residence, Public Health Order 20-24 stated that it "<u>helps reduce the property damage caused by COVID-19</u> and preserves the welfare of our residents by reducing the spread of the disease in our communities and our workplaces . . . ."  (Emphasis added.)

72.     Indeed, the expressed intent of Public Health Order 20-24 "is to minimize contact between residents and to the greatest extent possible minimize the exposure of the public to <u>contaminated public surfaces.</u>"  (Emphasis added.)

73.     Casinos expose the public to surfaces contaminated by COVID-19.

74.     On April 1, 2020, Governor Polis issued Executive Order D 2020 024.

75.     Like Public Health Order 20-24, Executive Order D 2020 024 stated that "<u>COVID-19 also physically contributes to property loss, contamination, and damage due to its propensity to attach to surfaces for prolonged periods of time.</u>"  (Emphasis added.)

76.     Executive Order D 2020 032, issued by Governor Polis on April 8, 2020, again stated that COVID-19 physically contributes to property loss, contamination, and damage due to its propensity to attach to surfaces for prolonged periods of time.

77.     Accordingly, three executive orders governing the people and businesses in the State of Colorado (Executive Order D 2020 024, Executive Order D 2020 032, and Public Health Order 20-24) state that COVID-19 physically contributes to property loss, contamination, and damage.

## THE NEVADA CLOSURE ORDERS

78.     Similar to Governor Polis, on March 12, 2020, Nevada Governor Steve Sisolak declared a state of emergency for COVID-19.

79.     In so doing, Governor Sisolak stated that "there are multiple confirmed and presumptive cases of COVID-19 in the State of Nevada."

80.     On March 17, 2020, Governor Sisolak, in conjunction with Nevada Health Response, announced the COVID-19 Risk Mitigation Initiative.

81.     Governor Sisolak required six feet of social distancing per person for non-household members.

82.     Governor Sisolak directed the closure to the public of all non-essential businesses, including casinos.

83.     Governor Sisolak mandated all restaurants and bars to close their dine-in facilities to stop the spread of COVID-19.

84.     Governor Sisolak announced that "all gaming machines, devices, tables, games, and any equipment related to gaming activity will be shut down.  Restaurants and bars located

within gaming properties will be subject to the same restrictions as those outside of gaming establishments."

85.     On March 18, 2020, Governor Sisolak issued Emergency Directive 002.

86.     Emergency Directive 002 ordered that "[t]he Nevada general public shall cease gathering at gaming establishments, and all gaming devices, machines, tables, games, and any equipment related to gaming activities effective March 17, 2020 at 11:59 p.m., for the duration that this Directive shall be in effect."

87.     On March 24, 2020, Governor Sisolak issued Emergency Directive 007.

88.     Emergency Directive 007 ordered the Nevada general public to not gather in groups of ten or more in any indoor or outdoor area except for persons living in the same household.

89.     Emergency Directive 007 likewise ordered the Nevada general public to maintain a minimum six-foot distance between persons in public places.

90.     On March 31, 2020, Governor Sisolak issued Emergency Directive 010.

91.     Emergency Directive 010 extended the Declaration of Emergency until April 30, 2020, ordered Nevadans to stay in their homes, and prohibited gatherings of individuals outside the home with limited exceptions not applicable in this case.

92.     On April 29, 2020, Governor Sisolak issued Emergency Directive 016.

93.     Emergency Directive 016 ordered that "[g]aming operations, not including licensed online gaming or mobile wagering operations, shall remain closed until the Gaming Control Board determines that operations may safely resume."

94.     On May 7, 2020, Governor Sisolak issued Emergency Directive 018.

95.     Emergency Directive 018 directed the phased opening of certain businesses but again ordered that gaming operations shall remain closed.

96.     As of the date of this filing, both the Atlantis Casino Resort and the Black Hawk Casino remain closed to the public pursuant to the respective civil and executive orders of Nevada and Colorado.

## THE POLICY

97.     AFM issued a policy of property insurance to Monarch, Policy No. ES130 (the "Policy").

98.     The Policy's term is from October 1, 2019 until October 1, 2020.

99.     The Policy has aggregate limits of $350,000,000 per occurrence, subject to certain sub-limits.

100.    The Policy provides all-risk coverage, meaning that it insures against all risks of physical loss or damage at the locations described in the declarations unless those risks are specifically excluded.

101.    The Policy states:

> This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

102.    The Atlantis Casino Resort is a described location in the Policy's declarations.

103.    The Black Hawk Casino is a described location in the Policy's declarations.

104.    Therefore, the Policy covers all risks of physical loss or damage to the Atlantis Casino Resort and the Black Hawk Casino unless specifically excluded.

105.    The Policy does not define "physical loss or damage."

*Communicable Disease Coverage*

106.    The Policy specifically <u>includes</u> property damage coverage for "communicable disease."

107.    The Policy defines a "communicable disease" as a disease which is "1. Transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges, or 2. Legionellosis."

108.    The Policy states that the actual presence of a "communicable disease" at a described location, coupled with access to the location being limited, restricted, or prohibited by an order of a government agency, constitutes "property damage."

109.    Specifically, the Policy states:

**5.  Communicable Disease – Property Damage**

If a **described location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **described location** is limited, restricted or prohibited by:

a)    An order of an authorized governmental agency regulating or as result of such presence of **communicable disease**; or

b)    A decision of an Officer of the Insured as a result of such presence of **communicable disease**,

This Policy covers the reasonable and necessary costs incurred by the Insured at such **described location** for the:

a)    Cleanup, removal and disposal of such presence of **communicable disease** from insured property; and

b)    Actual costs or fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from such presence of **communicable disease** on insured property.

This Additional Coverage does not cover any costs incurred due to any law or ordinance with which the Insured was legally obligated to comply prior to such presence of **communicable disease**.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

Communicable Disease - Property Damage Exclusions: As respects Communicable Disease – Property Damage, the following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

110.    The actual presence of a "communicable disease" at a described location, coupled with access to the location being limited, restricted, or prohibited by an order of a government agency, is a type of physical loss or damage insured by the Policy.

111.    The Policy does not define what constitutes the "actual presence" of a communicable disease.

112.    Nevertheless, the Policy does not require blood or antibody testing of employees or patrons at an insured location to establish the "actual presence" of a communicable disease.

113.    The Policy does not require testing of surfaces at an insured location to establish the "actual presence" of a communicable disease.

114.    The Policy does not require testing of any sort to establish the "actual presence" of a communicable disease.

115.    A communicable disease can be "actually present" at an insured location even if its presence cannot be confirmed through testing.

116.    A communicable disease can be "actually present" at an insured location even if it cannot be seen.

117.    Just because the presence of a communicable disease has not been confirmed through testing does not mean the disease is not actually present at an insured location.

118.    Testing and presence are not the same thing.

119.    For example, the novel coronavirus COVID-19 can be transmitted from humans to humans, from humans to surfaces, and from surfaces to humans at an insured location without being seen nor its presence confirmed through testing.

120.    COVID-19 is a disease which is transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges.

121.    COVID-19 is therefore a "communicable disease" as that term is used in the Policy.

122.    The presence of COVID-19 or another communicable disease at the Atlantis Casino Resort, coupled with access to the casino being limited, restricted, or prohibited by an order of a government agency, is a type of physical loss or damage insured by the Policy.

123.    The presence of COVID-19 or another communicable disease at the Black Hawk Casino, coupled with access to the casino being limited, restricted, or prohibited by an order of a government agency, is a type of physical loss or damage insured by the Policy.

124.    Additionally, the Policy defines a "contaminant" as meaning anything that causes "contamination," which, in turn, "means any condition of property due to the actual *or* suspected presence of any foreign substance, impurity . . . pathogen or pathogenic organism, bacteria, [or] virus . . . ." (Emphasis added.)

125.    A virus cannot be an excluded "contaminant" and a covered "communicable disease."

126.    Further, because COVID-19 is a "contaminant," which includes the "actual or suspected presence of" the virus, the Policy's Communicable Disease coverages (including the Communicable Disease – Property Damage and Communicable Disease – Business Interruption coverages) are ambiguous and extend to the suspected as well as the actual presence of a virus at a described location.

127.    Monarch incurred reasonable and necessary costs to cleanup, remove, or dispose of the presence of COVID-19 at the Atlantis Casino Resort and the Black Hawk Casino.

*Business Interruption Coverage*

128.    The Policy insures Monarch's business interruption losses as a direct result of physical loss or damage of the type insured by the Policy.

129.     The Policy insures business interruption to property described in the Policy, used by the insured, while at a location provided by the Policy, during the Policy's "period of liability."

130.     The Atlantis Casino Resort and the Black Hawk Casino are described properties.

131.     The Atlantis Casino Resort and the Black Hawk Casino were used by the insured, at locations provided in the Policy, during the "period of liability" described in the Policy.

132.     Specifically, the Policy's business interruption coverage states:



### A. LOSS INSURED

This Policy insures Business Interruption loss, as provided in the Business Interruption Coverage, as a direct result of physical loss or damage of the type insured:

1.   To property as described elsewhere in this Policy and not otherwise excluded by this Policy;

2.   Used by the Insured;

3.   While at a **location** or while in transit as provided by this Policy; and

4.   During the Period of Liability as described elsewhere in this Policy.

This Policy insures Business Interruption loss only to the extent it cannot be reduced through:

1.   The use of any property or service owned or controlled by the Insured;

2.   The use of any property or service obtainable from other sources;

3.   Working extra time or overtime; or

4.   The use of inventory;

All whether at a **location** or at any other premises. This Company reserves the right to take into consideration the combined operating results of all associated, affiliated or subsidiary companies of the Insured in determining the amount of loss.

In determining the amount of loss payable, this Company will consider:

1.   Any amount recovered elsewhere under this Policy for loss or damage to finished goods or merchandise at selling price as having been sold to the Insured's regular customers and credited against net sales.

2.   The experience of the business before and after and the probable experience during the Period of Liability. The probable experience will also consider any increase or decrease in demand for the Insured's goods or services during the Period of Liability, even if such increase or decrease is from the same event that caused physical loss or damage starting the Period of Liability.

3.   The continuation of only those normal charges and expenses that would have been earned had there been no interruption of production or business operations or services.

This Policy also covers expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this Policy. The amount of such recoverable expenses will not exceed the amount by which the loss is reduced.

133.     The Policy's business interruption coverage provides Monarch with the option to choose between calculating its business interruption claim based upon "gross earnings" or "gross profits."

134.    The Policy defines "gross earnings" as "The net sales value of production or business operations or services less the cost of:  (a) Raw stock; (b) Materials and supplies; and (c) Merchandise sold; Used in the production or business operations or services rendered by the Insured."

135.    The Policy defines "gross profits" as "The sum produced by adding the Net Profit to the **Insured Fixed Charges**.  If there is no **Net Profit** the amount of all **Insured Fixed Charges** less that proportion of any loss from business operations as the amount of the **Insured Fixed Charges** bears to all fixed charges."

136.    "Net Profit" means "The net operating profit excluding:  (a) Capital receipts and accruals; and (b) Outlay properly chargeable to capital; Resulting from the business of the Insured after due provision has been made for all fixed charges and any other expenses, including depreciation, but before deduction of any taxes on profits."

137.    The Policy does not define "insured fixed charges."

138.    If the insured selects "gross earnings" as the basis for calculating its business income loss, the "period of liability" is "1.  The period starting from the time of physical loss or damage of the type insured; and (2) Ending when, with due diligence and dispatch, (a) The lost or damaged property could be repaired or replaced and made ready for production or business operations or services under the same or equivalent physical operating conditions that existed prior to the loss or damage; or (b) The lost or damaged property under the course of construction or renovation could be repaired or replaced to the same or equivalent degree of completion that existed prior to the loss or damage.  This period of time will be applied to the level of business that

would have been reasonably achieved after construction and startup would have been completed had no physical damage happened."

139.   If the insured selects "gross profit" as the basis for calculating its business income loss, the "period of liability" is "The period starting from the time of physical loss or damage of the type insured and ending no later than the period of time shown in the Declarations section during which the results of the business shall be directly affected by such damage."

140.   The total limit of liability under the Policy for insured business losses is $60,000,000 as a result of any one occurrence.

141.   The losses incurred by Monarch at the Atlantis Casino Resort and the Black Hawk Casino were the result of two separate occurrences within the Policy definition, as they arose out of and were caused by discrete events of physical loss or damage at separate insured locations.

142.   The Policy has business interruption sub-limits of $50,000,000 for "gross earnings," which may include a maximum of 30 days for "ordinary payroll."

143.   The Policy defines "ordinary payroll" as "1.  Wages of all employees except officers, executives, department managers, and employees under contract or similar key employees; and 2. Includes taxes and charges dependent on the payment of those wages."

144.   The Policy has business interruption sub-limits of $50,000,000 for "gross profits" for a 12 month period of liability, which may include a maximum of 30 days for "ordinary payroll."

145.   Monarch incurred (and continues to incur) business interruption losses of between $7,500,000 and $12,500,000 per month as a result of COVID-19 and the attendant executive orders directing the closure of the Atlantis Casino Resort and the Black Hawk Casino.

*Business Interruption Coverage Extension – Attraction Property*

146.    The Policy contains a coverage extension covering the business interruption loss incurred by the insured during the period of liability from physical loss or damage to other properties of the type insured by the Policy, but not necessarily owned or operated by the insured, that attract business to a described location and are within one statute mile of the described location.

147.    The Policy states:

> **1. Attraction Property**
>
> This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability directly resulting from physical loss or damage of the type insured to property of the type insured that attracts business to a **described location** and is within one (1) statute mile of the **described location**.
>
> Attraction Property Exclusion: As respects Attraction Property, the following additional exclusion applies:
>
> This Policy does not insure loss resulting from:
>
> **a)**   Physical loss or damage caused by or resulting from **terrorism,** regardless of any other cause or event, whether or not insured by this Policy, contributing concurrently or in any other sequence to loss.

148.    The actual presence of a communicable disease, coupled with access to a property being limited, restricted, or prohibited by an order of a government agency, is a type of physical loss or damage insured by the Policy.

149.    The Reno Airport and other casinos, hotels, and businesses are within one statute mile of the Atlantis Casino Resort.

150.    COVID-19 was actually present in the Reno Airport and one or more of these other casinos, hotels, and businesses during the Policy's period of liability.

151.    Access to the Reno Airport and these other casinos, hotels, and businesses was limited, restricted, or prohibited by an order of a government agency.

152.    The Reno Airport and these other casinos, hotels, and businesses attract business to the Atlantis Casino Resort.

153.    Monarch incurred business interruption loss at the Atlantis Casino Resort during the period of liability due to the actual presence of communicable disease at these attraction properties.

154.    Similarly, other casinos, hotels, and businesses are within one statute mile of the Black Hawk Casino.

155.    COVID-19 was actually present in one or more of these casinos, hotels, and businesses during the Policy's period of liability.

156.    Access to these other casinos, hotels, and businesses was limited, restricted or prohibited by an order of a government agency.

157.    These other casinos, hotels, and businesses attract business to the Black Hawk Casino.

158.    Monarch incurred business interruption loss at the Black Hawk Casino during the period of liability due to the actual presence of communicable disease at these attraction properties.

*Business Interruption Coverage Extension – Civil Or Military Authority*

159.    The Policy contains a coverage extension covering the business interruption loss incurred by the insured during the period of liability if an order of a civil or military authority prohibits access to a "location," provided such order is the direct result of physical damage of the type insured at the "location" <u>or</u> within five miles of that "location."

160.    The Policy states:

> **2. Civil or Military Authority**
>
> This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability if an order of civil or military authority prohibits access to a **location** provided such order is the direct result of physical damage of the type insured at a **location** or within five (5) statute miles of it.

161.    The "period of liability" for this coverage extension is "The period of time starting at the time of such order of civil or military authority, but not to exceed the number of consecutive days shown in the Declarations section of this Policy."

162.    The Policy defines a "location" as "a location described in the Insurance Provided clause of the Declarations section or included as Newly Acquired Property or Unnamed Property Coverages."

163.    The Atlantis Casino Resort and the Black Hawk Casino are locations described in the Insurance Provided clause of the Policy's Declarations section.

164.    The presence of a communicable disease, coupled with access to a property being limited, restricted, or prohibited by an order of a government agency, is a type of physical loss or damage insured by the Policy.

165.    Public access to the Atlantis Casino Resort was prohibited by a civil authority to prevent the spread of COVID-19.

166.    Public access to other businesses and casinos within five miles of the Atlantis Casino Resort was likewise prohibited by a civil authority to prevent the spread of COVID-19.

167.    Monarch incurred business interruption loss at the Atlantis Casino Resort during the period of liability due to the civil order limiting, restricting, or prohibiting access to the resort and other businesses and casinos within five miles of it.

168.     Public access to the Black Hawk Casino was prohibited by a civil authority to prevent the spread of COVID-19.

169.     Public access to other businesses and casinos within five miles of the Black Hawk Casino was likewise prohibited by a civil authority to prevent the spread of COVID-19.

170.     Monarch incurred business interruption loss at the Black Hawk Casino during the period of liability due to the civil order limiting, restricting, or prohibiting access to the casino and other businesses and casinos within five miles of it.

*Business Interruption Coverage Extension – Communicable Disease*

171.     The Policy contains a coverage extension covering the business interruption loss incurred by the insured for the actual presence of a communicable disease coupled with a civil order limiting, restricting, or prohibiting access at a described location.

172.     The Policy states:

> **3.   Communicable Disease - Business Interruption**
>
> If a **described location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **described location** is limited, restricted or prohibited by:
>
> a)   An order of an authorized governmental agency regulating such presence of **communicable disease**; or
>
> b)   A decision of an Officer of the Insured as a result of such presence of **communicable disease**,
>
> This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability at such **described location** with such presence of **communicable disease**.
>
> This coverage is subject to the Qualifying Period in the Declarations section of this Policy.
>
> Communicable Disease - Business Interruption Exclusions: As respects Communicable Disease - Business Interruption, the following additional exclusions apply:
>
> This Policy does not insure loss resulting from:
>
> a)   The enforcement of any law or ordinance with which the Insured was legally obligated to comply prior to the time of the actual spread of **communicable disease**.
>
> b)   Loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any sequence of loss.
>
> The Period of Liability for this Business Interruption Coverage Extension will be:
>
> The period of time:
>
> a)   Starting at the time of the order of the authorized governmental agency or the Officer of the Insured; but
>
> b)   Not to exceed the time limit shown in the Limits of Liability clause in the Declarations section,
>
> This period of time is part of and not in addition to any Period of Liability applying to any coverage provided in the Business Interruption section.

173.    The Atlantis Casino Resort is a described location that is owned, leased, or rented by the insured (Monarch).

174.    The Atlantis Casino Resort had the actual presence of communicable disease.

175.    Specifically, Team Members of the Atlantis Casino Resort had COVID-19 or another communicable disease.

176.    Additionally, upon information and belief, at least one of the many patrons of the Atlantis Casino Resort had COVID-19 or another communicable disease.

177.    Public access to the Atlantis Casino Resort was limited, restricted, or prohibited by an order of an authorized government agency regulating COVID-19 and communicable disease.

178.    The Atlantis Casino Resort was not required to comply with any order limiting, restricting, or prohibiting access to it before the spread of COVID-19 and declaration of a state of emergency in Nevada.

179.    Monarch incurred business interruption loss at the Atlantis Casino Resort during the period of liability due to the order limiting, restricting, or prohibiting access.

180.    The Black Hawk Casino is a described location that is owned, leased, or rented by the insured (Monarch).

181.    The Black Hawk Casino had the actual presence of communicable disease.

182.    Specifically, Team Members of the Black Hawk Casino had COVID-19 or another communicable disease.

183.    Additionally, upon information and belief, at least one of the many patrons of the Black Hawk Casino had COVID-19 or another communicable disease.

184.    Public access to the Black Hawk Casino was limited, restricted, or prohibited by an order of an authorized government agency regulating COVID-19 and communicable disease.

185.    The Black Hawk Casino was not required to comply with any order limiting, restricting, or prohibiting access to it before the spread of COVID-19 and declaration of state of disaster emergency in Colorado.

186.    Monarch incurred business interruption loss at the Black Hawk Casino during the period of liability due to the order limiting, restricting, or prohibiting access.

*Business Interruption Coverage Extension – Ingress/Egress*

187.    The Policy contains a coverage extension covering the necessary business interruption loss incurred by the insured when ingress to or egress from a described location is physically prevented, in whole or in part, as a direct result of physical loss or damage of the type insured by the Policy *whether or not* that damage is at a described location.

188.    The Policy states:

> **8.   Ingress/Egress**
>
> This Policy covers the Business Interruption Coverage loss incurred by the Insured due to the necessary interruption of the Insured's business when ingress to or egress from a **described location(s)** is physically prevented, either partially or totally, as a direct result of physical loss or damage of the type insured to property of the type insured whether or not at a **described location**.
>
> Item B. 3. of Property Excluded does not apply to this Business Interruption Coverage Extension.
>
> Ingress/Egress Exclusion: As respects Ingress/Egress, the following additional exclusion applies:
>
> This Policy does not insure loss resulting from:
>
> **a)**   Physical loss or damage caused by or resulting from **terrorism,** regardless of any other cause or event, whether or not insured by this Policy, contributing concurrently or in any other sequence to the loss.

189.    The presence of a communicable disease, coupled with access to a property being limited, restricted, or prohibited by an order of a government agency, is a type of physical loss or damage insured by the Policy.

190.    By his order, Nevada Governor Sisolak physically prevented public ingress to and egress from the Atlantis Casino Resort.

191.    By his order, Governor Sisolak physically prevented public ingress to and egress from other casinos and resorts of the type insured by the Policy.

192.    The public was prevented from physically entering the Atlantis Casino Resort and other Nevada casinos.

193.    Monarch incurred business interruption loss due to the necessary interruption of its business when ingress to or egress from the Atlantis Casino Resort was physically prevented.

194.    By their orders, Colorado Governor Polis and the CDPHE physically prevented public ingress to and egress from the Black Hawk Casino.

195.    Indeed, Public Health Order 20-22 expressly closed all Colorado casinos "to ingress, egress, use, and occupancy by members of the public."

196.    By their orders, Governor Polis and the CDPHE physically prevented public ingress to and egress from other casinos and resorts of the type insured by the Policy.

197.    The CDPHE closed Colorado casinos, and prevented ingress to and egress from those casinos, pursuant to its authority to exercise "physical control" over property and persons within the State of Colorado—including physical control over the Black Hawk Casino.

198.    The public was prevented from physically entering the Black Hawk Casino and other Colorado casinos.

199.    Monarch incurred business interruption loss due to the necessary interruption of its business when ingress to or egress from the Black Hawk Casino was physically prevented.

*Business Interruption Coverage Extension – Protection And Preservation Of Property*

200.    The Policy contains a coverage extension covering the business interruption loss incurred by the insured for a period of 48 hours prior to and 48 hours after the insured first takes reasonable action for the temporary protection and preservation of property insured by the Policy, provided such action is necessary to prevent immediately impending insured physical loss or damage to such insured property.

201.    The Policy states:

> **13. Protection and Preservation of Property - Business Interruption**
>
> This Policy covers the Business Interruption Coverage loss incurred by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this Policy provided such action is necessary to prevent immediately impending insured physical loss or damage to such insured property.

202.    Monarch took reasonable action for the temporary protection and preservation of the property insured by the Policy.

203.    Specifically, Monarch took action to clean and disinfect the properties covered by the Policy to protect its employees and the public from communicable disease.

204.    The actions of Monarch were necessary to prevent the transmission of COVID-19 and other communicable diseases to other persons and surfaces within the properties insured by the Policy.

205.    The actual presence of a communicable disease in a property insured by the Policy is property damage under the Communicable Disease – Property Damage coverage.

206.    Monarch sustained business interruption loss during the 48 hours prior to and the 48 hours after taking these necessary and reasonable actions.

*Business Interruption Coverage – Soft Costs*

207.     The Policy contains a coverage extension covering soft costs incurred by the insured during the period of liability arising out of the delay in the completion of buildings and additions under construction.

208.     The Policy states:

> **15. Soft Costs**
>
> This Policy covers **soft costs** incurred by the Insured during the Period of Liability arising out of the delay in the completion of buildings and additions under construction directly resulting from physical loss or damage of the type insured to insured property under construction at **locations**.

209.     The Policy defines "soft costs" as:

> **soft costs** means the expenses over and above normal expenses at **locations** undergoing alterations or additions to existing property and property in the course of construction limited to the following:
>
> 1.  Construction loan fees - the additional cost incurred to rearrange loans necessary for the completion of construction, repairs or reconstruction including the cost to arrange refinancing, accounting work necessary to restructure financing, legal work necessary to prepare new documents, and charges by the lenders for the extension or renewal of loans necessary.
>
> 2.  Commitment fees, leasing and marketing expenses - the cost of returning any commitment fees received from prospective tenant(s) or purchaser(s), the cost of releasing and marketing of the Insured Project due to loss of tenant(s) or purchaser(s).
>
> 3.  Additional fees - for architects, engineers, consultants, attorneys and accountants needed for the completion of construction, repairs or reconstruction.
>
> 4.  Carrying costs - building permits, additional interest on loans, insurance premiums and property and realty taxes.

210.     The Policy contains $5,000,000 in additional limits for soft costs coverage.

211.     At the time that Monarch incurred property loss and damage due to COVID-19 and the consequential closure orders, the Black Hawk Casino was undergoing a substantial expansion project.

212.     This expansion project included the construction of additional gaming facilities, a new hotel tower, and several new restaurants and bars.

213.     Property damage and business interruption from communicable disease are types of property loss or damage insured by the Policy.

214.    Completion of the expansion project at the Black Hawk Casino has been delayed due to COVID-19 and/or other communicable disease.

215.    Monarch has incurred additional construction expenses due to the construction delays caused by COVID-19 or other communicable disease.

*Emergency Evacuation Expense*

216.    The Policy contains a real estate endorsement covering the reasonable and necessary costs incurred by the insured for the emergency evacuation and return of tenants or lawful occupants as a direct result of immediately impending physical loss or damage of the type insured by the Policy.

217.    The Policy states:

**2.  Emergency Evacuation Expense**

This Policy covers the reasonable and necessary costs incurred by the Insured for the emergency evacuation and subsequent return of tenants or lawful occupants when the Insured's management, using reasonable discretion, or a civil authority orders the emergency evacuation of a **described location** as a direct result of immediately impending physical loss or damage of the type insured by this Policy.

Emergency Evacuation Expense Exclusions: As respects Emergency Evacuation Expense, the following additional exclusions apply:

This Policy excludes:

a)  The cost to move personal property of tenants or lawful occupants.

b)  The cost of temporary or permanent housing or lodging.

c)  Loss caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

218.    Communicable disease is a type of physical loss or damage insured by the Policy.

219.    A civil authority of the State of Nevada ordered the closure of the Atlantis Casino Resort, including the evacuation of the resort's lawful occupants.

220.    A civil authority of the State of Colorado ordered the closure of the Black Hawk Casino, including the evacuation of the casino's lawful occupants.

221.    The closures and evacuations were the direct result of immediately impending physical loss or damage from COVID-19 or other communicable disease.

222.    Monarch incurred reasonable and necessary costs to effectuate the evacuation of the lawful occupants of its properties.

*Decontamination Costs*

223.    The Policy covers the increased cost of decontamination and/or the removal of contaminated insured property as a direct result of enforcement of a law or ordinance regulating contamination.

224.    The Policy states:

> **8.   Decontamination Costs**
>
> If insured property is contaminated as a direct result of insured physical damage and there is in force at the time of the loss any law or ordinance regulating **contamination** due to the actual not suspected presence of **contaminant(s)**, then this Policy covers, as a direct result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal of such contaminated insured property in a manner to satisfy such law or ordinance. This coverage applies only to that part of insured property so contaminated due to such presence of **contaminant(s)** as a direct result of insured physical damage.
>
> The Company is not liable for the costs required for removing:
>
> **a)**   Contaminated uninsured property; or
>
> **b)**   The **contaminant** in or on uninsured property;
>
> Whether or not the **contamination** results from insured physical loss or damage.

225.    Monarch's properties were contaminated by COVID-19 or another contaminant.

226.    The contamination was a direct result of physical damage insured under the Policy's Communicable Disease – Property Damage coverage.

227.    A law or ordinance is in force regulating COVID-19 contamination (the Nevada and Colorado Executive Orders).

228.    Monarch incurred costs to remove contaminated insured property in a manner to satisfy such law or ordinance.

*Expediting Expenses Coverage*

229.     The Policy covers the reasonable and necessary costs incurred to temporarily repair or replace insured property that has sustained insured physical loss or damage.

230.     The Policy likewise covers the reasonable and necessary costs incurred to expedite the permanent repair or replacement of insured property that has sustained insured physical loss or damage.

231.     The Policy states:

> **13. Expediting Expenses**
>
> This Policy covers the reasonable and necessary costs incurred to:
>
> **a)**   Temporarily repair or replace; and
>
> **b)**   Expedite the permanent repair or replacement of;
>
> Insured property that has sustained insured physical loss or damage.
>
> This coverage does not include expenses payable elsewhere in this Policy including the cost of permanent repair or replacement of damaged property.

232.     The presence of a communicable disease is insured physical loss or damage under the Policy's Communicable Disease – Property Damage and Communicable Disease – Business Interruption coverage provisions.

233.     Monarch incurred reasonable and necessary costs to temporarily repair insured property that sustained insured physical loss or damage due to the presence of communicable disease.

*Professional Fees Coverage*

234.     The Policy covers the reasonable and necessary expenses incurred by the insured for the services of certain professionals to determine the amount of loss payable on claims for which AFM has accepted liability.

235.    The Policy states:

**23. Professional Fees**

This Policy covers the reasonable and necessary expenses incurred by the Insured of:

a)   Auditors;

b)   Accountants;

c)   Architects;

d)   Engineers; or

e)   Other professionals; and

f)   The Insured's own employees,

For producing and certifying particulars or details to determine the amount of loss payable under this Policy for which this Company has accepted liability.

This coverage does not include the fees and expenses of attorneys, public adjusters, loss appraisers, loss consultants or any of their subsidiaries or related or associated entities.

236.    Monarch has incurred, and will incur in the future, reasonable and necessary expenses of auditors, accountants, its own employees, or other professionals for producing and certifying particulars or details to determine the amount of loss payable under the Policy.

## AFM'S FAILURE TO INVESTIGATE AND CLAIMS REJECTION

237.    By letter dated April 14, 2020, Monarch tendered notice of loss under the Policy for the damages it sustained due to the COVID-19 pandemic and the government-mandated closures of its businesses.

238.    Monarch's notice was timely.

239.    The timing of Monarch's notice resulted in no prejudice to AFM.

240.    Monarch's April 14, 2020 letter specifically stated that it was making "a claim for coverage and payment" under the Policy.

241.    Monarch's notice of loss and claim for coverage sought payment for its losses under various coverages, including, but not limited to, the Policy's: "ALL RISK" coverage; Communicable Disease – Property Damage coverage; Decontamination Costs coverage;

Expediting Expenses coverage; Professional Fees coverage; Protection and Preservation of Property – Property Damage coverage; Business Interruption coverage; Attraction Property coverage; Civil or Military Authority coverage; Communicable Disease – Business Interruption coverage; Ingress/Egress coverage; Protection and Preservation of Property – Business Interruption coverage; Soft Costs coverage; and the Real Estate Endorsement's Emergency Vacating Expense coverage.

242.     Monarch's 12-page, single-spaced letter explained the nature of the losses incurred and why each specific coverage applied.

243.     Monarch explained that its losses were "substantial" and "continue to mount with each passing day."

244.     Monarch explained that the losses "have been devastating to everyone affected, including not only the company's owners, executives, and managers, but to each of the Team Members."

245.     Monarch "implore[d] Affiliated FM to review this claim as expeditiously as possible, and to confirm that coverage is available for the claim . . . ."

246.     On April 27, 2020, AFM for the most part rejected coverage for Monarch's claimed losses, while at the same time it postulated that Monarch had not even submitted a claim.

247.     AFM denied benefits under various Policy coverages because Monarch purportedly failed to "identify any physical loss or damage to insured property."

248.     In its April 14, 2020 correspondence, however, Monarch carefully explained that COVID-19 and other communicable diseases cause physical loss and damage to property within the scope of coverage under an "all risk" policy such as the Policy issued by AFM to Monarch.

249.    Monarch alerted AFM to the presence of COVID-19 at its properties, as well as of the government orders directing the closure of those properties because of COVID-19.

250.    Executive orders have the full force and effect of law.

251.    Three executive orders governing the people and businesses in the State of Colorado (Executive Order D 2020 024, Executive Order D 2020 032, and Public Health Order 20-24) state that COVID-19 physically contributes to property loss, contamination, and damage.

252.    These executive orders are statements of the law in Colorado such that AFM's position that COVID-19 does not cause property loss or damage is contrary to the law and public policy of Colorado.

253.    Apparently with reference to the Policy's Communicable Disease coverages, AFM also asserted that Monarch "did not state whether any employees, guests or other individuals have been infected with the virus or whether the virus was present at" Monarch's casinos.

254.    Not true.  Monarch's claim letter specifically stated that several of its Team Members had COVID-19 symptoms and were presumptively positive for the virus.

255.    Further with respect to the Communicable Disease coverages, AFM contended that Monarch "ha[s] not reported any confirmed case of COVID-19 at" the insured locations.

256.    The Policy, however, does not require a "confirmed case" of a communicable disease to trigger coverage under the Communicable Disease coverages.

257.    Presence and confirmation are not synonymous.

258.    A communicable disease can be present at an insured location even if no confirmed cases have been reported at that location.

259.    For example, an employee or patron can have COVID-19, and disperse the virus to surfaces within an insured location, or to other persons occupying the insured location, even if the employee or patron has not been confirmed to have COVID-19 via testing.

260.    As the drafter of the Policy, AFM could have included language requiring confirmation of a communicable disease through a positive blood or antibody test had it so desired. It chose not to.

261.    Regardless, the duty to investigate whether coverage is owed under the Policy's Communicable Disease coverages (and its other coverages) belongs solely to AFM.

262.    AFM had a good faith duty to investigate whether a communicable disease was present at Monarch's insured locations.

263.    Insureds do not have to investigate or adjust their own claims.

264.    It was incumbent upon (and still is incumbent upon) AFM to conduct an investigation based on all available information to ascertain whether COVID-19 or another communicable disease was present at Monarch's properties.

265.    For example, if an insured sustains a fire loss and tenders notice, it is the insurer's duty and obligation (not the insured's) to determine the cause of the fire, whether coverage is owed under the policy, and the amount of any benefits due.

266.    AFM has conducted no investigation into the presence of communicable disease at Monarch's properties.

267.    AFM has not sought to interview any Monarch employees regarding the presence of COVID-19 or any other communicable disease at the insured locations.

268.     AFM has not hired an epidemiologist or other professional to investigate the presence of communicable disease at Monarch's properties.

269.     AFM has not conducted a statistical analysis of the likelihood of the presence of COVID-19 at Monarch's properties given the number of employees who worked there, the number of patrons coming and going each day, the proximity of employees and patrons at gaming facilities and amenities at the locations, and where those employees or patrons were travelling from.

270.     COVID-19 tests are available to AFM.

271.     AFM has not tested the infected Team Members or any other Monarch employees for COVID-19 antibodies.

272.     AFM did not provide Monarch with any testing materials.

273.     Indeed, AFM did not conduct any testing whatsoever regarding Monarch's claims for insurance benefits.

274.     Further, AFM did not investigate whether any patrons at Monarch's properties had COVID-19 or COVID-19 symptoms.

275.     Regarding the Real Estate Endorsement's Emergency Evacuation Expense Coverage, AFM asserted that Monarch didn't report "any evacuation of guests pursuant to an Order as a direct result of immediately impending physical loss or damage of the type insured."

276.     But Monarch's claim letter said that its businesses were ordered to close by their respective state governments due to the COVID-19 pandemic, thus requiring the evacuation of their guests.

277.     Further, those government orders repeatedly and emphatically state that the closures were necessary to prevent the imminent spread of COVID-19.

278.    The Colorado executive orders likewise expressly state that COVID-19 physically contributes to property loss and damage because it can contaminate and infect surfaces.

279.    AFM failed to consider any of this before it essentially rejected coverage under the Emergency Evacuation Expense provision.

280.    Regarding the Policy's coverages for Decontamination Costs, Protection and Preservation of Property – Property Damage, Protection and Preservation of Property – Business Interruption, Attraction Property, Civil or Military Authority, Ingress/Egress, Expediting Expenses, and Soft Costs, AFM rejected Monarch's claims on the ground that "the Insured's property must sustain physical loss or damage of the type insured," and "[Monarch has] not reported any physical loss or damage of the type insured."

281.    The Attraction Property coverage provision, however, does not require physical loss or damage at Monarch's locations.

282.    Rather, business interruption benefits are available under the Attraction Property coverage provision if *another* location, not listed in the Policy, that attracts business to an insured location and is within one statute mile of the insured location, sustains physical loss or damage of the type insured by the Policy.

283.    Thus, coverage is available to Monarch under the Attraction Property provision if a *different* casino or business within one statute mile of either the Atlantis Casino Resort or the Black Hawk Casino had physical loss or damage of the type insured by the Policy.

284.    By stating that Monarch was not entitled to coverage under the Attraction Property provision because its businesses had allegedly not sustained physical loss or damage, AFM misrepresented and misapplied the provision.

285.    The same goes for the Policy's Civil or Military Authority provision.

286.    The Civil or Military Authority provision covers business interruption loss incurred by Monarch during the period of liability when an order of a civil or military authority prohibits access to an insured location, provided such order is the direct result of physical damage of the type insured at a location "or within five (5) statute miles of it."  (Emphasis added.)

287.    Thus, the Policy's Civil or Military Authority provision is not limited to physical loss or damage at Monarch's properties.

288.    Instead, a governmental or military order limiting, restricting, or prohibiting access to Monarch's properties that directly results from physical damage to any business within five statute miles of Monarch's properties gives rise to coverage.

289.    AFM never investigated nor considered whether any other businesses within five statute miles of the Atlantis Casino Resort or the Black Hawk Casino suffered property loss or damage, including, but not limited to, property loss or damage from communicable diseases like COVID-19.

290.    By asserting that the Policy's Civil or Military coverage provision did not provide benefits because Monarch's casinos allegedly did not sustain physical loss or damage, AFM misrepresented and misapplied the provision.

291.    Likewise, the Policy's Ingress/Egress coverage provision does not require that Monarch's properties sustain physical loss or damage.

292.    The Ingress/Egress provision is triggered when Monarch incurs business interruption losses when ingress to or egress from its properties is partially or totally prevented as

a direct result of physical loss or damage "of the type insured to property of the type insured [sic] <u>whether or not at a described location</u>."  (Emphasis added.)

293.    Thus, under the Ingress/Egress provision, Monarch is entitled to coverage if it incurs business interruption losses because ingress to or egress from its properties is partially or totally prevented as a direct result of physical loss or damage of the type insured by the Policy without regard to whether that physical loss or damage was incurred at its properties.

294.    For example, the highway to Black Hawk, Colorado could get washed out, or a bridge could collapse, preventing ingress to or egress from the Black Hawk Casino.

295.    By asserting that the Ingress/Egress coverage provision did not provide benefits because Monarch's casinos allegedly did not sustain physical loss or damage, AFM misrepresented and misapplied the provision.

296.    With regard to all of the above coverage provisions in the Policy, as well as the Expediting Expenses, Decontamination Costs, and Soft Costs provisions, AFM failed to apprehend or consider that the presence of communicable diseases can constitute property loss or damage and that whether a communicable disease is present does not require confirmatory testing.

297.    Further, AFM failed to conduct a meaningful investigation based upon all available information into whether COVID-19 or another communicable disease was present at Monarch's properties.

298.    On April 30, 2020, Monarch responded to AFM by pointing out various misstatements and inadequacies in its response to Monarch's claims.  Monarch asked that, after an appropriate investigation, AFM advise that it would be affording coverage for Monarch's losses under each of the applicable Policy provisions.

299.    AFM did not perform the requisite investigation.  Instead, on May 13, 2020, it sent more letters asking that Monarch identify how it determined that COVID-19 was present at the insured locations, provide it with HIPPA-protected information regarding its infected employees, send it all of the publicly-accessible government closure orders, and calculate how many guests at Monarch's properties were evacuated because of the orders.

300.    Monarch responded to AFM's questions two days later, including its provision of general information regarding employees and other individuals on Monarch's premises who had either tested positive or were presumed positive for COVID-19.

301.    Subsequently, Monarch provided a Proof of Loss in compliance with the Policy's Requirements in Event of Loss provision – despite the fact that AFM had failed to acknowledge coverage under any of the Policy insuring provisions – and also advised AFM of additional persons working at the Black Hawk Casino who have either tested positive for COVID-19 or have exhibited its unique symptoms.

302.    Despite issuing a Policy to Monarch with $350,000,000 per occurrence in aggregate limits, including $60,000,000+ per occurrence for Business Interruption losses, AFM has paid nothing to Monarch for Monarch's losses caused by the COVID-19 pandemic and the government-mandated closures of its properties.

303.    Monarch has complied with all conditions precedent to coverage under the Policy and/or such conditions have been waived, released, prevented, or excused by AFM's unreasonable conduct and/or breach of the Policy contract.

## FIRST CLAIM FOR RELIEF
(Breach of Contract)

304.    Monarch re-alleges each and every allegation of this Complaint as if fully set forth herein.

305.    The Policy is a valid and enforceable contract of insurance.

306.    AFM's acts and omissions as described herein constitute a breach of the Policy, including, but not limited to, its failure to pay benefits owed to Monarch under the Policy's Property, Business Interruption, and Real Estate Endorsement coverages.

307.    As a direct and proximate result of AFM's breaches of the Policy, Monarch has suffered and is entitled to damages in amounts to be proved at trial, including without limitation the amount of the benefits owed and/or wrongfully withheld under the Policy.

## SECOND CLAIM FOR RELIEF
(Bad Faith Breach of Insurance Contract)

308.    Monarch re-alleges each and every allegation of this Complaint as if fully set forth herein.

309.    Under the Policy's implied covenant of good faith and fair dealing, AFM covenanted that it would deal with Monarch fairly and honestly, and do nothing to impair, hinder, or injure Monarch's rights to benefits under the Policy.

310.    Through the acts and omissions described above, AFM breached that covenant. AFM's conduct fell below the applicable common law and industry standards of care, violated the duties of good faith and fair dealing, and constituted the tort of bad faith breach of insurance contract.

311.     AFM's acts and omissions were unreasonable and AFM knew so, and/or AFM acted with a reckless disregard for Monarch's rights and interests.

312.     AFM's acts and omissions were committed in disregard of Monarch's reasonable expectations as an insured under the Policy.

313.     AFM breached its duty of good faith and fair dealing though the following unreasonable acts, among others:

    a.      Depriving Monarch of the benefits and protections of the Policy;

    b.      Placing its own interests above those of Monarch;

    c.      Failing to timely pay benefits owed under the Policy;

    d.      Misrepresenting facts concerning the Policy's coverage;

    e.      Failing to conduct a reasonable and impartial investigation of the loss based upon all available information;

    f.      Forcing Monarch to bring a lawsuit to recover benefits owed and protections guaranteed under the Policy;

    g.      Violating the Unfair Claims Settlement Practices Acts of Colorado and Nevada; and

    h.      Other conduct to be revealed in discovery.

314.     As a direct and proximate result of AFM's bad faith breach of the Policy, Monarch has suffered and is entitled to damages in amounts to be proved at trial.

## THIRD CLAIM FOR RELIEF
(Violation of C.R.S. § 10-3-1115 and Relief Under C.R.S. § 10-3-1116)

315.     Monarch re-alleges each and every allegation of this Complaint as if fully set forth herein.

316.     Sections 10-3-1115(1) and (2), C.R.S., forbid insurers such as AFM from unreasonably denying or delaying payment of a claim for benefits owed to or on behalf of a first-party claimant.

317.     Monarch is a first-party claimant as that term is used under C.R.S. § 10-3-1115(1)(A)(I).

318.     AFM is an entity engaged in the business of insurance.

319.     AFM delayed and/or denied payment of first-party benefits owed to Monarch and did so without a reasonable basis within the meaning of C.R.S. § 10-3-1115(2) for the reasons set forth above.

320.     Section 10-3-1116(1), C.R.S., provides that a first-party claimant whose claim has been unreasonably denied or delayed by an insurer may bring an action to recover reasonable attorneys' fees and court costs and two times the covered benefit that was unreasonably delayed or denied.

321.     As described herein, AFM's acts and omissions violated C.R.S. § 10-3-1115(2).

322.     Monarch therefore brings this claim to recover damages awardable under C.R.S. § 10-3-1116, separate from and in addition to those remedies and damages available under any other applicable claims for relief.

## FOURTH CLAIM FOR RELIEF
(Declaratory Judgment)

323.     Monarch re-alleges each and every allegation of this Complaint as if fully set forth herein.

324.     The Policy is a contract under which Monarch paid AFM substantial premiums in exchange for AFM's promise to pay Monarch's claims for losses covered by the Policy.

325.    Monarch has complied with all applicable provisions of the Policy and/or those provisions have been waived by AFM, but AFM has vitiated its obligations toward Monarch pursuant to the Policy's terms.

326.    An actual case or controversy exists regarding Monarch's rights and AFM's obligations under the Policy to provide benefits and coverage for the losses incurred by Monarch in connection with the COVID-19 pandemic and the government-mandated closure of Monarch's properties.

327.    Pursuant to 28 U.S.C. § 2201, Monarch seeks a declaratory judgment from the Court declaring the following:

    a.    That Monarch's losses incurred due to the COVID-19 pandemic and government-mandated closure of Monarch's properties are insured losses under the Policy; and

    b.    AFM is obligated to pay Monarch for the full amount of the losses it has incurred in connection with the COVID-19 pandemic and government-mandated closure of Monarch's properties.

**WHEREFORE**, Plaintiff, Monarch Casino & Resort, Inc., requests that the Court enter judgment in its favor and against Defendant Affiliated FM Insurance Company and award damages as follows:

    a.    For all benefits due under the Policy for covered losses;

    b.    For other compensatory economic damages in amounts to be proved at trial;

    c.    For two-times the covered benefit as permitted by C.R.S. § 10-3-1116(1);

    d.    For reasonable attorneys' fees, costs, and expenses incurred herein;

e.      For all pre- and post-judgment interest, statutory and moratory, as permitted by

        law;

f.      For a declaratory judgment as set forth above; and

g.      For such other and further relief as the law permits and this Court deems just

        and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Dated this 22nd day of May 2020.

                                Respectfully submitted,

                                **LEVIN SITCOFF PC**


                                _s/ Nelson A. Waneka_
                                Bradley A. Levin
                                Nelson A. Waneka
                                _Attorneys for Plaintiff_


Plaintiff's Address:
3800 South Virginia Street
Reno, Nevada 89502