## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:20-cv-001470

MONARCH CASINO & RESORT, INC.,

     Plaintiff,

v.

AFFILIATED FM INSURANCE COMPANY,

     Defendant.

---

### FIRST AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff, Monarch Casino & Resort, Inc., through its attorneys, Bradley A. Levin and Nelson A. Waneka of the law firm LEVIN SITCOFF PC, states and alleges as follows for its First Amended Complaint and Jury Demand:

### PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff Monarch Casino & Resort, Inc., is a Nevada corporation with its principal place of business in Reno, Nevada.

2.    Monarch owns and operates the Atlantis Casino Resort in Reno, Nevada.

3.    Monarch also owns and operates the Black Hawk Casino in Black Hawk, Colorado.

4.    Defendant Affiliated FM Insurance Company ("AFM") is a Rhode Island corporation with its principal place of business in Johnston, Rhode Island.

5.    At all times pertinent hereto, AFM was conducting the business of insurance in Nevada by insuring the real property and business operations of the Atlantis Casino Resort.

**EXHIBIT 6**

6.      At all times pertinent hereto, AFM was conducting the business of insurance in Colorado by insuring the real property and business operations of the Black Hawk Casino.

7.      Diversity jurisdiction is appropriate under 28 U.S.C. § 1332 because there is complete diversity of citizenship between Monarch and AFM, and the amount in controversy exceeds $75,000.

8.      Venue in this District is appropriate under 28 U.S.C. § 1391(b)(2) because a substantial part of the property at issue in this action is situated in Colorado, and a substantial portion of the errors and omissions at issue occurred in Colorado.

## THE COVID-19 PANDEMIC

9.      COVID-19 is a communicable disease that is highly infectious.

10.     On March 11, 2020, the World Health Organization declared that COVID-19 constituted a global pandemic.

11.     When a person infected with COVID-19 coughs or sneezes (symptoms the disease can cause), droplets containing the virus can be dispersed into the air and/or deposited on surfaces.

12.     The virus can likewise spread when an infected person touches his or her mouth, nose, or eyes and thereafter touches another person or surface.

13.     When deposited in this manner, the COVID-19 virus physically infects and can stay alive on surfaces for up to 17 days.

14.     According to a study published in The New England Journal of Medicine, COVID-19 was detectable in aerosols for up to three hours, up to four hours on copper, up to 24 hours on cardboard, and up to two to three days on stainless steel.

15.     All of these materials are present in casinos.

16.     The results of the study suggest that individuals could get COVID-19 through indirect contact with surfaces or objects used by an infected person (such as a casino gaming machine) whether or not they were symptomatic.

17.     Moreover, a recent research article published in the Journal of the American Medical Association "suggests small, virus-laden droplets may be displaced by airflows and deposited on equipment such as vents."

18.     This makes property exposed to COVID-19 unsafe and dangerous.

19.     The secondary exposure of surfaces to humans is particularly concerning in places where people gather to gamble, socialize, eat, drink, and be entertained.

20.     This is why numerous governmental authorities across the United States and the world have ordered social distancing and prohibited large public gatherings.

21.     Any person who touches a surface containing the COVID-19 virus—who then touches his or her face—can become infected with the virus and spread it to other people.

22.     The average person touches his or her face approximately 2,000 times a day.

23.     The clinical features of COVID-19 vary from asymptomatic forms to fatal conditions of severe respiratory failure that requires ventilation and support in an intensive care unit.

24.     Pneumonia has been the most frequent severe manifestation of COVID-19, with symptoms of fever, cough, dyspnea, and bilateral infiltrates on chest imaging.

25.     There are no specific treatments for COVID-19, and when the original complaint was filed, no vaccine was available.

26.     It has now been discovered by scientists that COVID-19 has several modes of transmission.

27.     Pursuant to a "Situation Report" issued by the World Health Organization, the virus can be transmitted through symptomatic transmission, pre-symptomatic transmission, or asymptomatic transmission.

28.     Symptomatic transmission refers to transmission by an individual who is experiencing symptoms associated with the virus who then transfers COVID-19 to another person, object, or surface.

29.     The incubation period for COVID-19, which is the time between exposure to the virus (becoming infected) and symptom onset, averages 5-6 days, however, it can be up to 14 days.

30.     During this period, also known as the "pre-symptomatic period," some infected persons can be contagious.

31.     For this reason, transmission of COVID-19 from a pre-symptomatic person can occur before symptom onset.

32.     An individual who does not develop symptoms, an asymptomatic case of COVID-19, can still transmit the disease to another.

33.     As more and more people are infected by COVID-19, the number of infected persons rises exponentially.

34.     As the number of infected persons rises, the number of people killed by the disease rises.

35.     COVID-19 is an infectious disease caused by SARS-CoV-2.  It damages Monarch's properties in multiple ways:  persons on site with COVID-19 shed SARS-CoV-2 into the indoor

air and on surfaces at Monarch Properties.  This results in tangible and demonstrable physical impact, alteration and transformation to the indoor air and surfaces, rendering them dangerous transmission vehicles for the virus that causes this potentially deadly disease.  This impact, change, and physical damage to the property renders it uninhabitable and unfit for its intended use.  (Report of Virologist Angela Rasmussen, Ph.D., attached as **Exhibit 1, at p.5**).

36.     The impact, change and physical damage caused by persons with COVID-19 on Monarch Properties is <u>not</u> brief and/or temporary; rather it is sustained through any ongoing occupation of the property.  Moreover, due to the fact that a primary risk of SARS-CoV-2 exposure is inhalation, and the nature of Monarch's businesses involves guests and staff sitting in a large enclosed space for prolonged periods of time while gaming, cleaning, wiping, and/or disinfection under these circumstances are <u>insufficient</u> to remediate the damage.  (Ex. 1 at p.6).

37.     As of the date of the original complaint's filing, there have been more than 5,150,000 confirmed cases of COVID-19 worldwide.

38.     335,000 of those people have died from the disease.

39.     As of the date of the original complaint's filing, there have been more than 1,610,000 confirmed cases of COVID-19 in the United States—more than any other country.

40.     95,213 of those Americans have died from the disease.

41.     As of the date of the original complaint's filing, 7,255 people have been infected with COVID-19 in Nevada.

42.     381 of those Nevadans have died from the disease.

43.     As of the date of the original complaint's filing, 23,191 people have been infected with COVID-19 in Colorado.

44. 1,310 of those Coloradans have died from the disease.

## THE COLORADO CLOSURE ORDERS

45. On March 10, 2020, Colorado Governor Jared Polis verbally declared a state of disaster emergency in Colorado due to the presence of COVID-19 within the State.

46. On March 11, 2020, Governor Polis memorialized this state of disaster emergency in Executive Order D 2020 003.

47. Executive Order D 2020 003 explained that Colorado law defines a "disaster" as "the <u>occurrence</u> or imminent threat of <u>widespread</u> or severe <u>damage</u>, injury, or loss of life or <u>property</u> resulting from any natural cause or cause of human origin, including but not limited to . . . <u>epidemic</u>." (Emphasis added.)

48. Executive Order D 2020 003 stated that "[t]he threat currently posed by COVID-19, a respiratory illness that can spread from person to person, constitutes a disaster for purposes of the [Colorado Disaster Emergency] Act."

49. Executive Order D 2020 003 stated that presumptive positive cases of COVID-19 had been confirmed in Colorado.

50. Executive Order D 2020 003 directed the Department of Labor and Employment to engage in emergency rulemaking to ensure that certain workers (including those in the hospitality and food services industries present in casinos) received paid sick leave if they exhibited flu-like symptoms—regardless of whether testing confirmed they had COVID-19.

51. On March 13, 2020, the President of the United States declared a National Emergency due to COVID-19.

52.    On March 16, 2020, following Executive Order D 2020 003, the Executive Director of the Colorado Department of Public Health and Environment ("CDPHE") issued Public Health Order 20-22.

53.    Public Health Order 20-22 was implemented to stop the spread of COVID-19.

54.    In Public Health Order 20-22, the Executive Director of the CDPHE made the following findings:

- COVID-19 was first detected in Wuhan, China in late 2019;

- Since its detection, COVID-19 had spread to over 60 countries, including the United States;

- As of March 16, 2020, there were 131 presumptive positive cases of COVID-19 in Colorado;

- COVID-19 is a respiratory illness that is transmitted through person-to-person contact "or by contact with surfaces contaminated with the virus,";

- "A significant number of Coloradans are at risk of serious health complications, including death, from COVID-19"; and

- "Colorado is experiencing a rapid increase in COVID-19 transmission that threatens the health of residents and risks overwhelming the healthcare system in the State of Colorado."

55.    As a result of these findings, Public Health Order 20-22 in part "close[d] bars, restaurants, gyms, theaters, casinos, nonessential personal services facilities and horse track and off-track betting facilities to slow the spread of the COVID-19 virus."

56.     Public Health Order 20-22 specifically closed casinos and the other identified businesses to "ingress, egress, use, and occupancy by members of the public." (Emphasis added.)

57.     Public Health Order 20-22 was issued pursuant to the CDPHE's authority "to exercise such physical control over property and the persons of the people within this state as the department may find necessary for the protection of public health."  (Emphasis added.)

58.     Consistent with Public Health Order 20-22, Monarch immediately ceased nonessential operations at the Black Hawk Casino and closed the property to the public.

59.     On March 25, 2020, Governor Polis issued Executive Order D 2020 017.

60.     Executive Order D 2020 017 stated that the number of confirmed COVID-19 cases in Colorado "continued to climb."

61.     Executive Order D 2020 017 stated that Colorado had "evidence of community spread throughout the State."

62.     Executive Order D 2020 017 stated that "[t]he actions we have undertaken to date are not yet doing enough to reduce the spread of the virus, and we must take additional action to minimize the duration of this epidemic and of the disruption to our daily lives."

63.     Executive Order D 2020 017 required Coloradans to stay at home, subject to certain exceptions.

64.     Executive Order D 2020 017 likewise directed "all businesses other than those qualified as 'Critical Businesses' under Public Health Order 20-24 or any Public Health Order issued pursuant to this Executive Order, to close temporarily, except as necessary to engage in minimum basic operations needed to protect assets and maintain personnel functions, as of the effective date of this Executive Order."

65.     Casinos were not designated as Critical Businesses.

66.     On March 27, 2020, the Executive Director of the CDPHE issued its second updated Public Health Order 20-24 in response to the existence of hundreds of confirmed and presumptive cases of COVID-19 and related deaths across the State of Colorado.

67.     Among other things, Public Health Order 20-24 imposed social distancing requirements on persons within the State of Colorado.

68.     It also prohibited all public and private gatherings of people outside a residence, with limited exceptions not applicable to this case.

69.     Public Health Order 20-24 stated, "There is clear evidence that some individuals who contract the COVID-19 virus have no symptoms or have mild symptoms, which means they may not be aware they carry the virus.  Because even people without symptoms can transmit the disease, and because evidence shows the disease is easily spread, gatherings promote transmission of COVID-19."

70.     Casinos like the Black Hawk Casino have expansive gaming facilities, together with attached restaurants and bars, where large gatherings of people necessarily interact in close contact.

71.     Casinos therefore promote transmission of COVID-19.

72.     Public Health Order 20-24 stated that "COVID-19 also physically contributes to property loss, contamination, and damage due to its propensity to attach to surfaces for prolonged periods of time."  (Emphasis added.)

73.     By imposing social distancing requirements on all persons in the State of Colorado and prohibiting gatherings outside a residence, Public Health Order 20-24 stated that it "helps

reduce the property damage caused by COVID-19 and preserves the welfare of our residents by reducing the spread of the disease in our communities and our workplaces . . . ." (Emphasis added.)

74.    Indeed, the expressed intent of Public Health Order 20-24 "is to minimize contact between residents and to the greatest extent possible minimize the exposure of the public to contaminated public surfaces." (Emphasis added.)

75.    Casinos expose the public to surfaces contaminated by COVID-19.

76.    On April 1, 2020, Governor Polis issued Executive Order D 2020 024.

77.    Like Public Health Order 20-24, Executive Order D 2020 024 stated that "COVID-19 also physically contributes to property loss, contamination, and damage due to its propensity to attach to surfaces for prolonged periods of time." (Emphasis added.)

78.    Executive Order D 2020 032, issued by Governor Polis on April 8, 2020, again stated that COVID-19 physically contributes to property loss, contamination, and damage due to its propensity to attach to surfaces for prolonged periods of time.

79.    Accordingly, three executive orders governing the people and businesses in the State of Colorado (Executive Order D 2020 024, Executive Order D 2020 032, and Public Health Order 20-24) state that COVID-19 physically contributes to property loss, contamination, and damage.

## THE NEVADA CLOSURE ORDERS

80.    Similar to Governor Polis, on March 12, 2020, Nevada Governor Steve Sisolak declared a state of emergency for COVID-19.

81.    In so doing, Governor Sisolak stated that "there are multiple confirmed and presumptive cases of COVID-19 in the State of Nevada."

82.     On March 17, 2020, Governor Sisolak, in conjunction with Nevada Health Response, announced the COVID-19 Risk Mitigation Initiative.

83.     Governor Sisolak required six feet of social distancing per person for non-household members.

84.     Governor Sisolak directed the closure to the public of all non-essential businesses, including casinos.

85.     Governor Sisolak mandated all restaurants and bars to close their dine-in facilities to stop the spread of COVID-19.

86.     Governor Sisolak announced that "all gaming machines, devices, tables, games, and any equipment related to gaming activity will be shut down.  Restaurants and bars located within gaming properties will be subject to the same restrictions as those outside of gaming establishments."

87.     On March 18, 2020, Governor Sisolak issued Emergency Directive 002.

88.     Emergency Directive 002 ordered that "[t]he Nevada general public shall cease gathering at gaming establishments, and all gaming devices, machines, tables, games, and any equipment related to gaming activities effective March 17, 2020 at 11:59 p.m., for the duration that this Directive shall be in effect."

89.     On March 24, 2020, Governor Sisolak issued Emergency Directive 007.

90.     Emergency Directive 007 ordered the Nevada general public to not gather in groups of ten or more in any indoor or outdoor area except for persons living in the same household.

91.     Emergency Directive 007 likewise ordered the Nevada general public to maintain a minimum six-foot distance between persons in public places.

92.   On March 31, 2020, Governor Sisolak issued Emergency Directive 010.

93.   Emergency Directive 010 extended the Declaration of Emergency until April 30, 2020, ordered Nevadans to stay in their homes, and prohibited gatherings of individuals outside the home with limited exceptions not applicable in this case.

94.   On April 29, 2020, Governor Sisolak issued Emergency Directive 016.

95.   Emergency Directive 016 ordered that "[g]aming operations, not including licensed online gaming or mobile wagering operations, shall remain closed until the Gaming Control Board determines that operations may safely resume."

96.   On May 7, 2020, Governor Sisolak issued Emergency Directive 018.

97.   Emergency Directive 018 directed the phased opening of certain businesses but again ordered that gaming operations shall remain closed.

98.   The Atlantis Casino Resort was closed from March 17, 2020 to June 4, 2020.

99.   The Black Hawk Casino was closed from March 16, 2020 until June 17, 2020.

## **THE POLICY**

100.   AFM issued a policy of property insurance to Monarch, Policy No. ES130 (the "Policy").

101.   The Policy's term is from October 1, 2019 until October 1, 2020.

102.   The Policy has aggregate limits of $350,000,000 per occurrence, subject to certain sub-limits.

103.   The Policy provides all-risk coverage, meaning that it insures against all risks of physical loss or damage at the locations described in the declarations unless those risks are specifically excluded.

104.   The Policy states:

> This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

105.   The Atlantis Casino Resort is a described location in the Policy's declarations.

106.   The Black Hawk Casino is a described location in the Policy's declarations.

107.   Therefore, the Policy covers all risks of physical loss or damage to the Atlantis Casino Resort and the Black Hawk Casino unless specifically excluded.

108.   The Policy does not define "physical loss or damage."

*Communicable Disease Coverage*

109.   The Policy specifically <u>includes</u> property damage coverage for "communicable disease."

110.   The Policy defines a "communicable disease" as a disease which is "1. Transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges, or 2.  Legionellosis."

111.   The Policy states that the actual presence of a "communicable disease" at a described location, coupled with access to the location being limited, restricted, or prohibited by an order of a government agency, constitutes "property damage."

112.   Specifically, the Policy states:

**5. Communicable Disease – Property Damage**

If a **described location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **described location** is limited, restricted or prohibited by:

a)   An order of an authorized governmental agency regulating or as result of such presence of **communicable disease**; or

b)   A decision of an Officer of the Insured as a result of such presence of **communicable disease**,

This Policy covers the reasonable and necessary costs incurred by the Insured at such **described location** for the:

a)   Cleanup, removal and disposal of such presence of **communicable disease** from insured property; and

b)   Actual costs or fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from such presence of **communicable disease** on insured property.

This Additional Coverage does not cover any costs incurred due to any law or ordinance with which the Insured was legally obligated to comply prior to such presence of **communicable disease**.

This coverage is subject to the Qualifying Period in the Declarations section of this Policy.

Communicable Disease - Property Damage Exclusions: As respects Communicable Disease – Property Damage, the following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from **terrorism** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

113.    The actual presence of a "communicable disease" at a described location, coupled with access to the location being limited, restricted, or prohibited by an order of a government agency, is a type of physical loss or damage insured by the Policy.

114.    The Policy does not define what constitutes the "actual presence" of a communicable disease.

115.    Nevertheless, the Policy does not require blood or antibody testing of employees or patrons at an insured location to establish the "actual presence" of a communicable disease.

116.    The Policy does not require testing of surfaces at an insured location to establish the "actual presence" of a communicable disease.

117.    The Policy does not require testing of any sort to establish the "actual presence" of a communicable disease.

118.    A communicable disease can be "actually present" at an insured location even if its presence cannot be confirmed through testing.

119.    A communicable disease can be "actually present" at an insured location even if it cannot be seen.

120.    Just because the presence of a communicable disease has not been confirmed through testing does not mean the disease is not actually present at an insured location.

121.    Testing and presence are not the same thing.

122.    For example, the novel coronavirus COVID-19 can be transmitted from humans to humans, from humans to surfaces, and from surfaces to humans at an insured location without being seen nor its presence confirmed through testing.

123.    COVID-19 is a disease which is transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges.

124.    COVID-19 is therefore a "communicable disease" as that term is used in the Policy.

125.    Defendant Affiliated FM Insurance Company has determined, and prepared "Talking Points" stating, that the presence of an individual with COVID-19 within an insured location constitutes the "actual presence" of the disease within that location.  (AFM Talking Points attached as **Exhibit 2**).

126.    Even under conservative assumptions about the background prevalence of SARS-CoV-2 infection during early 2020, there is greater than 99% probability that more than one individual with SARS-CoV-2 infection was present at each of Monarch's casinos during February through March of 2020 until the date of the closure orders.  (Report of Epidemiologist Joseph Lewnard, Ph.D., attached as **Exhibit 3**, at p.7).

127.     Following re-opening of the casinos, with greater than 99% probability, more than one individual with SARS-CoV-2 infection was present at each of Monarch's casinos during each month from June 2020 to February 2021.  (Ex. 3, p.10).

128.     The presence of COVID-19 or another communicable disease at the Atlantis Casino Resort, coupled with access to the casino being limited, restricted, or prohibited by an order of a government agency, is a type of physical loss or damage insured by the Policy.

129.     The presence of COVID-19 or another communicable disease at the Black Hawk Casino, coupled with access to the casino being limited, restricted, or prohibited by an order of a government agency, is a type of physical loss or damage insured by the Policy.

130.     Additionally, the Policy defines a "contaminant" as meaning anything that causes "contamination," which, in turn, "means any condition of property due to the actual *or* suspected presence of any foreign substance, impurity . . . pathogen or pathogenic organism, bacteria, [or] virus . . . ." (Emphasis added.)

131.     A virus cannot be an excluded "contaminant" and a covered "communicable disease."

132.     The Policy's communicable disease coverage and contamination exclusions are contradictory and inconsistent with the fundamental biology of COVID-19.  (Ex. 1, p.8).

133.     Further, because COVID-19 is a "contaminant," which includes the "actual or suspected presence of" the virus, the Policy's Communicable Disease coverages (including the Communicable Disease – Property Damage and Communicable Disease – Business Interruption coverages) are ambiguous and extend to the suspected as well as the actual presence of a virus at a described location.

134.    Monarch incurred reasonable and necessary costs to cleanup, remove, or dispose of the presence of COVID-19 at the Atlantis Casino Resort and the Black Hawk Casino.

*Business Interruption Coverage*

135.    The Policy insures Monarch's business interruption losses as a direct result of physical loss or damage of the type insured by the Policy.

136.    The Policy insures business interruption to property described in the Policy, used by the insured, while at a location provided by the Policy, during the Policy's "period of liability."

137.    The Atlantis Casino Resort and the Black Hawk Casino are described properties.

138.    The Atlantis Casino Resort and the Black Hawk Casino were used by the insured, at locations provided in the Policy, during the "period of liability" described in the Policy.

139.    Specifically, the Policy's business interruption coverage states:

**A. LOSS INSURED**

This Policy insures Business Interruption loss, as provided in the Business Interruption Coverage, as a direct result of physical loss or damage of the type insured:

1.    To property as described elsewhere in this Policy and not otherwise excluded by this Policy;

2.    Used by the Insured;

3.    While at a **location** or while in transit as provided by this Policy; and

4.    During the Period of Liability as described elsewhere in this Policy.

This Policy insures Business Interruption loss only to the extent it cannot be reduced through:

1.    The use of any property or service owned or controlled by the Insured;

2.    The use of any property or service obtainable from other sources;

3.    Working extra time or overtime; or

4.    The use of inventory;

All whether at a **location** or at any other premises. This Company reserves the right to take into consideration the combined operating results of all associated, affiliated or subsidiary companies of the Insured in determining the amount of loss.

In determining the amount of loss payable, this Company will consider:

1.    Any amount recovered elsewhere under this Policy for loss or damage to finished goods or merchandise at selling price as having been sold to the Insured's regular customers and credited against net sales.

2.    The experience of the business before and after and the probable experience during the Period of Liability. The probable experience will also consider any increase or decrease in demand for the Insured's goods or services during the Period of Liability, even if such increase or decrease is from the same event that caused physical loss or damage starting the Period of Liability.

3.    The continuation of only those normal charges and expenses that would have been earned had there been no interruption of production or business operations or services.

This Policy also covers expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this Policy. The amount of such recoverable expenses will not exceed the amount by which the loss is reduced.

140.    The Policy's business interruption coverage provides Monarch with the option to choose between calculating its business interruption claim based upon "gross earnings" or "gross profits."

141.    The Policy defines "gross earnings" as "The net sales value of production or business operations or services less the cost of:  (a) Raw stock; (b) Materials and supplies; and (c) Merchandise sold; Used in the production or business operations or services rendered by the Insured."

142.    The Policy defines "gross profits" as "The sum produced by adding the Net Profit to the **Insured Fixed Charges**.  If there is no **Net Profit** the amount of all **Insured Fixed Charges** less that proportion of any loss from business operations as the amount of the **Insured Fixed Charges** bears to all fixed charges."

143.    "Net Profit" means "The net operating profit excluding:  (a) Capital receipts and accruals; and (b) Outlay properly chargeable to capital; Resulting from the business of the Insured after due provision has been made for all fixed charges and any other expenses, including depreciation, but before deduction of any taxes on profits."

144.    The Policy does not define "insured fixed charges."

145.    If the insured selects "gross earnings" as the basis for calculating its business income loss, the "period of liability" is "1.  The period starting from the time of physical loss or damage of the type insured; and (2) Ending when, with due diligence and dispatch, (a) The lost or damaged property could be repaired or replaced and made ready for production or business operations or services under the same or equivalent physical operating conditions that existed prior to the loss or damage; or (b) The lost or damaged property under the course of construction or

renovation could be repaired or replaced to the same or equivalent degree of completion that existed prior to the loss or damage.  This period of time will be applied to the level of business that would have been reasonably achieved after construction and startup would have been completed had no physical damage happened."

146.    If the insured selects "gross profit" as the basis for calculating its business income loss, the "period of liability" is "The period starting from the time of physical loss or damage of the type insured and ending no later than the period of time shown in the Declarations section during which the results of the business shall be directly affected by such damage."

147.    The total limit of liability under the Policy for insured business losses is $60,000,000 as a result of any one occurrence.

148.    The losses incurred by Monarch at the Atlantis Casino Resort and the Black Hawk Casino were the result of two separate occurrences within the Policy definition, as they arose out of and were caused by discrete events of physical loss or damage at separate insured locations.

149.    The Policy has business interruption sub-limits of $50,000,000 for "gross earnings," which may include a maximum of 30 days for "ordinary payroll."

150.    The Policy defines "ordinary payroll" as "1.  Wages of all employees except officers, executives, department managers, and employees under contract or similar key employees; and 2. Includes taxes and charges dependent on the payment of those wages."

151.    The Policy has business interruption sub-limits of $50,000,000 for "gross profits" for a 12 month period of liability, which may include a maximum of 30 days for "ordinary payroll."

152.    Monarch incurred more than $30,000,000 in damages from the closures of its casinos.

*Business Interruption Coverage Extension – Attraction Property*

153.    The Policy contains a coverage extension covering the business interruption loss incurred by the insured during the period of liability from physical loss or damage to other properties of the type insured by the Policy, but not necessarily owned or operated by the insured, that attract business to a described location and are within one statute mile of the described location.

154.    The Policy states:

> **1.  Attraction Property**
>
> This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability directly resulting from physical loss or damage of the type insured to property of the type insured that attracts business to a **described location** and is within one (1) statute mile of the **described location**.
>
> Attraction Property Exclusion: As respects Attraction Property, the following additional exclusion applies:
>
> This Policy does not insure loss resulting from:
>
> **a)**   Physical loss or damage caused by or resulting from **terrorism,** regardless of any other cause or event, whether or not insured by this Policy, contributing concurrently or in any other sequence to loss.

155.    The actual presence of a communicable disease, coupled with access to a property being limited, restricted, or prohibited by an order of a government agency, is a type of physical loss or damage insured by the Policy.

156.    The Reno Airport and other casinos, hotels, and businesses are within one statute mile of the Atlantis Casino Resort.

157.    COVID-19 was actually present in the Reno Airport and one or more of these other casinos, hotels, and businesses during the Policy's period of liability.

158.    Access to the Reno Airport and these other casinos, hotels, and businesses was limited, restricted, or prohibited by an order of a government agency.

159.    The Reno Airport and these other casinos, hotels, and businesses attract business to the Atlantis Casino Resort.

160.    Monarch incurred business interruption loss at the Atlantis Casino Resort during the period of liability due to the actual presence of communicable disease at these attraction properties.

161.    Similarly, other casinos, hotels, and businesses are within one statute mile of the Black Hawk Casino.

162.    COVID-19 was actually present in one or more of these casinos, hotels, and businesses during the Policy's period of liability.

163.    Access to these other casinos, hotels, and businesses was limited, restricted or prohibited by an order of a government agency.

164.    These other casinos, hotels, and businesses attract business to the Black Hawk Casino.

165.    Monarch incurred business interruption loss at the Black Hawk Casino during the period of liability due to the actual presence of communicable disease at these attraction properties.

### *Business Interruption Coverage Extension – Civil Or Military Authority*

166.    The Policy contains a coverage extension covering the business interruption loss incurred by the insured during the period of liability if an order of a civil or military authority prohibits access to a "location," provided such order is the direct result of physical damage of the type insured at the "location" or within five miles of that "location."

167.    The Policy states:

> **2. Civil or Military Authority**
>
> This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability if an order of civil or military authority prohibits access to a **location** provided such order is the direct result of physical damage of the type insured at a **location** or within five (5) statute miles of it.

168.     The "period of liability" for this coverage extension is "The period of time starting at the time of such order of civil or military authority, but not to exceed the number of consecutive days shown in the Declarations section of this Policy."

169.     The Policy defines a "location" as "a location described in the Insurance Provided clause of the Declarations section or included as Newly Acquired Property or Unnamed Property Coverages."

170.     The Atlantis Casino Resort and the Black Hawk Casino are locations described in the Insurance Provided clause of the Policy's Declarations section.

171.     The presence of a communicable disease, coupled with access to a property being limited, restricted, or prohibited by an order of a government agency, is a type of physical loss or damage insured by the Policy.

172.     Public access to the Atlantis Casino Resort was prohibited by a civil authority to prevent the spread of COVID-19.

173.     Public access to other businesses and casinos within five miles of the Atlantis Casino Resort was likewise prohibited by a civil authority to prevent the spread of COVID-19.

174.     Monarch incurred business interruption loss at the Atlantis Casino Resort during the period of liability due to the civil order limiting, restricting, or prohibiting access to the resort and other businesses and casinos within five miles of it.

175.    Public access to the Black Hawk Casino was prohibited by a civil authority to prevent the spread of COVID-19.

176.    Public access to other businesses and casinos within five miles of the Black Hawk Casino was likewise prohibited by a civil authority to prevent the spread of COVID-19.

177.    Monarch incurred business interruption loss at the Black Hawk Casino during the period of liability due to the civil order limiting, restricting, or prohibiting access to the casino and other businesses and casinos within five miles of it.

*Business Interruption Coverage Extension – Communicable Disease*

178.    The Policy contains a coverage extension covering the business interruption loss incurred by the insured for the actual presence of a communicable disease coupled with a civil order limiting, restricting, or prohibiting access at a described location.

179.    The Policy states:

> **3.  Communicable Disease - Business Interruption**
>
> If a **described location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **described location** is limited, restricted or prohibited by:
>
> **a)**   An order of an authorized governmental agency regulating such presence of **communicable disease**; or
>
> **b)**   A decision of an Officer of the Insured as a result of such presence of **communicable disease**,
>
> This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability at such **described location** with such presence of **communicable disease**.
>
> This coverage is subject to the Qualifying Period in the Declarations section of this Policy.
>
> Communicable Disease - Business Interruption Exclusions: As respects Communicable Disease - Business Interruption, the following additional exclusions apply:
>
> This Policy does not insure loss resulting from:
>
> **a)**   The enforcement of any law or ordinance with which the Insured was legally obligated to comply prior to the time of the actual spread of **communicable disease**.
>
> **b)**   Loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any sequence of loss.
>
> The Period of Liability for this Business Interruption Coverage Extension will be:
>
> The period of time:
>
> **a)**   Starting at the time of the order of the authorized governmental agency or the Officer of the Insured; but
>
> **b)**   Not to exceed the time limit shown in the Limits of Liability clause in the Declarations section,
>
> This period of time is part of and not in addition to any Period of Liability applying to any coverage provided in the Business Interruption section.

180.    The Atlantis Casino Resort is a described location that is owned, leased, or rented by the insured (Monarch).

181.    The Atlantis Casino Resort had the actual presence of communicable disease.

182.    Specifically, Team Members of the Atlantis Casino Resort had COVID-19 or another communicable disease.

183.    Additionally, with greater than 99% probability, at least one of the many patrons of the Atlantis Casino Resort had COVID-19 or another communicable disease.

184.    Public access to the Atlantis Casino Resort was limited, restricted, or prohibited by an order of an authorized government agency regulating COVID-19 and communicable disease.

185.    The Atlantis Casino Resort was not required to comply with any order limiting, restricting, or prohibiting access to it before the spread of COVID-19 and declaration of a state of emergency in Nevada.

186.    Monarch incurred business interruption loss at the Atlantis Casino Resort during the period of liability due to the order limiting, restricting, or prohibiting access.

187.    The Black Hawk Casino is a described location that is owned, leased, or rented by the insured (Monarch).

188.    The Black Hawk Casino had the actual presence of communicable disease.

189.    Specifically, Team Members of the Black Hawk Casino had COVID-19 or another communicable disease.

190.    Additionally, with greater than 99% probability, at least one of the many patrons of the Black Hawk Casino had COVID-19 or another communicable disease.

191.    Public access to the Black Hawk Casino was limited, restricted, or prohibited by an order of an authorized government agency regulating COVID-19 and communicable disease.

192.    The Black Hawk Casino was not required to comply with any order limiting, restricting, or prohibiting access to it before the spread of COVID-19 and declaration of state of disaster emergency in Colorado.

193.    Monarch incurred business interruption loss at the Black Hawk Casino during the period of liability due to the order limiting, restricting, or prohibiting access.

194.    Indeed, on or around August 11, 2021, Defendant Affiliated FM Insurance Company determined that one or both of Monarch's casinos had the actual presence of a communicable disease and that Monarch had suffered business interruption loss as a result. (August 11, 2021 Letter, attached as **Exhibit 4**).

<u>*Business Interruption Coverage Extension – Ingress/Egress*</u>

195.    The Policy contains a coverage extension covering the necessary business interruption loss incurred by the insured when ingress to or egress from a described location is physically prevented, in whole or in part, as a direct result of physical loss or damage of the type insured by the Policy *whether or not* that damage is at a described location.

196.    The Policy states:

**8.  Ingress/Egress**

This Policy covers the Business Interruption Coverage loss incurred by the Insured due to the necessary interruption of the Insured's business when ingress to or egress from a **described location(s)** is physically prevented, either partially or totally, as a direct result of physical loss or damage of the type insured to property of the type insured whether or not at a **described location**.

Item B. 3. of Property Excluded does not apply to this Business Interruption Coverage Extension.

Ingress/Egress Exclusion: As respects Ingress/Egress, the following additional exclusion applies:

This Policy does not insure loss resulting from:

a)   Physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured by this Policy, contributing concurrently or in any other sequence to the loss.

197.    The presence of a communicable disease, coupled with access to a property being limited, restricted, or prohibited by an order of a government agency, is a type of physical loss or damage insured by the Policy.

198.    By his order, Nevada Governor Sisolak physically prevented public ingress to and egress from the Atlantis Casino Resort.

199.    By his order, Governor Sisolak physically prevented public ingress to and egress from other casinos and resorts of the type insured by the Policy.

200.    The public was prevented from physically entering the Atlantis Casino Resort and other Nevada casinos.

201.    Monarch incurred business interruption loss due to the necessary interruption of its business when ingress to or egress from the Atlantis Casino Resort was physically prevented.

202.    By their orders, Colorado Governor Polis and the CDPHE physically prevented public ingress to and egress from the Black Hawk Casino.

203.    Indeed, Public Health Order 20-22 expressly closed all Colorado casinos "to ingress, egress, use, and occupancy by members of the public."

204.    By their orders, Governor Polis and the CDPHE physically prevented public ingress to and egress from other casinos and resorts of the type insured by the Policy.

205.    The CDPHE closed Colorado casinos, and prevented ingress to and egress from those casinos, pursuant to its authority to exercise "physical control" over property and persons within the State of Colorado—including physical control over the Black Hawk Casino.

206.    The public was prevented from physically entering the Black Hawk Casino and other Colorado casinos.

207.    Monarch incurred business interruption loss due to the necessary interruption of its business when ingress to or egress from the Black Hawk Casino was physically prevented.

*Business Interruption Coverage Extension – Protection And Preservation Of Property*

208.    The Policy contains a coverage extension covering the business interruption loss incurred by the insured for a period of 48 hours prior to and 48 hours after the insured first takes reasonable action for the temporary protection and preservation of property insured by the Policy, provided such action is necessary to prevent immediately impending insured physical loss or damage to such insured property.

209.    The Policy states:

> **13. Protection and Preservation of Property - Business Interruption**
>
> This Policy covers the Business Interruption Coverage loss incurred by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this Policy provided such action is necessary to prevent immediately impending insured physical loss or damage to such insured property.

210.    Monarch took reasonable action for the temporary protection and preservation of the property insured by the Policy.

211.    Specifically, Monarch took action to clean and disinfect the properties covered by the Policy to protect its employees and the public from communicable disease.

27

212.    The actions of Monarch were necessary to prevent the transmission of COVID-19 and other communicable diseases to other persons and surfaces within the properties insured by the Policy.

213.    The actual presence of a communicable disease in a property insured by the Policy is property damage under the Communicable Disease – Property Damage coverage.

214.    Monarch sustained business interruption loss during the 48 hours prior to and the 48 hours after taking these necessary and reasonable actions.

*Business Interruption Coverage – Soft Costs*

215.    The Policy contains a coverage extension covering soft costs incurred by the insured during the period of liability arising out of the delay in the completion of buildings and additions under construction.

216.    The Policy states:

> **15. Soft Costs**
>
> This Policy covers **soft costs** incurred by the Insured during the Period of Liability arising out of the delay in the completion of buildings and additions under construction directly resulting from physical loss or damage of the type insured to insured property under construction at **locations**.

217.    The Policy defines "soft costs" as:

> **soft costs** means the expenses over and above normal expenses at **locations** undergoing alterations or additions to existing property and property in the course of construction limited to the following:
>
> 1.  Construction loan fees - the additional cost incurred to rearrange loans necessary for the completion of construction, repairs or reconstruction including the cost to arrange refinancing, accounting work necessary to restructure financing, legal work necessary to prepare new documents, and charges by the lenders for the extension or renewal of loans necessary.
>
> 2.  Commitment fees, leasing and marketing expenses - the cost of returning any commitment fees received from prospective tenant(s) or purchaser(s), the cost of releasing and marketing of the Insured Project due to loss of tenant(s) or purchaser(s).
>
> 3.  Additional fees - for architects, engineers, consultants, attorneys and accountants needed for the completion of construction, repairs or reconstruction.
>
> 4.  Carrying costs - building permits, additional interest on loans, insurance premiums and property and realty taxes.

218.    The Policy contains $5,000,000 in additional limits for soft costs coverage.

219.     At the time that Monarch incurred property loss and damage due to COVID-19 and the consequential closure orders, the Black Hawk Casino was undergoing a substantial expansion project.

220.     This expansion project included the construction of additional gaming facilities, a new hotel tower, and several new restaurants and bars.

221.     Property damage and business interruption from communicable disease are types of property loss or damage insured by the Policy.

222.     Completion of the expansion project at the Black Hawk Casino has been delayed due to COVID-19 and/or other communicable disease.

223.     Monarch has incurred additional construction expenses due to the construction delays caused by COVID-19 or other communicable disease.

*Emergency Evacuation Expense*

224.     The Policy contains a real estate endorsement covering the reasonable and necessary costs incurred by the insured for the emergency evacuation and return of tenants or lawful occupants as a direct result of immediately impending physical loss or damage of the type insured by the Policy.

225.     The Policy states:

**2. Emergency Evacuation Expense**

This Policy covers the reasonable and necessary costs incurred by the Insured for the emergency evacuation and subsequent return of tenants or lawful occupants when the Insured's management, using reasonable discretion, or a civil authority orders the emergency evacuation of a **described location** as a direct result of immediately impending physical loss or damage of the type insured by this Policy.

Emergency Evacuation Expense Exclusions: As respects Emergency Evacuation Expense, the following additional exclusions apply:

This Policy excludes:

**a)** The cost to move personal property of tenants or lawful occupants.

**b)** The cost of temporary or permanent housing or lodging.

**c)** Loss caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

226.   Communicable disease is a type of physical loss or damage insured by the Policy.

227.   A civil authority of the State of Nevada ordered the closure of the Atlantis Casino Resort, including the evacuation of the resort's lawful occupants.

228.   A civil authority of the State of Colorado ordered the closure of the Black Hawk Casino, including the evacuation of the casino's lawful occupants.

229.   The closures and evacuations were the direct result of immediately impending physical loss or damage from COVID-19 or other communicable disease.

230.   Monarch incurred reasonable and necessary costs to effectuate the evacuation of the lawful occupants of its properties.

*Decontamination Costs*

231.   The Policy covers the increased cost of decontamination and/or the removal of contaminated insured property as a direct result of enforcement of a law or ordinance regulating contamination.

232.   The Policy states:

> **8. Decontamination Costs**
>
> If insured property is contaminated as a direct result of insured physical damage and there is in force at the time of the loss any law or ordinance regulating **contamination** due to the actual not suspected presence of **contaminant(s)**, then this Policy covers, as a direct result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal of such contaminated insured property in a manner to satisfy such law or ordinance. This coverage applies only to that part of insured property so contaminated due to such presence of **contaminant(s)** as a direct result of insured physical damage.
>
> The Company is not liable for the costs required for removing:
>
> **a)**   Contaminated uninsured property; or
>
> **b)**   The **contaminant** in or on uninsured property;
>
> Whether or not the **contamination** results from insured physical loss or damage.

233.    Monarch's properties were contaminated by COVID-19 or another contaminant.

234.    The contamination was a direct result of physical damage insured under the Policy's Communicable Disease – Property Damage coverage.

235.    A law or ordinance is in force regulating COVID-19 contamination (the Nevada and Colorado Executive Orders).

236.    Monarch incurred costs to remove contaminated insured property in a manner to satisfy such law or ordinance.

### *Expediting Expenses Coverage*

237.    The Policy covers the reasonable and necessary costs incurred to temporarily repair or replace insured property that has sustained insured physical loss or damage.

238.    The Policy likewise covers the reasonable and necessary costs incurred to expedite the permanent repair or replacement of insured property that has sustained insured physical loss or damage.

239.    The Policy states:

> **13. Expediting Expenses**
>
> This Policy covers the reasonable and necessary costs incurred to:
>
> **a)**   Temporarily repair or replace; and
>
> **b)**   Expedite the permanent repair or replacement of;
>
> Insured property that has sustained insured physical loss or damage.
>
> This coverage does not include expenses payable elsewhere in this Policy including the cost of permanent repair or replacement of damaged property.

240.    The presence of a communicable disease is insured physical loss or damage under the Policy's Communicable Disease – Property Damage and Communicable Disease – Business Interruption coverage provisions.

241.    Monarch incurred reasonable and necessary costs to temporarily repair insured property that sustained insured physical loss or damage due to the presence of communicable disease.

*Professional Fees Coverage*

242.    The Policy covers the reasonable and necessary expenses incurred by the insured for the services of certain professionals to determine the amount of loss payable on claims for which AFM has accepted liability.

243.    The Policy states:

> **23. Professional Fees**
>
> This Policy covers the reasonable and necessary expenses incurred by the Insured of:
>
> **a)**   Auditors;
>
> **b)**   Accountants;
>
> **c)**   Architects;
>
> **d)**   Engineers; or
>
> **e)**   Other professionals; and
>
> **f)**   The Insured's own employees,
>
> For producing and certifying particulars or details to determine the amount of loss payable under this Policy for which this Company has accepted liability.
>
> This coverage does not include the fees and expenses of attorneys, public adjusters, loss appraisers, loss consultants or any of their subsidiaries or related or associated entities.

244.   Monarch has incurred, and will incur in the future, reasonable and necessary expenses of auditors, accountants, its own employees, or other professionals for producing and certifying particulars or details to determine the amount of loss payable under the Policy.

## AFM'S FAILURE TO INVESTIGATE AND CLAIMS REJECTION

245.   By letter dated April 14, 2020, Monarch tendered notice of loss under the Policy for the damages it sustained due to the COVID-19 pandemic and the government-mandated closures of its businesses.

246.   Monarch's notice was timely.

247.   The timing of Monarch's notice resulted in no prejudice to AFM.

248.   Monarch's April 14, 2020 letter specifically stated that it was making "a claim for coverage and payment" under the Policy.

249.   Monarch's notice of loss and claim for coverage sought payment for its losses under various coverages, including, but not limited to, the Policy's: "ALL RISK" coverage; Communicable Disease – Property Damage coverage; Decontamination Costs coverage; Expediting Expenses coverage; Professional Fees coverage; Protection and Preservation of Property – Property Damage coverage; Business Interruption coverage; Attraction Property coverage; Civil or Military Authority coverage; Communicable Disease – Business Interruption coverage; Ingress/Egress coverage; Protection and Preservation of Property – Business Interruption coverage; Soft Costs coverage; and the Real Estate Endorsement's Emergency Vacating Expense coverage.

250.   Monarch's 12-page, single-spaced letter explained the nature of the losses incurred and why each specific coverage applied.

251.    Monarch explained that its losses were "substantial" and "continue to mount with each passing day."

252.    Monarch explained that the losses "have been devastating to everyone affected, including not only the company's owners, executives, and managers, but to each of the Team Members."

253.    Monarch "implore[d] Affiliated FM to review this claim as expeditiously as possible, and to confirm that coverage is available for the claim . . . ."

254.    On April 27, 2020, AFM for the most part rejected coverage for Monarch's claimed losses, while at the same time it postulated that Monarch had not even submitted a claim.

255.    AFM denied benefits under various Policy coverages because Monarch purportedly failed to "identify any physical loss or damage to insured property."

256.    In its April 14, 2020 correspondence, however, Monarch carefully explained that COVID-19 and other communicable diseases cause physical loss and damage to property within the scope of coverage under an "all risk" policy such as the Policy issued by AFM to Monarch.

257.    Monarch alerted AFM to the presence of COVID-19 at its properties, as well as of the government orders directing the closure of those properties because of COVID-19.

258.    Executive orders have the full force and effect of law.

259.    Three executive orders governing the people and businesses in the State of Colorado (Executive Order D 2020 024, Executive Order D 2020 032, and Public Health Order 20-24) state that COVID-19 physically contributes to property loss, contamination, and damage.

260.     These executive orders are statements of the law in Colorado such that AFM's position that COVID-19 does not cause property loss or damage is contrary to the law and public policy of Colorado.

261.     Apparently with reference to the Policy's Communicable Disease coverages, AFM also asserted that Monarch "did not state whether any employees, guests or other individuals have been infected with the virus or whether the virus was present at" Monarch's casinos.

262.     Not true.   Monarch's claim letter specifically stated that several of its Team Members had COVID-19 symptoms and were presumptively positive for the virus.

263.     Further with respect to the Communicable Disease coverages, AFM contended that Monarch "ha[s] not reported any confirmed case of COVID-19 at" the insured locations.

264.     The Policy, however, does not require a "confirmed case" of a communicable disease to trigger coverage under the Communicable Disease coverages.

265.     Presence and confirmation are not synonymous.

266.     A communicable disease can be present at an insured location even if no confirmed cases have been reported at that location.

267.     For example, an employee or patron can have COVID-19, and disperse the virus to surfaces within an insured location, or to other persons occupying the insured location, even if the employee or patron has not been confirmed to have COVID-19 via testing.

268.     As the drafter of the Policy, AFM could have included language requiring confirmation of a communicable disease through a positive blood or antibody test had it so desired. It chose not to.

269.     Regardless, the duty to investigate whether coverage is owed under the Policy's Communicable Disease coverages (and its other coverages) belongs solely to AFM.

270.     AFM had a good faith duty to investigate whether a communicable disease was present at Monarch's insured locations.

271.     Insureds do not have to investigate or adjust their own claims.

272.     It was incumbent upon (and still is incumbent upon) AFM to conduct an investigation based on all available information to ascertain whether COVID-19 or another communicable disease was present at Monarch's properties.

273.     For example, if an insured sustains a fire loss and tenders notice, it is the insurer's duty and obligation (not the insured's) to determine the cause of the fire, whether coverage is owed under the policy, and the amount of any benefits due.

274.     AFM has conducted no investigation into the presence of communicable disease at Monarch's properties.

275.     AFM has not sought to interview any Monarch employees regarding the presence of COVID-19 or any other communicable disease at the insured locations.

276.     AFM has not hired an epidemiologist or other professional to investigate the presence of communicable disease at Monarch's properties.

277.     AFM has not conducted a statistical analysis of the likelihood of the presence of COVID-19 at Monarch's properties given the number of employees who worked there, the number of patrons coming and going each day, the proximity of employees and patrons at gaming facilities and amenities at the locations, and where those employees or patrons were travelling from.

278.     COVID-19 tests are available to AFM.

279.   AFM has not tested the infected Team Members or any other Monarch employees for COVID-19 antibodies.

280.   AFM did not provide Monarch with any testing materials.

281.   Indeed, AFM did not conduct any testing whatsoever regarding Monarch's claims for insurance benefits.

282.   Further, AFM did not investigate whether any patrons at Monarch's properties had COVID-19 or COVID-19 symptoms.

283.   Regarding the Real Estate Endorsement's Emergency Evacuation Expense Coverage, AFM asserted that Monarch didn't report "any evacuation of guests pursuant to an Order as a direct result of immediately impending physical loss or damage of the type insured."

284.   But Monarch's claim letter said that its businesses were ordered to close by their respective state governments due to the COVID-19 pandemic, thus requiring the evacuation of their guests.

285.   Further, those government orders repeatedly and emphatically state that the closures were necessary to prevent the imminent spread of COVID-19.

286.   The Colorado executive orders likewise expressly state that COVID-19 physically contributes to property loss and damage because it can contaminate and infect surfaces.

287.   AFM failed to consider any of this before it essentially rejected coverage under the Emergency Evacuation Expense provision.

288.   Regarding the Policy's coverages for Decontamination Costs, Protection and Preservation of Property – Property Damage, Protection and Preservation of Property – Business Interruption, Attraction Property, Civil or Military Authority, Ingress/Egress, Expediting

Expenses, and Soft Costs, AFM rejected Monarch's claims on the ground that "the Insured's property must sustain physical loss or damage of the type insured," and "[Monarch has] not reported any physical loss or damage of the type insured."

289.    The Attraction Property coverage provision, however, does not require physical loss or damage at Monarch's locations.

290.    Rather, business interruption benefits are available under the Attraction Property coverage provision if *another* location, not listed in the Policy, that attracts business to an insured location and is within one statute mile of the insured location, sustains physical loss or damage of the type insured by the Policy.

291.    Thus, coverage is available to Monarch under the Attraction Property provision if a *different* casino or business within one statute mile of either the Atlantis Casino Resort or the Black Hawk Casino had physical loss or damage of the type insured the Policy.

292.    By stating that Monarch was not entitled to coverage under the Attraction Property provision because its businesses had allegedly not sustained physical loss or damage, AFM misrepresented and misapplied the provision.

293.    The same goes for the Policy's Civil or Military Authority provision.

294.    The Civil or Military Authority provision covers business interruption loss incurred by Monarch during the period of liability when an order of a civil or military authority prohibits access to an insured location, provided such order is the direct result of physical damage of the type insured at a location "or within five (5) statute miles of it."  (Emphasis added.)

295.    Thus, the Policy's Civil or Military Authority provision is not limited to physical loss or damage at Monarch's properties.

296.    Instead, a governmental or military order limiting, restricting, or prohibiting access to Monarch's properties that directly results from physical damage to any business within five statute miles of Monarch's properties gives rise to coverage.

297.    AFM never investigated nor considered whether any other businesses within five statute miles of the Atlantis Casino Resort or the Black Hawk Casino suffered property loss or damage, including, but not limited to, property loss or damage from communicable diseases like COVID-19.

298.    By asserting that the Policy's Civil or Military coverage provision did not provide benefits because Monarch's casinos allegedly did not sustain physical loss or damage, AFM misrepresented and misapplied the provision.

299.    Likewise, the Policy's Ingress/Egress coverage provision does not require that Monarch's properties sustain physical loss or damage.

300.    The Ingress/Egress provision is triggered when Monarch incurs business interruption losses when ingress to or egress from its properties is partially or totally prevented as a direct result of physical loss or damage "of the type insured to property of the type insured [sic] whether or not at a described location."  (Emphasis added.)

301.    Thus, under the Ingress/Egress provision, Monarch is entitled to coverage if it incurs business interruption losses because ingress to or egress from its properties is partially or totally prevented as a direct result of physical loss or damage of the type insured by the Policy without regard to whether that physical loss or damage was incurred at its properties.

302.    For example, the highway to Black Hawk, Colorado could get washed out, or a bridge could collapse, preventing ingress to or egress from the Black Hawk Casino.

303. By asserting that the Ingress/Egress coverage provision did not provide benefits because Monarch's casinos allegedly did not sustain physical loss or damage, AFM misrepresented and misapplied the provision.

304. With regard to all of the above coverage provisions in the Policy, as well as the Expediting Expenses, Decontamination Costs, and Soft Costs provisions, AFM failed to apprehend or consider that the presence of communicable diseases can constitute property loss or damage and that whether a communicable disease is present does not require confirmatory testing.

305. Further, AFM failed to conduct a meaningful investigation based upon all available information into whether COVID-19 or another communicable disease was present at Monarch's properties.

306. On April 30, 2020, Monarch responded to AFM by pointing out various misstatements and inadequacies in its response to Monarch's claims. Monarch asked that, after an appropriate investigation, AFM advise that it would be affording coverage for Monarch's losses under each of the applicable Policy provisions.

307. AFM did not perform the requisite investigation. Instead, on May 13, 2020, it sent more letters asking that Monarch identify how it determined that COVID-19 was present at the insured locations, provide it with HIPPA-protected information regarding its infected employees, send it all of the publicly-accessible government closure orders, and calculate how many guests at Monarch's properties were evacuated because of the orders.

308. Monarch responded to AFM's questions two days later, including its provision of general information regarding employees and other individuals on Monarch's premises who had either tested positive or were presumed positive for COVID-19.

309.    Subsequently, Monarch provided a Proof of Loss in compliance with the Policy's Requirements in Event of Loss provision – despite the fact that AFM had failed to acknowledge coverage under any of the Policy insuring provisions – and also advised AFM of additional persons working at the Black Hawk Casino who have either tested positive for COVID-19 or have exhibited its unique symptoms.

310.    Despite issuing a Policy to Monarch with $350,000,000 per occurrence in aggregate limits, including $60,000,000+ per occurrence for Business Interruption losses, AFM has paid just $100,000 to Monarch for Monarch's losses caused by the COVID-19 pandemic and the government-mandated closures of its properties.

311.    Monarch has complied with all conditions precedent to coverage under the Policy and/or such conditions have been waived, released, prevented, or excused by AFM's unreasonable conduct and/or breach of the Policy contract.

### FIRST CLAIM FOR RELIEF
(Breach of Contract)

312.    Monarch re-alleges each and every allegation of this Complaint as if fully set forth herein.

313.    The Policy is a valid and enforceable contract of insurance.

314.    AFM's acts and omissions as described herein constitute a breach of the Policy, including, but not limited to, its failure to pay benefits owed to Monarch under the Policy's Property, Business Interruption, and Real Estate Endorsement coverages.

315.    As a direct and proximate result of AFM's breaches of the Policy, Monarch has suffered and is entitled to damages in amounts to be proved at trial, including without limitation the amount of the benefits owed and/or wrongfully withheld under the Policy.

## SECOND CLAIM FOR RELIEF
(Bad Faith Breach of Insurance Contract)

316.    Monarch re-alleges each and every allegation of this Complaint as if fully set forth herein.

317.    Under the Policy's implied covenant of good faith and fair dealing, AFM covenanted that it would deal with Monarch fairly and honestly, and do nothing to impair, hinder, or injure Monarch's rights to benefits under the Policy.

318.    Through the acts and omissions described above, AFM breached that covenant. AFM's conduct fell below the applicable common law and industry standards of care, violated the duties of good faith and fair dealing, and constituted the tort of bad faith breach of insurance contract.

319.    AFM's acts and omissions were unreasonable and AFM knew so, and/or AFM acted with a reckless disregard for Monarch's rights and interests.

320.    AFM's acts and omissions were committed in disregard of Monarch's reasonable expectations as an insured under the Policy.

321.    AFM breached its duty of good faith and fair dealing though the following unreasonable acts, among others:

    a.    Depriving Monarch of the benefits and protections of the Policy;

    b.    Placing its own interests above those of Monarch;

    c.    Failing to timely pay benefits owed under the Policy;

    d.    Misrepresenting facts concerning the Policy's coverage;

    e.    Failing to conduct a reasonable and impartial investigation of the loss based upon all available information;

f.      Forcing Monarch to bring a lawsuit to recover benefits owed and protections guaranteed under the Policy;

g.      Violating the Unfair Claims Settlement Practices Acts of Colorado and Nevada; and

h.      Other conduct to be revealed in discovery.

322.    As a direct and proximate result of AFM's bad faith breach of the Policy, Monarch has suffered and is entitled to damages in amounts to be proved at trial.

<strong><u>THIRD CLAIM FOR RELIEF</u></strong><br>(Violation of C.R.S. § 10-3-1115 and Relief Under C.R.S. § 10-3-1116)

323.    Monarch re-alleges each and every allegation of this Complaint as if fully set forth herein.

324.    Sections 10-3-1115(1) and (2), C.R.S., forbid insurers such as AFM from unreasonably denying or delaying payment of a claim for benefits owed to or on behalf of a first-party claimant.

325.    Monarch is a first-party claimant as that term is used under C.R.S. § 10-3-1115(1)(A)(I).

326.    AFM is an entity engaged in the business of insurance.

327.    AFM delayed and/or denied payment of first-party benefits owed to Monarch and did so without a reasonable basis within the meaning of C.R.S. § 10-3-1115(2) for the reasons set forth above.

328.    Section 10-3-1116(1), C.R.S., provides that a first-party claimant whose claim has been unreasonably denied or delayed by an insurer may bring an action to recover reasonable

attorneys' fees and court costs and two times the covered benefit that was unreasonably delayed or denied.

329.    As described herein, AFM's acts and omissions violated C.R.S. § 10-3-1115(2).

330.    Monarch therefore brings this claim to recover damages awardable under C.R.S. § 10-3-1116, separate from and in addition to those remedies and damages available under any other applicable claims for relief.

**FOURTH CLAIM FOR RELIEF**
(Declaratory Judgment)

331.    Monarch re-alleges each and every allegation of this Complaint as if fully set forth herein.

332.    The Policy is a contract under which Monarch paid AFM substantial premiums in exchange for AFM's promise to pay Monarch's claims for losses covered by the Policy.

333.    Monarch has complied with all applicable provisions of the Policy and/or those provisions have been waived by AFM, but AFM has vitiated its obligations toward Monarch pursuant to the Policy's terms.

334.    An actual case or controversy exists regarding Monarch's rights and AFM's obligations under the Policy to provide benefits and coverage for the losses incurred by Monarch in connection with the COVID-19 pandemic and the government-mandated closure of Monarch's properties.

335.    Pursuant to 28 U.S.C. § 2201, Monarch seeks a declaratory judgment from the Court declaring the following:

a. That Monarch's losses incurred due to the COVID-19 pandemic and government-mandated closure of Monarch's properties are insured losses under the Policy; and

b. AFM is obligated to pay Monarch for the full amount of the losses it has incurred in connection with the COVID-19 pandemic and government-mandated closure of Monarch's properties.

**WHEREFORE**, Plaintiff, Monarch Casino & Resort, Inc., requests that the Court enter judgment in its favor and against Defendant Affiliated FM Insurance Company and award damages as follows:

a. For all benefits due under the Policy for covered losses;

b. For other compensatory economic damages in amounts to be proved at trial;

c. For two-times the covered benefit as permitted by C.R.S. § 10-3-1116(1);

d. For reasonable attorneys' fees, costs, and expenses incurred herein;

e. For all pre- and post-judgment interest, statutory and moratory, as permitted by law;

f. For a declaratory judgment as set forth above; and

g. For such other and further relief as the law permits and this Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Dated this 17th day of August 2021.

Respectfully submitted,

**LEVIN SITCOFF PC**

_s/ Nelson A. Waneka_
Bradley A. Levin
Nelson A. Waneka
1512 Larimer Street, Suite 650
Denver, Colorado 80202
Telephone: (303) 575-9390
Fax: (303) 575-9385
bal@levinsitcoff.com
naw@levinsitcoff.com
**_Attorneys for Plaintiff_**

Plaintiff's Address:
3800 South Virginia Street
Reno, Nevada 89502

**Expert Report**

**Angela L. Rasmussen, Ph.D.**

**July 14, 2021**

1

**EXHIBIT 1**

**Table of Contents**

I.     **Expert Report**

     A.  Scope of Retention and Compensation
     B.  Summary of Qualifications
     C.  Summary of Opinions
     D.  Statement of Opinions and Basis for Opinions

II.    **Exhibits**

     A.  Supporting Analyses
     B.  Curriculum Vitae of Angela L. Rasmussen
     C.  List of Documents Considered

## I.   Expert Report

### A.   Scope of Retention and Compensation

I was engaged by Nelson Waneka of Levin Sitcoff in the matter of Monarch v. Affiliated Factory Mutual Insurance Company.  I was asked to give opinions within my area of expertise, virology, on the following topics: (1) whether (and if so, how) persons on-site with COVID-19 impact the property at Monarch properties; (2) if yes, whether the impact is temporary; (3) the effect of closing the property on any impact from COVID-19; and (4) the effect of reopening with personal protective equipment, administrative controls, and engineering controls on any impact from COVID-19. I am being compensated $500/hour for my work on this report and for deposition and trial testimony and $300/hour for travel time.

As part of my analysis, I have reviewed data on the number of people (guests and staff) on the property at the Atlantis Reno and Monarch Black Hawk casinos from 2/1/2020 through 6/3/2021. I have data concerning guest activities on the property (such as gaming) and the origin of these guests. I also reviewed COVID testing and symptom data from staff at both properties. I have also conducted an extensive literature review concerning transmission, virology, and epidemiology of SARS-CoV-2. Finally, I reviewed public health agency guidance, including past and present CDC guidance regarding transmission and mitigating COVID-19 risk for businesses, and CDC and WHO general guidance on SARS-CoV-2 risk reduction. A full list of documents considered is included in Section II, Exhibit C. My evaluation is based on my own education and experience as a virologist specializing in emerging viral pathogens, including SARS-CoV-2, as well as the current evidence-based understanding in my field of SARS-CoV-2 biology with regard to environmental persistence, transmission, virulence, and pathogenesis of COVID-19.

### B.   Summary of Qualifications

I am currently a Research Scientist III (Associate Professor equivalent for research faculty and principal investigator of my laboratory) at the Vaccine and Infectious Diseases Organization (VIDO), a research institute at the University of Saskatchewan. I am also an Affiliate at the Georgetown Center for Global Health Science and Security, as well as a senior member of the Viral Emergence Research Consortium (Verena) based at Georgetown. Previously, I held Assistant Professor-level faculty positions at the Columbia Mailman School of Public Health and the University of Washington. I study the host response to infection with emerging viral pathogens of significant concern to global public health including avian influenza, Ebola virus, MERS-CoV, and SARS-CoV-2. My particular area of expertise is combining classical virology techniques with modern systems biology approaches to study critical problems in understanding and developing countermeasures for novel emerging viral pathogens. I have extensive experience integrating data from experimental systems, including in vitro and animal models of infection and disease, and clinical settings.

3

I have studied human viral pathogens since 2003 and have 34 peer-reviewed publications in this area, including 8 publications on SARS-CoV-2, with an additional 2 manuscripts currently undergoing peer review or available as pre-prints. My work on emerging pathogens has been published in top tier journals including *Science*, *Nature*, *Nature Medicine*, *Cell*, *the Proceedings of the National Academy of Sciences*, and the *New England Journal of Medicine*. I have also presented my work at a number of conferences and seminars. I currently sit on the editorial board for three specialty journals, *Cell Reports, mSphere,* and *Vaccine*. Previously I have served as a guest editor for *Frontiers in Cellular and Infection Microbiology, Vaccines*, and *Viruses*. My work has been funded by the National Institutes of Health (NIH), the National Science Foundation, the Defense Advanced Research Projects Agency, and the Defense Threat Reduction Agency. I have also served on study sections for NIH, the National Aeronautics and Space Administration, the Department of Defense, and several private foundations' funding programs.

In addition, I have written numerous general interest pieces on viral infection and transmission for *Forbes*, *Slate*, *Leaps.org*, *The Guardian*, *Foreign Affairs*, the *Washington Post,* and the *New York Times*, and been interviewed and quoted multiple times in print, radio, and broadcast media, including the *New York Times*, the *Washington Post*, the Associated Press, Reuters, National Public Radio, ABC, NBC, CBS, PBS, Fox, CBC, and BBC. I have also been engaged as a consultant and scientific advisor for a wide range of clients, including marketing, investment, and medical or scientific educational firms. I have over 225,000 Twitter followers on my verified account and am widely regarded as an expert researcher and communicator regarding the biology of emerging zoonotic viruses, including SARS-CoV-2. My updated curriculum vitae is included in Section II, Exhibit B.

## C.  Summary of Opinions

I have evaluated the facts in this case in the context of this matter and my experience with evaluating the pathogenic properties of emergent epidemic and pandemic viruses, as well as my professional background as a virologist studying novel coronaviruses, including SARS-CoV-2. The opinions expressed herein are based on my knowledge, skill, training, education and materials considered (identified herein). It is my professional opinion to a reasonable degree of scientific certainty:

**1.   COVID-19 is an infectious disease caused by SARS-CoV-2. It damages Monarch properties in multiple ways: persons on site with COVID-19 shed SARS-CoV-2 into the indoor air and on surfaces at Monarch Properties. This results in tangible and demonstrable physical impact, alteration and transformation to the indoor air and surfaces, rendering them dangerous transmission vehicles for the virus that causes this potentially deadly disease. This impact, change, and physical damage to the property renders it uninhabitable and unfit for its intended use.**

**2.   The impact, change and physical damage caused by persons with COVID-19 on Monarch Properties is <u>not</u> brief and/or temporary; rather it is sustained through any ongoing occupation of the property. Moreover, due to the fact that a primary risk of SARS-CoV-2 exposure is inhalation, and the nature of Monarch's businesses involves**

4

guests and staff sitting in a large enclosed space for prolonged periods of time while gaming , cleaning, wiping, and/or disinfection under these circumstances are **insufficient** to remediate the damage.

**3.  The communicable disease coverage and contamination exclusions are contradictory and inconsistent with the fundamental biology of COVID-19.**

**D.  Statement of Opinions and Basis for Opinions**

**1.   COVID-19 is an infectious disease caused by SARS-CoV-2. It damages Monarch properties in multiple ways: persons on site with COVID-19 shed SARS-CoV-2 into the indoor air and on surfaces at Monarch Properties.  This results in tangible and demonstrable physical impact, alteration and transformation to the indoor air and surfaces, rendering them dangerous transmission vehicles for the virus that causes this potentially deadly disease. This impact, change, and physical damage to the property renders it uninhabitable and unfit for its intended use.**

SARS-CoV-2 is a novel emergent betacoronavirus that is the causative agent of COVID-19. Infected people shed copious amounts of SARS-CoV-2 into the air and surfaces around them by several different mechanisms (Section II, Exhibit A, Figure 1)[1]. SARS-CoV-2 is exhaled in respiratory particles through normal breathing, as well as coughing, speaking, singing, shouting, or exerted breathing, into the air by persons with COVID-19, where it persists in respiratory aerosols and droplets[1–11]. Aerosols can remain suspended in the air for prolonged periods of time, where they can travel distances greater than 6 feet and eventually settle on surfaces to become fomites (infectious objects). Infectious aerosols can accumulate in enclosed spaces and present a significant infection risk in a manner that is dependent on concentration, not distance[12]. Notably, without adequate ventilation and air filtration, the transformation of indoor air by people in an enclosed space for a long period of time presents a substantial infection hazard that cannot be mitigated solely with masks and distancing[1,12–15], resulting in damage to the property. In addition to damage to the property via transformation of the indoor air, SARS-CoV-2 can be deposited on surfaces either through direct contact with respiratory secretions or saliva of an infected person (transfer by hand or tissue) or by settling of particles from the air. In addition, "toilet plumes" generated by flushing toilets can cause large quantities of SARS-CoV-2-containing fecal particles to be aerosolized, where they can remain in poorly ventilated restrooms. Fecal bioaerosols behave like respiratory aerosols and can likewise travel over distances greater than 6 feet through the air, present a cumulative infection hazard for anyone breathing shared air in that space, and settle on surfaces. SARS-CoV-2 in the indoor air and on surfaces presents a substantial infection risk to persons occupying the property. For this reason, current CDC guidance states that going to an indoor venue like a casino is an activity considered "least safe" for an unvaccinated person, even if they are wearing a mask[16], reflecting the current scientific consensus that SARS-CoV-2 transforms the indoor air, causes damage to the property, and renders the property unsafe for its intended use (absent extraordinary mitigation and controls discussed below).

Inhalation of infectious aerosols is a major mode of SARS-CoV-2 transmission, providing a clear mechanism for SARS-CoV-2 in the air to damage property. Although fomite transmission

is thought to be uncommon, it is still a viable mode of transmission along with the more dominant modes of transmission by direct contact and inhalation of infectious SARS-CoV-2, and risk of fomite transmission is dependent on prevalence in the community, virus shedding, environmental features such as heat or humidity, mitigation efforts such as masks, distancing, or ventilation, rate of deposition of virus particles onto surfaces, frequency of exposure to those surfaces, and achieving minimum infectious dose[29]. All three modes of transmission have been demonstrated in multiple experimental models[30–38]. Exhaled respiratory particles and fecal bioaerosols present a significant transmission risk even after they have settled and are no longer suspended in the air, and disturbances can resuspend them in the air. Thus, SARS-CoV-2 causes substantial property damage by rendering it unsafe and unfit for habitation and use, by transforming both the shared air breathed by the property's occupants and the physical surfaces of the property itself.

Monarch properties comprises two casinos, the Atlantis Reno and Monarch Black Hawk. The normal use of these properties involves bringing customers and staff together in an enclosed space for an extended period of time and providing multiple opportunities for interpersonal interaction, as well as accumulation of potentially infectious particles in the air and on surfaces on the property. The indoor air and all of the surfaces in these spaces is transformed and damaged by the presence of people with COVID-19.

SARS-CoV-2 was certainly and undeniably present at both Monarch casinos. While the likelihood of an infected person coming to any Monarch property will differ based on the prevalence in the community, there are multiple reports of known or presumed cases of Monarch employees with COVID-19 beginning in March 2020. Given increasing transmission of SARS-CoV-2 and explosive growth of COVID-19 in the US and with thousands of guests and hundreds of staff members being present daily from February to March 2020, and subsequently from June 2020 onwards after reopening, the presence of SARS-CoV-2 on both properties, and the property damage that has resulted, is certain.

Based on the above, I conclude that the pervasive and sustained presence of SARS-CoV-2 in the indoor air and on surfaces on Monarch property results in tangible and demonstrable impact, change,  and physical damage, resulting in the transformation of indoor air and surfaces on the property into dangerous vehicles for transmission of SARS-CoV-2, the cause of a deadly communicable disease, COVID-19.

**2.    The impact, change and physical damage caused by persons with COVID-19 on Monarch Properties is <u>not</u> brief and/or temporary; rather it is sustained through any ongoing occupation of the property. Moreover, due to the fact that a primary risk of SARS-CoV-2 exposure is inhalation, and the nature of Monarch's businesses involves guests and staff sitting in a large enclosed space for prolonged periods of time while gaming, cleaning, wiping, and/or disinfection under these circumstances are <u>insufficient</u> to remediate the damage.**

This transformation is <u>not</u> brief and/or temporary but sustained: an infected person on the property will shed SARS-CoV-2 virus into the air and on surfaces (Section II, Exhibit A, Figure 1); an infected person spreads SARS-CoV-2 throughout the property while there; a different

6

infected person entering the property repeats this process. This becomes a cycle of persistent and iterative property damage.

One major reason why SARS-CoV-2 transmission risk is so difficult to mitigate is the fact that there is significant transmission by presymptomatic individuals, or infected people who have no clinical signs of illness[39]. A study estimated that early in the outbreak, nearly half of all new cases in Wuhan, China were the result of "undocumented" cases, or those that were not identified because they were not producing symptoms and patients were unaware that they had been exposed or were infected[40]. Viral loads in respiratory secretions are highest 24-48 hours prior to symptom onset[41,42]. Ocular secretions such as tears have also been reported to contain SARS-CoV-2, though transmission potential remains unknown. As a result, community transmission has proven very difficult to control, particularly in a population with little pre-existing immune protection. Businesses cannot screen for presymptomatic individuals capable of transmitting virus, as rapid testing only just became available and is not being used by casinos or other similar businesses to screen for customers with COVID-19. Temperature screening will not detect cases in symptomless people who do not have a fever. Due to inadequate testing and limited epidemiological surveillance in the United States, people in close contact with symptomless cases may be unaware that they have been exposed and thus not realize that they should quarantine rather than enter Monarch casinos as staff or guests. Furthermore, studies have shown that infected people without symptoms shed substantial amounts of virus into the surrounding physical environment[43]. Thus, businesses open to individuals in regions with ongoing community transmission will invariably be subject to substantial exposure risks from presymptomatic individuals who are not aware that they are infected, and this will result in inevitable damage to property air and surfaces, which will be amplified by reintroduction.

The extent and nature of presymptomatic viral shedding suggests that property damage through environmental exposure and persistence in the air, surfaces, and floors is inevitable for high-traffic venues, particularly those such as Monarch, which owns properties in communities with high transmission rates and attracts customers to an environment that is highly conducive to SARS-CoV-2 spread, specifically one including table games, restaurants, bars, retail, and other recreational and entertainment activities that involve being indoors in large groups of people for prolonged periods of time. Even in the absence of casino guests, employees and external vendors are required for routine maintenance, resulting in multiple SARS-CoV-2 introductions and causing continuous, repeated transformation. This leads to additive, sustained property damage, as those who are infected as a result of exposure to damaged property can then shed virus themselves, further damaging the property and rendering the property unsafe and unfit for use.

A single introduction (or reintroduction) of SARS-CoV-2 can persist in indoor environments for long periods of time. On the Diamond Princess cruise ship, viral RNA was detected 17 days after passengers disembarked despite attention paid to surface disinfection[17,18]. Initially this was thought to be mediated primarily by direct contact and fomite transmission, but subsequent studies have showed that while SARS-CoV-2 was not transmitted on the Diamond Princess via the air conditioning system, spread was likely driven by direct contact and aerosol transmission in indoor spaces and shared quarters, particularly those that were poorly ventilated[19–21]. SARS-CoV-2 RNA has been detected on packages even after international transport, as well as on

7

numerous environmental samples in locations where infected people have visited or shopped, such as markets, airplanes, ships, or event venues.

Multiple studies demonstrate that SARS-CoV-2 shed by people with COVID-19 can remain infectious in both aerosols and on many different types of surfaces[22–25], and in some cases can remain infectious for weeks depending on ambient temperature and humidity conditions in the environment[22] (Section II, Exhibit A, Figure 2). Particles on surfaces can be further reintroduced into the air after settling, as well, in which case they continue to present an aerosol infectious hazard while they are suspended in the air. Furthermore, the presence of proteins, which are ubiquitous in the environment and in respiratory and skin secretions, significantly prolongs particle infectivity, or the length of time in which particles remain infectious[23]. Low temperature, low humidity environments that are protected from sunlight or ultraviolet radiation are particularly conducive to retained infectivity[26,27], and as such air conditioned, indoor environments present a substantial risk for maintaining infectious SARS-CoV-2 in the air and on surfaces. Importantly, infectious particles suspended in the air produced from speech will settle onto surfaces in the ambient environment and become potential fomites (Section II, Exhibit A, Figure 1). While particles produced by speech can themselves remain as indoor air infection hazards for long periods of time[28], they can remain infectious for days or weeks after settling on surfaces in the environment[22].

Based on the above, I conclude that damage to property caused by persons with COVID-19 is not limited to the duration that SARS-CoV-2 from a single source remains infectious. This recurrent cycle of transmission results in sustained property damage, as it makes using Monarch properties unsafe and unfit for their intended purpose.

**3.   The communicable disease coverage and contamination exclusions are contradictory and inconsistent with the fundamental biology of COVID-19.**

The policy defines communicable disease as disease which is: 1. Transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges, or 2. Legionellosis (p. 42 of the policy).  A communicable disease is by definition a pathological condition caused by infection with a pathogen that is transmissible to a human by direct or indirect contact with an infected person, animal, or fomite, or consumption of contaminated food or water. From my perspective as a virologist, COVID-19 is a communicable disease caused by infection with SARS-CoV-2, a viral pathogen that is transmitted via direct or indirect contact with an infected person or fomite, and thus meets this definition.

The policy contains affirmative coverage for communicable disease, which includes, among other things, the physical presence of disease. However, a disease does not have a physical presence. The communicable disease coverage, as written, pertains to the etiologic agent of the disease, which in this case is SARS-CoV-2.  SARS-CoV-2 is a physical entity, has a physical presence, and as stated above, has resulted in physical damage to Monarch properties. In this case, the communicable disease is COVID-19 and the virus which causes it is SARS-CoV-2. In my view as a virologist, the communicable disease coverage, therefore, must apply to damage caused by SARS-CoV-2.

8

However, the policy contains an exclusion for contamination (p. 5 of the policy). The policy defines contamination as "any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease-causing or illness-causing agent, fungus, mold or mildew" (p. 42 of the policy). This is directly at odds with and inconsistent the affirmative communicable disease coverage, which unequivocally includes diseases like COVID-19 that are caused by viral infections.

From my perspective as a virologist, therefore, the only reasonable way to interpret the policy's communicable disease coverage is to read that coverage applies specifically to SARS-CoV-2, the causative agent of COVID-19.

Because SARS-CoV-2 is a novel virus unknown prior to December 30, 2019, the science is constantly evolving. SARS-CoV-2 is fundamentally different from previous emergent betacoronaviruses including SARS-CoV and MERS-CoV, with unique properties concerning its biology, replication, pathogenesis, and transmissibility. I reserve the right to supplement or amend my opinion as new data emerges and/or I am provided with additional documents or data.

Angela L. Rasmussen, Ph.D.

9

## II. Exhibits

### A.  Supporting Analyses

### Figure 1. The Cycle of Property Damage by Persons with COVID-19 in Air and On Surfaces



**Figure 2. Persistence of Infectious Virus on Materials in Laboratory Studies**[22–25,60]



**B. Curriculum vitae of Angela L. Rasmussen**

**EDUCATION**
**University of Washington,** Seattle, WA                                    2009-2012
Department of Microbiology
Postdoctoral Fellowship

**Columbia University Graduate School of Arts & Sciences, Coordinated Doctoral Program**
**in Biomedical Sciences,** New York, NY                          2003-2009
Department of Microbiology and Immunology
Ph.D, Microbiology, 2009
M.Phil., Microbiology, 2006
M.A., Microbiology, 2005

**Smith College**, Northampton, MA                                    1996-2000
B.A., Biological Sciences

**AWARDS, HONORS, AND INVITED LECTURES**

| | |
|---|---|
| Invited lecturer, Host Responses to Viral Pathogens, UC-Riverside | 2021 |
| Invited speaker/panelist, American Thoracic Society 2021 | 2021 |
| Invited speaker, W. Harry Feinstone Department of Molecular Microbiology and Immunology, Johns Hopkins Bloomberg School of Public Health | 2021 |
| Invited speaker, American Public Health Association and National Academy of Medicine COVID-19 Conversations: Variants and Vaccines | 2021 |
| Invited speaker, the Spectrum Virtual Summit | 2021 |
| Invited speaker, MJH Life Sciences, Emerging SARS-CoV-2 Variants | 2021 |
| Keynote speaker 32nd Annual Holiday Conference, Hospital for Special Surgery | 2020 |
| Invited speaker/panelist, Cell Press Beijing Online Conference | 2020 |
| Invited speaker, The Scientist Webinar Series | 2020 |
| Invited speaker/honoree, Department of Biological Sciences, Smith College | 2020 |
| Invited panelist, ASM Virtual Journal Club | 2020 |
| Invited speaker, NYC Health System Special Pathogens | 2020 |
| Invited speaker, Memorial Sloan Kettering Grand Rounds: Advanced Topics in Infectious Disease | 2020 |
| Elemental 50 Experts to Follow in a Pandemic | 2020 |
| Invited speaker, MJH Life Sciences, COVID-19 Fact or Fiction? | 2020 |
| Invited speaker, MJH Life Sciences, Battling Dual Threats: Flu and COVID-19 | 2020 |
| Member, MJH Life Sciences COVID-19 Coalition | 2020 |
| Invited speaker, MJH Life Sciences, COVID-19: Race for a Vaccine | 2020 |
| Invited speaker, COVID-19 Lessons Learned and Best Practices Dialogue, DTRA and the Republic of Philippines Department of Health | 2020 |
| Invited panelist, Pandemic Preparedness: A Roadmap for Future Outbreaks, Center for Global Development | 2020 |
| Invited lecturer, Breaking Science Writing, Johns Hopkins University | 2020 |

| | |
|---|---|
| Invited speaker, COVID-19 Seminar Series, HHMI Janelia | 2020 |
| Invited speaker, Coronavirus Preparedness Summit | 2020 |
| Invited lecturer, Host Responses to Viral Pathogens, UC-Riverside | 2020 |
| Calderone Junior Faculty Prize, Columbia Mailman School of Public Health | 2019 |
| Invited speaker, Hot Topics in Emerging Pathogens, New York University | 2018 |
| Invited lecturer, Institute of Systems Genetics, New York University | 2016 |
| Invited speaker, Mini-Medical School, University of Washington | 2016 |
| Invited speaker, Department of Biological Sciences, Smith College | 2012 |
| Invited speaker, Faculty of Veterinary Medicine, Udayana University, Denpasar, Bali, Indonesia | 2012 |
| Elected to Sigma Xi | 2000 |
| Margaret Wemble Brigham Award for Excellence in Microbiology or Immunology Research, Smith College | 2000 |
| Blakeslee Fellowship, Smith College | 1999 |
| Elizabeth Drew Memorial Prize for best short fiction, Smith College | 1997 |

**Please see _angelarasmussen.org_ for a full record of press clippings and non-scientific writing**

**EXPERIENCE**

**Research Scientist III (Associate Professor equivalent)**          2021-present
Vaccine and Infectious Disease Organization-International Vaccine Centre (VIDO-InterVac),
      Saskatoon, Saskatchewan, Canada
   ▪ *Principal Investigator leading a lab studying host responses to emerging virus infections*
   ▪ *Leading several studies including host response to SARS-CoV-2 in animal models and studying sex bias to emerging viruses in human and wildlife hosts*
   ▪ *Continuing collaborations established in my prior academic positions, studying SARS-CoV-2, MERS-CoV, Ebola virus, influenza virus, Lassa virus, Crimean-Congo hemorrhagic fever virus, and other emerging viruses of critical importance to public health and biosecurity.*

**Non-Resident Affiliate**                                           2020-present
Center for Global Health Science and Security, Georgetown University, Washington, DC
   ▪ *Affiliate member collaborating closely with GHSS center faculty and staff*
   ▪ *Virology lead of the Viral Emergence Research Initiative (VERENA) Consortium, a multi-disciplinary research effort to study the ecology, evolution, and emergence potential of novel viral pathogens using machine learning and advanced analytical approaches, with an emphasis on open data and equity.*
   ▪ *Contribute to VERENA workshops and seminar series*

**Consultant and Writer**                                            2020-present
Self-employed
   ▪ *Provide expert advice on virology and public health practices for a variety of clients in the field of law, marketing, pharmaceutical development, education, and public health.*
   ▪ *Write on current scientific state of the art for major media outlets including Forbes,*

13

*Slate, The Guardian, Leapsmag, Foreign Affairs, the Washington Post, and the New York Times.*

- *Leveraging my considerable social media platform (~225,000 Twitter followers) to maximize engagement with the public for scientific communication, including providing guidance regarding best practices during a pandemic, critiquing and clarifying policy positions, and educating about the current state of the art in virology and immunology research.*

**Associate Research Scientist (Assistant Professor equivalent)**        2016-2020
Center for Infection and Immunity, Mailman School of Public Health, Columbia University, New York, NY

- *Principal Investigator on a FastGrant award to use transcriptomics and machine learning approaches to study host responses to SARS-CoV-2 infection in rhesus macaques. We also used classification approaches combined with functional analysis to predict infection and identify host-directed drugs with potential as antiviral therapeutics.*
- *Lead scientist and project manager for a project grant within the Center for Research on Discovery and Diagnostics (CRDD), a U19 Center of Excellence for Translational Research. This project employs systems biology approaches to develop host response signatures with diagnostic or prognostic value.*
- *Principal Investigator on a cooperative agreement with the Defense Advanced Research Projects Agency (DARPA) to investigate host responses associated with tolerance to infection with Ebola virus and MERS-CoV*
- *Lead scientist on contracts with the Defense Threat Reduction Agency (DTRA), and the National Biodefense and Countermeasures Center (NBACC) in the Department of Homeland Security (DHS), investigating the host transcriptional response to infection with multiple emerging pathogens with significant relevance to biodefense (Ebola and Burkholderia pseudomallei).*
- *Directly supervise a veterinarian-scientist performing all high-containment work on BSL-4 pathogens as a special volunteer at the Rocky Mountain Laboratories Integrated Research Facility*
- *Directly supervise technicians and bioinformaticians*
- *Write grants, establish collaborations, and obtain support for an independent research program.*
- *Coordinate with international team of investigators to transfer samples, manage personnel, write grant proposals, and publish manuscripts.*
- *Drive scientific studies with integral roles in project conceptualization, experimental design, data collection and analysis, and authorship of original research manuscripts. These studies use a systems biology-based approach and analysis on zoonotic viral pathogens, primarily those that cause hemorrhagic fever (Ebola virus, Marburg virus, Lassa virus, Lujo virus, Hantaan virus), respiratory disease (influenza, MERS-CoV), and emerging arboviruses (dengue virus, SFTSV, Heartland virus, Powassan virus, Rift Valley fever virus).*

**Research Assistant Professor**                                    2014- 2016
Department of Microbiology, University of Washington, Seattle, WA
Katze Laboratory

14

- *Lead scientist and project manager on three U19 program projects totaling $7.2 million in direct costs. Also responsible for reporting, personnel management, resource allocation, and funding renewal of these programs.*
- *Write grants and establish collaborations.*
- *Coordinate with international team of investigators to transfer samples, manage personnel, write grant proposals, and publish manuscripts.*
- *Responsible for all efforts involving emerging or highly pathogenic viruses, specializing in highly pathogenic emerging viruses.*
- *Drive scientific studies with integral roles in project conceptualization, experimental design, data collection and analysis, and authorship of original research manuscripts. These studies focused on emerging pathogens including filoviruses, MERS-CoV, dengue virus, H7N9 influenza virus, bunyaviruses, and arenaviruses.*
- *Guest lecturer during spring quarter graduate-level virology lecture courses.*
- *Mentor postdoctoral fellows and junior scientists in the laboratory.*

**Scientific Project Manager**                                              2012-2014
Department of Microbiology, University of Washington, Seattle, WA
Katze Laboratory

- *Management of Katze lab efforts contributing to three large, multi-institutional research grants (PNWRCE, CETR, Systems ImmunoGenetics), including personnel, resources, scientific contributions, programmatic reporting, compliance, and funding renewal.*
- *Coordination with other researchers worldwide for sample procurement, data acquisition, and analysis.*

**Senior (Postdoctoral) Fellow**                                           2009-2012
Department of Microbiology, University of Washington, Seattle, WA
Katze Laboratory
Principal Investigator: Professor Michael G. Katze, Ph.D.

- *Systems biology-based analysis of infection and pathogenesis of hepatitis C virus in both human liver transplant recipients and experimental models of HCV replication.*
- *Use of both systems approaches (transcriptomics, proteomics, metabolomics) and traditional molecular, biochemical, cellular, and virologic techniques.*

**Graduate Research Associate**                                            2003-2009
Department of Microbiology, Columbia University, New York, NY
Principal Investigator: Professor Vincent R. Racaniello, Ph.D.
Dissertation: "Development of a mouse model of rhinovirus infection."

- *Development of a mouse model of rhinovirus infection by isolating and characterizing host range variants capable of enhanced replication in mouse cells.*
- *Maintained Racaniello laboratory mouse colony.*

**Graduate Technology Fellow**                                             2006-2008
Columbia Technology Ventures

- *Performed numerous analyses to support intellectual property and technology transfer at Columbia University, including evaluating inventions for commercial viability, patent*

15

*searches, scientific literature searches, and identification of potential licensees.*

**Research Associate**                                                                    2000-2003
Xcyte Therapies, Inc., Seattle, WA
- *Developed T-cell expansion technologies for large-scale lymphocyte cultivation in the context of samples collected from patients with hematological malignancies*
- *Performed a variety of functional and characterization studies to support preclinical development of T-cell immunotherapies for renal cell carcinoma, prostate cancer, B-cell chronic lymphocytic leukemia, non-Hodgkin's lymphoma, and multiple myeloma.*

**Blakeslee Fellow/Student Researcher**                                                   1998-1999
Smith College, Northampton, MA
Principal Investigator: Professor Christine A. White-Ziegler, Ph.D.
Areas of Concentration: Microbiology, Microbial Genetics
Special Studies Project: "Mutational Analysis of rimJ"
- *Mutational analysis of rimJ, a gene involved in transcriptional thermoregulation of Escherichia coli Pap fimbrial gene expression.*

**Intern**                                                                                1998
XOMA (US) LLC, Berkeley, CA
- *Comparison of rBPI$_{21}$, a recombinant antibacterial peptide, to Polymyxin B as inhibitors of lipopolysaccharide-mediated proinflammatory cytokine secretion*


**ACADEMIC SERVICE**

Associate Editor, *Vaccine*, 2021-present
Member, Editorial Board, *mSphere*, 2020-present
Reviewer, E-1 and E-2 panels, FY22 Military Infectious Diseases Research Program (MIDRP), intramural research program study section, December 2020-March 2021.
Guest Editor, "Host Factors in Viral Infection," *Viruses*, 2020-present
Member, Editorial Advisory Board, *Cell Reports*, 2020-present
Member, WHO Ad Hoc Expert Group on Preclinical Models of COVID-19 Disease. February 2020-present.
Reviewer, Tick Borne Disease Panel, FY20 Peer Review Tick Borne Disease Research Program (TBDRP), CDMRP, August 2020-October 2020.
Reviewer, Viral Infectious Disease Panel, FY20 Peer Review Medical Research Program (PRMRP) Discovery Award, CDMRP, May 2020-July 2020.
Reviewer, Fondazione Cariplo, Call to support the development of collaborations for the identification of therapies, diagnostic tools, protective equipment and analysis systems to help fight the Coronavirus emergency and other potential future viral emergencies, April-May 2020.
Reviewer, Flavivirus RA-S-IN Panel, FY20 Military Infectious Diseases Research Program (MIDRP), intramural research program study section, December 2019-January 2020.

Steering Committee, Public Health 2035: Developing a Bold Vision for Our Second Century,

16

Columbia Mailman School of Public Health, October 2019-November 2020.

Reviewer, Emerging Infectious Diseases Panel, Congressionally Directed Medical Research Programs (CDMRP), FY20 Peer Review Medical Research Program (PRMRP) Focused Program Award, July-September 2019.

Member, NIH Advisory Committee to the Director Working Group on Changing the Culture to End Sexual Harassment, 2019-present.

Reviewer, National Aeronautics and Space Administration (NASA), HERO Inflammation-Immunology study section, 2018.

Reviewer, National Aeronautics and Space Administration (NASA), Space Biology study section, 2018.

Topic editor, "Host-pathogen interactions during arboviral infections," *Frontiers in Cellular Infection and Microbiology.* 2018-2019.

Guest editor, "Host Responses to Viral Infection," *Vaccines*. 2017.

Member, Institutional Biosafety Committee, University of Washington, November 2014-March 2016.

Reviewer, Pre-Dengue Panel, Congressionally Directed Medical Research Programs (CDMRP), FY15 Peer Review Medical Research Program (PRMRP), July 2015.

Reviewer, Lethal Virus Countermeasures Panel, US Army Medical Research and Materiel Command, FY16 Military Infectious Diseases Research Program (MIDRP), Joint Program Committee-2, intramural research program study section, March 2015.

Panelist, NIH Pathways to Prevention (P2P): Advancing the Research on Myalgic Encephalomyelitis/Chronic Fatigue Syndrome (ME/CFS), 2014.

Reviewer, National Aeronautics and Space Administration (NASA), Space Biology study section, 2014.


**SCIENTIFIC PUBLICATIONS**

C. Carlson, M. Farrell, Z. Grange, B. Han, N. Mollentze, A. Phelan, **A. Rasmussen**, G. Albery, B. Bett, D. Brett-Major, L. Cohen, T. Dallas, E. Eskew, A. Fagre, K. Forbes, R. Gibb, S. Halabi, C. Hammer, R. Katz, J. Kindrachuk, R. Muylaert, F. Nutter, J. Ogola, K. Olival, M. Rourke, S. Ryan, N. Ross, S. Seifert, T. Sironen, C. Standley, K. Taylor, M. Ventner, P. Webala. ***Zoonotic Risk Technology Enters the Viral Emergence Toolkit.*** *Preprints*. DOI: 10.20944/preprints202104.0200.v1. April 7, 2021.

**A.L. Rasmussen** and S.V. Popescu, ***SARS-CoV-2 Transmission Without Symptoms***. *Science* 371(6535):1206-1207. DOI: 10.1126/science.abf9569. March 19, 2021.

K.M. Forbes, O. Anzala, C.J. Carlson, A.A. Kelvin, K. Kuppalli, E.M. Leroy, G.D. Maganga, M.M. Masika, I.M. Mombo, D.M. Mwaengo, R.F. Niama, J. Nziza, J. Ogola, B.S. Pickering, **A.L. Rasmussen**, T. Sironen, O. Vapalahti, P.W. Webala, J. Kindrachuk. ***Toward a coordinated strategy for intercepting human disease emergence in Africa.*** *Lancet Microbe* 2(2): E51-E52. February 21, 2021. DOI: 10.1016/S2666-5247(20)30220-2.

R. Gibb, G.F. Albery, D.J. Becker, L. Brierley, R. Connor, T.A. Dallas, E.A. Eskew, M.J. Farrell, **A.L. Rasmussen**, S.J. Ryan, A. Sweeny, C.J. Carlson, and T. Poisot. ***Data proliferation, reconciliation, and synthesis in viral ecology.*** *bioRxiv* 2021.01.14.426572. DOI: 10.1101/2021.01.14.426572. January 16, 2021.

**A.L. Rasmussen**. ***On the origins of SARS-CoV-2.*** *Nature Medicine* 27(9). DOI: 10.1038/s41591-020-01205-5. January 13, 2021.

**A.L. Rasmussen**. ***Vaccination Is the Only Acceptable Path to Herd Immunity.*** *Med*, online. DOI: 10.1016/j.medj.2020.12.004. December 18, 2020.

D. Gurdasani, L. Bear, D. Bogaert, R.A. Burgess, R. Busse, R. Cacciola, Y. Charpak, T. Colbourn, J. Drury, K. Friston, V. Gallo, L.R. Goldman, T. Greenhalgh, Z. Hyde, K. Kuppalli, M.S. Majumder, J.M. Martin-Moreno, M. McKee, S. Michie, E. Mossialos, A. Nouri, C. Pagel, D. Pimenta, S. Popescu, V. Priesemann, **A.L. Rasmussen,** S. Reicher, W. Ricciardi, K. Rice, J. Silver, T.C. Smith, C. Wenham, R. West, G. Yamey, C. Yates, H. Ziauddeen. ***The UK needs a sustainable strategy for COVID-19.*** *The Lancet*, online. DOI: 10.1016/S0140-6736(20)32350-3. November 9, 2020.

**A.L. Rasmussen**, K. Escandón, and S.V. Popescu. ***Facial Masking for Covid-19***. *New England Journal of Medicine*, online. October 23, 2020. DOI: 10.1056/NEJMc2030886. PMID: 33095523.

C. Muñoz-Fontela, W.E. Dowling, S.G.P. Funnell, P.S. Gsell, X.R. Balta, R. Albrecht, H. Andersen, R. Baric, M.W. Carroll, Q. Chuan, I. Crozier, K. Dallmeier, L. de Waal, E. de Wit, L. Deland, E. Dohm, P. Duprex, D. Falzarano, C. Finch, M.B. Frieman, B. Graham, L. Gralinski, B. Haagmans, G. Hamilton, A.L. Hartman, S. Herfst, W. Klimstra, I. Knezevic, J. Kuhn, R. Le Grand, M. Lewis, W.-C. Liu, P. Maisonnasse, A.K. McElroy, V. Munster, N. Oreshkova, **A.L. Rasmussen**, J. Riha, J. Rocha Pereira, B. Rockx, E. Rodríguez, T. Rogers, F.J. Salguero, M. Shotsaert, K. Stittelaar, H.J. Thibaut, C.-T. Tseng, J. Vergara-Alert, M. Beer, T. Brasel, J.F.W. Chan, A. García-Sastre, J. Neyts, S. Perlman, D. Reed, J.A. Richt, C.J. Roy, J. Segalés, S. Vasan, A.M. Henao-Restrepo, and D.H. Barouch. ***Animal models for COVID-19.*** *Nature*, online. DOI: 10.1038/s41586-020-2787-6. Sept. 2020. DOI: 10.1038/s41586-020-2787-6. PMID: 32967005.

K. Escandón, **A.L. Rasmussen**, I.I. Bogoch, E.J. Murray, K. Escandón, and J. Kindrachuk.

*COVID-19 and false dichotomies: time to change the black-or-white messaging about health, economy, SARS-CoV-2 transmission, masks, and reinfection*. OSF Preprints, August 5, 2020. DOI: 10.31219/osf.io/k2d84.

N.D. Grubaugh, W.P. Hanage, and **A.L. Rasmussen**. *Making sense of mutation: what D614G means for the COVID-19 pandemic remains unclear. Cell,* S0092-8674(20)30817-5. July 2020. DOI: 10.1016/j.cell.2020.06.040. PMID: 32697970.

K. Kuppalli and **A.L. Rasmussen**. *A glimpse into the eye of the COVID-19 cytokine storm. EBioMedicine* 55: 102789. May 7, 2020. PMID: 32388462.

A. Price, A. Okumura, E. Haddock, F. Feldmann, K. Meade-White, P. Sharma, M. Artami, W.I. Lipkin, D.W. Threadgill, H. Feldmann, **A.L. Rasmussen**. *Transcriptional Correlates of Tolerance and Lethality in Mice Predict Ebola Virus Disease Patient Outcomes. Cell Reports* 30(6): 1702-1713. Feb 11, 2020. PMID: 32049004.

A.G. Goodman and **A.L. Rasmussen**. *Host-Pathogen Interactions During Arbovirus Infection. Frontiers in Cellular and Infection Microbiology* 9:77. March 26, 2019. PMID: 30972308.

A. Price, A. Caciula, C. Guo, B. Lee, J. Morrison, A. Rasmussen, W.I. Lipkin, and K. Jain**.** *DEvis: An R package for aggregation and visualization of differential expression data. BMC Bioinformatics* 20(1): 110. March 4, 2019. PMID: 30832568.

**A.L. Rasmussen.** *Host Factors Involved in Ebola Virus Replication. Current Topics in Microbiology and Immunology* 419: 113-150. 2018. PMID: 28710692

J. Olejnik, A. Forero, L.R. Deflube, A.J. Hume, W.A. Manhart, A. Nishida, A. Marzi, M.G. Katze, H. Ebihara, **A.L. Rasmussen**, and E. Mühlberger. *Ebolaviruses associated with differential pathogenicity induce distinct host responses in human macrophages. Journal of Virology* 91(11): pii e00179-17. June 1, 2017. PMID: 28331091.

M. Dutta, S.J. Robertson, A. Okumura, D.P. Scott, J. Chang, J.M. Weiss, G.L. Sturdevant, F. Feldmann, E. Haddock, A.I. Chiramel, S.S. Ponia, J.D. Dougherty, M.G. Katze, **A.L. Rasmussen**, and S.M. Best. *A Systems Approach Reveals MAVS Signaling in Myeloid Cells as Critical for Resistance to Ebola Virus in Murine Models of Infection. Cell Reports* 18(3): 816-829. January 17, 2017. PMID: 28099857. PMCID: PMC5289750.

**A.L. Rasmussen.** *Host Factors in Ebola Infection. Annual Reviews in Genetics and Genomics* 17: 333-351. August 31, 2016. PMID: 27147086.

**A.L. Rasmussen** and M.G. Katze. *Genomic Signatures of Emerging Viruses: A New Era of Systems Epidemiology. Cell Host and Microbe* 19(5): 611-618. May 11, 2016. PMID: 27173929.

**A.L. Rasmussen.** *Probing the Viromic Frontiers. mBio* 6(6): e01767-15. November 10, 2015. PMID: 26556279. PMCID: PMC4659475.

A. Okumura, **A.L. Rasmussen**, P. Halfmann, F. Feldmann, A. Yoshimura, H. Feldmann, Y. Kawaoka, R.N. Harty, and M.G. Katze. ***Suppressor of Cytokine Signaling 3 Is an Inducible Host Factor That Regulates Virus Egress during Ebola Virus Infection.*** *Journal of Virology* 89(20): 10399-406. October 15, 2015. PMID: 26246577. PMCID: PMC4580175.

K.J. Lubick, S.J. Robertson, K.L. McNally, B.A. Freedman, **A.L. Rasmussen**, R.T. Taylor, A.D. Walts, S. Tsuruda, M. Sakai, M. Ishizuka, E.F. Boer, E.C. Foster, A.I. Chiramel, C.B. Addison, R. Green, D.L. Kastner, M.G. Katze, S.M. Holland, A. Forlino, A.F. Freeman, M. Boehm, K. Yoshii, and S.M. Best. ***Flavivirus Antagonism of Type I Interferon Signaling Reveals Prolidase as a Regulator of IFNAR1 Surface Expression.*** *Cell Host Microbe* 18(1): 61-74. July 8, 2015. PMID: 26159719. PMCID: PMC4505794.

C.R. Green, P. Cowan, R. Elk, K.M. O'Neil, and **A.L. Rasmussen**. ***National Institutes of Health Pathways to Prevention Workshop: advancing the research on myalgic encephalomyelitis/chronic fatigue syndrome.*** *Annals of Internal Medicine* 162:841-50. June 16, 2015. PMID: 26075757.

**A.L. Rasmussen,** N. Tchitchek, D. Safronetz, V.S. Carter, C.M. Williams, E. Haddock, M.J. Korth, H. Feldmann, and M.G. Katze.  ***Delayed inflammatory and cell death responses are associated with reduced pathogenicity in Lujo virus-infected cynomolgous macaques.*** *Journal of Virology*: 89(5): 2543-52. March 1, 2015. PMID: 25520505. PMCID: PMC4325716.

**A.L. Rasmussen,** A. Okumura, M.T. Ferris, R. Green, F. Feldmann, S.M. Kelly, D.P. Scott, D. Safronetz, E. Haddock, R. LaCasse, M.J. Thomas, P. Sova, V.S. Carter, D.R. Miller, G.D. Shaw, M.J. Korth, M.T. Heise, R.S. Baric, F.P.M. de Villena, H. Feldmann, and M.G. Katze.  ***Host genetic diversity enables Ebola hemorrhagic fever pathogenesis and resistance.*** *Science* 346(6212): 987-91.  November 21, 2014. PMID: 25359852.  PMCID: PMC4241145.

N. Tchitchek, D. Safronetz, **A.L. Rasmussen**, C. Martens, K. Virtaneva, S.F. Porcella, H. Feldmann, H. Ebihara*, and M.G. Katze*.  ***Assembly of an Expressed Sequence Tag Library Derived from Syrian Hamster (Mesocricetus auratus) Organs***. *PLoS ONE* 9(11):e112617.  November 14, 2014.  PMID: 25398096.  PMCID: PMC4232415.

D. Falzarano, E. de Wit, F. Feldmann, **A. L. Rasmussen**, A. Okumura, X. Peng, M.J. Thomas, N. van Doremalen, E. Haddock, L. Nagy, R. LaCasse, T. Liu, J. Zhu, J.S. McLellan, D.P. Scott, M.G. Katze, H. Feldmann, and V.J. Munster.  ***Infection with MERS-CoV causes lethal pneumonia in the common marmoset.*** *PLoS Pathogens*.  10(8): e1004250. August 21, 2014.  PMID: 25144235.  PMCID: PMC4140844.

E. de Wit, **A.L. Rasmussen**, F. Feldmann, T. Bushmaker, C. Martellaro, E. Haddock, A. Okumura, S.C. Proll, J. Chang, D. Gardner, M.G. Katze, V.J. Munster, and H. Feldmann. ***Influenza virus A/Anhui/1/2013 (H7N9) replicates efficiently in the upper and lower***

*respiratory tract of cynomolgus macaques.* *mBio* 5(4): e01331-14. August 12, 2014. PMID: 25118237.  PMCID: PMC4145683.

D. Falzarano, E. de Wit, **A.L. Rasmussen**, F. Feldmann, A. Okumura, D.P. Scott, D. Brining, T. Bushmaker, C. Martellaro, A.G. Benecke, M.G. Katze, V.J. Munster, and H. Feldmann. ***Combined interferon-ɑ2b and ribavirin treatment of rhesus macaques improves clinical outcome following infection with Middle East respiratory syndrome coronavirus (MERS-CoV).*** *Nature Medicine* 19(10): 1313-1317.  October 2013. PMID: 24013700. PMCID: PMC4093902.

E. de Wit, **A.L. Rasmussen**, D. Falzarano, T. Bushmaker, F. Feldmann, D.L. Brining, E.R. Fischer, C. Martellaro, A. Okumura, J. Chang, D. Scott, A.G. Benecke, M.G. Katze, H. Feldmann, and V.J. Munster.  ***Middle East respiratory syndrome coronavirus (MERS-CoV) causes transient lower respiratory tract infection in rhesus macaques.*** *Proceedings of the National Academy of Sciences* 110(41):16598-603.  October 8, 2013. PMID: 24062443. PMCID: PMC3799368.

**A.L. Rasmussen\***, I.-M. Wang\*, M.C. Shuhart\*, S.C. Proll, Y. He, R. Cristescu, C. Roberts, V.S. Carter, C.M. Williams, D.L. Diamond, J.T. Bryan, R. Ulrich, M.J. Korth, L.V. Thomassen, and M.G. Katze.  ***Chronic Immune Activation is a Distinguishing Feature of Liver and PBMC Gene Signatures from HCV/HIV Coinfected Patients and May Contribute to Hepatic Fibrogenesis.*** *Virology* 430(1): 43-52.  August 15, 2012.  PMID: 22608059.  PMCID: PMC3371131.

**A.L. Rasmussen\***, N. Tchitchek\*, N.J. Susnow, A.L. Krasnoselsky, D.L. Diamond, M.M. Yeh, S.C. Proll, M.J. Korth, K.-A. Walters, S. Lederer, A.M. Larson, R. L. Carithers Jr., A. Benecke, and M.G. Katze.  ***Early Transcriptional Programming Links Progression to Hepatitis C Virus-Induced Severe Liver Disease in Transplant Patients.*** *Hepatology* 56(1): 17-27. July 2012. PMID: 22278598. PMCID: PMC3349763.

D.L. Diamond, A.L. Krasnoselsky, K. E. Burnum, M.E. Monroe, B. Webb-Robertson, J.E. McDermott, M.M. Yeh, S. Strom, S.C. Proll, S.E. Belisle, **A.L. Rasmussen**, K. Walters, J.M. Jacobs, M.A. Gritsenko, D.G. Camp, R. Bhattacharya, J.D. Perkins, R.L. Carithers Jr., I.W. Liou, A.M. Larson, K.M. Waters, R.D. Smith, and M.G. Katze.  ***Proteome and Computational Analyses Reveal New Insights into the Mechanisms of Hepatitis C Virus-Mediated Liver Disease.*** *Hepatology* 56(1): 28-38. July 2012. PMID: 22331615. PMCID: PMC3387320.

J.E. McDermott, D.L. Diamond, C. Corley, **A.L. Rasmussen**, M.G. Katze, and K.M. Waters. ***Topological Analysis of Protein Co-Abundance Networks Identifies Novel Host Targets Important for HCV Infection and Pathogenesis.*** *BMC Systems Biology* 6: 28, April 30, 2012. PMID: 22546282.  PMCID: PMC3383540.

**A.L. Rasmussen**, D.L. Diamond, J.E. McDermott, X. Gao, T.O. Metz, M.M. Matzke, V.S. Carter, S.E. Belisle, M.J. Korth, K.M. Waters, R.D. Smith, and M.G. Katze.  ***Systems Virology Identifies a Mitochondrial Fatty Acid Oxidation Enzyme, DCI, Required for***

***HCV Replication and Likely Pathogenesis.*** *Journal of Virology*, 85(22): 11646-11654. 15 November 2011. PMID: 21917952.  PMCID: PMC3209311.

**A.L. Rasmussen** and V.R. Racaniello, ***Selection of Rhinovirus 1A Variants Adapted for Growth in Mouse Lung Epithelial Cells.*** *Virology* 420(2): 82-88, 25 November 2011. PMID: 21943827.  PMCID: PMC3205939.

M. Bonyhadi, M. Frohlich, **A. Rasmussen**, C. Ferrand, L. Grosmaire, E. Robinet, J. Leis, R.T. Maziarz, P. Tiberghien, and R.J. Berenson.  **In vitro *engagement of CD3 and CD28 Corrects T Cell Defects in Chronic Lymphocytic Leukemia.*** *Journal of Immunology* 174(4): 2366-2375.  15 Feb 2005. PMID: 15699173.

*Authors contributed equally to this work

**C. List of Documents Considered**

Case-Specific Documents

US District Court of Colorado Civil Action No: 1:20-cv-001470, Monarch Casino & Resort v. Affiliated FM Insurance Company, Complaint and Jury Demand
Document 36-1, AFM Policy No. ES130, Account No. 1-37981
Traffic counts and safety measures at Monarch Properties
Monarch Properties head counts
COVID case counts at Atlantis Reno
COVID case counts at Monarch Black Hawk

Cited References

1.  CDC. Scientific Brief: SARS-CoV-2 Transmission. *Centers for Disease Control and Prevention* https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html (2021).

2.  Edwards, D. A. *et al.* Exhaled aerosol increases with COVID-19 infection, age, and obesity. *PNAS* **118**, (2021).

3.  van Kampen, J. J. A. *et al.* Duration and key determinants of infectious virus shedding in hospitalized patients with coronavirus disease-2019 (COVID-19). *Nature Communications* **12**, 267 (2021).

4.  Cevik, M. *et al.* SARS-CoV-2, SARS-CoV, and MERS-CoV viral load dynamics, duration of viral shedding, and infectiousness: a systematic review and meta-analysis. *The Lancet Microbe* **2**, E13–E22 (2021).

5.  Lednicky, J. A. *et al.* Viable SARS-CoV-2 in the air of a hospital room with COVID-19 patients. *International Journal of Infectious Diseases* **0**, (2020).

6.  Ong, S. W. X. *et al.* Air, Surface Environmental, and Personal Protective Equipment Contamination by Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) from a Symptomatic Patient. *JAMA - Journal of the American Medical Association* **323**, 1610–1612 (2020).

7.  Chia, P. Y. *et al.* Detection of air and surface contamination by SARS-CoV-2 in hospital rooms of infected patients. *Nature Communications* **11**, 2800–2800 (2020).

8.  Wei, L. *et al.* Asymptomatic COVID-19 Patients Can Contaminate Their Surroundings: an Environment Sampling Study. *mSphere* **5**, (2020).

9.  Wu, S. *et al.* Environmental contamination by SARS-CoV-2 in a designated hospital for coronavirus disease 2019. *American Journal of Infection Control* **48**, 910–914 (2020).

10. Guo, Z. D. *et al.* Aerosol and Surface Distribution of Severe Acute Respiratory Syndrome Coronavirus 2 in Hospital Wards, Wuhan, China, 2020. *Emerging Infectious Diseases* **26**, 1586–1591 (2020).

11. Ye, G. *et al.* Environmental contamination of SARS-CoV-2 in healthcare premises. *Journal of Infection* **81**, e1–e5 (2020).

12. Cheng, Y. *et al.* Face masks effectively limit the probability of SARS-CoV-2 transmission. *Science* (2021) doi:10.1126/science.abg6296.

13. Jia, Y. *et al.* Analysis on the risk of respiratory virus transmission by air conditioning system operation based on experimental evidence. *Environ Sci Pollut Res Int* (2021) doi:10.1007/s11356-021-14495-0.

14. Shen, J., Kong, M., Dong, B., Birnkrant, M. J. & Zhang, J. A systematic approach to estimating the effectiveness of multi-scale IAQ strategies for reducing the risk of airborne infection of SARS-CoV-2. *Build Environ* **200**, 107926 (2021).

15. Allen, J. G. & Ibrahim, A. M. Indoor Air Changes and Potential Implications for SARS-CoV-2 Transmission. *JAMA* **325**, 2112 (2021).

16. CDC. Choosing Safer Activities. *Centers for Disease Control and Prevention* https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/participate-in-activities.html (2020).

17. Yamagishi, T., Kamiya, H., Kakimoto, K., Suzuki, M. & Wakita, T. Descriptive study of COVID-19 outbreak among passengers and crew on Diamond Princess cruise ship, Yokohama Port, Japan, 20 January to 9 February 2020. *Eurosurveillance* **25**, 2000272 (2020).

18. Moriarty, L. F. *et al.* Public Health Responses to COVID-19 Outbreaks on Cruise Ships — Worldwide, February–March 2020. *MMWR. Morbidity and Mortality Weekly Report* **69**, 347–352 (2020).

19. Xu, P. *et al.* Lack of cross-transmission of SARS-CoV-2 between passenger's cabins on the Diamond Princess cruise ship. *Build Environ* **198**, 107839 (2021).

20. Plucinski, M. M. *et al.* Coronavirus Disease 2019 (COVID-19) in Americans Aboard the Diamond Princess Cruise Ship. *Clinical Infectious Diseases* **72**, e448–e457 (2021).

21. Azimi, P., Keshavarz, Z., Laurent, J. G. C., Stephens, B. & Allen, J. G. Mechanistic transmission modeling of COVID-19 on the Diamond Princess cruise ship demonstrates the importance of aerosol transmission. *PNAS* **118**, (2021).

22. Riddell, S., Goldie, S., Hill, A., Eagles, D. & Drew, T. W. The effect of temperature on persistence of SARS-CoV-2 on common surfaces. *Virology Journal* **17**, 145 (2020).

23. Pastorino, B., Touret, F., Gilles, M., de Lamballerie, X. & Charrel, R. N. Prolonged Infectivity of SARS-CoV-2 in Fomites. *Emerging infectious diseases* vol. 26 (2020).

24. Van Doremalen, N. *et al.* Aerosol and surface stability of SARS-CoV-2 as compared with SARS-CoV-1. *New England Journal of Medicine* vol. 382 1564–1567 (2020).

25. Chin, A. W. H. *et al.* Stability of SARS-CoV-2 in different environmental conditions. *The Lancet Microbe* **1**, e10 (2020).

26. Morris, D. H. *et al.* The effect of temperature and humidity on the stability of SARS-CoV-2 and other enveloped viruses. *bioRxiv* (2020).

27. Biryukov, J. *et al.* Increasing temperature and relative humidity accelerates inactivation of SARS-COV-2 on surfaces. *mSphere* **5**, (2020).

28. Stadnytskyi, V., Bax, C. E., Bax, A. & Anfinrud, P. The airborne lifetime of small speech droplets and their potential importance in SARS-CoV-2 transmission. *Proceedings of the National Academy of Sciences of the United States of America* **117**, 11875–11877 (2020).

29. CDC. Science Brief: SARS-CoV-2 and Surface (Fomite) Transmission for Indoor Community Environments. *Centers for Disease Control and Prevention* https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html (2021).

30. Chan, J. F.-W. *et al.* Simulation of the Clinical and Pathological Manifestations of Coronavirus Disease 2019 (COVID-19) in a Golden Syrian Hamster Model: Implications for Disease Pathogenesis and Transmissibility. *Clinical Infectious Diseases* **71**, 2428–2446 (2020).

31. Sia, S. F. *et al.* Pathogenesis and transmission of SARS-CoV-2 in golden hamsters. *Nature* **583**, 834–838 (2020).

32. Richard, M. *et al.* SARS-CoV-2 is transmitted via contact and via the air between ferrets. *Nature Communications* **11**, 1–6 (2020).

33. Imai, M. *et al.* Syrian hamsters as a small animal model for SARS-CoV-2 infection and countermeasure development. *PNAS* **117**, 16587–16595 (2020).

34. Halfmann, P. J. *et al.* Transmission of SARS-CoV-2 in Domestic Cats. *The New England journal of medicine* **383**, 592–594 (2020).

35. Kim, Y.-I. *et al.* Infection and Rapid Transmission of SARS-CoV-2 in Ferrets. *Cell Host & Microbe* **27**, 704-709.e2 (2020).

36. Shi, J. *et al.* Susceptibility of ferrets, cats, dogs, and other domesticated animals to SARS–coronavirus 2. *Science* **368**, 1016–1020 (2020).

37. Kutter, J. S. *et al.* SARS-CoV and SARS-CoV-2 are transmitted through the air between ferrets over more than one meter distance. *Nature Communications* **12**, 1653 (2021).

38. Port, J. R. *et al.* SARS-CoV-2 disease severity and transmission efficiency is increased for airborne but not fomite exposure in Syrian hamsters. *bioRxiv* 2020.12.28.424565 (2020) doi:10.1101/2020.12.28.424565.

39. Rasmussen, A. L. & Popescu, S. V. SARS-CoV-2 transmission without symptoms. *Science* **371**, 1206–1207 (2021).

26

40. Li, R. *et al.* Substantial undocumented infection facilitates the rapid dissemination of novel coronavirus (SARS-CoV-2). *Science* **368**, 489–493 (2020).

41. He, X. *et al.* Temporal dynamics in viral shedding and transmissibility of COVID-19. *Nature Medicine* **26**, 672–675 (2020).

42. Wölfel, R. *et al.* Virological assessment of hospitalized patients with COVID-2019. *Nature* **581**, 465–469 (2020).

43. Wei, L. *et al.* Asymptomatic COVID-19 Patients Can Contaminate Their Surroundings: an Environment Sampling Study. *mSphere* **5**, (2020).

44. Richard, M. *et al.* SARS-CoV-2 is transmitted via contact and via the air between ferrets. *Nature Communications* **11**, 1–6 (2020).

45. Halfmann, P. J. *et al.* Transmission of SARS-CoV-2 in Domestic Cats. *The New England journal of medicine* vol. 383 592–594 (2020).

46. Shen, Y. *et al.* Community Outbreak Investigation of SARS-CoV-2 Transmission among Bus Riders in Eastern China. *JAMA Internal Medicine* (2020) doi:10.1001/jamainternmed.2020.5225.

47. Choi, E. M. *et al.* In-Flight Transmission of Severe Acute Respiratory Syndrome Coronavirus 2. *Emerging Infectious Diseases* **26**, (2020).

48. Eldin, C., Lagier, J. C., Mailhe, M. & Gautret, P. Probable aircraft transmission of Covid-19 in-flight from the Central African Republic to France. *Travel Medicine and Infectious Disease* vol. 35 101643 (2020).

49. Li, Y. *et al.* Evidence for probable aerosol transmission of SARS-CoV-2 in a poorly ventilated restaurant. *medRxiv* 2020.04.16.20067728 (2020) doi:10.1101/2020.04.16.20067728.

50. Kwon, K.-S. *et al.* Evidence of Long-Distance Droplet Transmission of SARS-CoV-2 by Direct Air Flow in a Restaurant in Korea. *Journal of Korean Medical Science* **35**, (2020).

51. Kim, T. Work Environment Surrounding COVID-19 Outbreak in Call Center, South Korea. *Emerging infectious diseases* vol. 26 2533–2534 (2020).

52. Park, S. Y. *et al.* Coronavirus disease outbreak in call center, South Korea. *Emerging Infectious Diseases* **26**, 1666–1670 (2020).

53. Hamner, L. *et al.* High SARS-CoV-2 Attack Rate Following Exposure at a Choir Practice — Skagit County, Washington, March 2020. *MMWR. Morbidity and Mortality Weekly Report* **69**, 606–610 (2020).

54. Addetia, A. *et al.* Neutralizing antibodies correlate with protection from SARS-CoV-2 in humans during a 1 fishery vessel outbreak with high attack rate 2 3. *medRxiv* 2020.08.13.20173161 (2020) doi:10.1101/2020.08.13.20173161.

55. Szablewski, C. M. *et al.* SARS-CoV-2 Transmission and Infection Among Attendees of an Overnight Camp — Georgia, June 2020. *MMWR. Morbidity and Mortality Weekly Report* **69**, 1023–1025 (2020).

56. de Man, P. *et al.* Outbreak of COVID-19 in a nursing home associated with aerosol transmission as a result of inadequate ventilation. *Clinical Infectious Diseases* (2020) doi:10.1093/cid/ciaa1270.

57. Liu, Y. *et al.* Aerodynamic analysis of SARS-CoV-2 in two Wuhan hospitals. *Nature* **582**, 557–560 (2020).

58. Nissen, K. *et al.* Long-distance airborne dispersal of SARS-CoV-2 in COVID-19 wards. *Scientific Reports* **10**, 19589 (2020).

59. Jang, S., Han, S. H. & Rhee, J. Y. Cluster of Coronavirus disease associated with fitness dance classes, South Korea. *Emerging Infectious Diseases* **26**, 1917–1920 (2020).

60. Fears, A. C. *et al.* Persistence of Severe Acute Respiratory Syndrome Coronavirus 2 in Aerosol Suspensions. *Emerging infectious diseases* **26**, (2020).

61. Lednicky, J. A. *et al.* Viable SARS-CoV-2 in the air of a hospital room with COVID-19 patients. *International Journal of Infectious Diseases* **0**, (2020).

Talking Points on the 2019 Novel Coronavirus (2019-nCoV)

"2019 Novel Coronavirus (2019-nCoV) is a virus (more specifically, a coronavirus) identified as the cause of an outbreak of respiratory illness first detected in Wuhan, China. Early on, many of the patients in the outbreak in Wuhan, China reportedly had some link to a large seafood and animal market, suggesting animal-to-person spread. However, a growing number of patients reportedly have not had exposure to animal markets, indicating person-to-person spread is occurring. At this time, it's unclear how easily or sustainably this virus is spreading between people.  The latest situation summary updates are available on CDC's web page 2019 Novel Coronavirus, Wuhan, China."[1]

Several of our clients have inquired as to whether there is coverage for losses they have or expect to incur as a result of the virus, which has spread outside of China. As one might expect, we have a wide range of clients who may be affected in a variety of ways by this outbreak. This document will not deal with all the issues associated with this matter, but will be helpful in providing responses to basic questions as it relates to the coverage provided by our policies.

The standard FM Global Advantage and AFM proVision forms provide a specific coverage for Communicable Disease. The Advantage policy provides Communicable Disease Response under Property Damage and Interruption by Communicable Disease under Time Element. The proVision policy provides coverage for Communicable Disease – Property Damage and Communicable Disease – Business Interruption. This memo addresses the standard policy language (cited below).

**Lead in policy language policy language is noted below:**
<u>Property Damage</u>
   The 2019Advantage Policy states in part:
      If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such location is limited, restricted or prohibited by:
      1) an order of an authorized governmental agency regulating the actual not suspected presence of communicable disease; or
      2) a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,

   The proVision states:
      If a **described location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **described location** is limited, restricted or prohibited by:
        **a)** An order of an authorized governmental agency regulating or as result of such presence of **communicable disease**; or
        **b)** A decision of an Officer of the Insured as a result of such presence of **communicable disease**

This same initial lead in language also appears under the Advantage Time Element coverage and the proVision Business Interruption coverage.

Q. What is the trigger of coverage for Property Damage?

    A. Under each policy there must be the <u>actual presence</u> of a **communicable disease** at a location owned, leased or rented by the Insured <u>and</u> the access must be limited by either 1) or 2) under the Advantage, or a) or b) under proVision

Q. When does this coverage apply?

    A.  Advantage Policy – under both Property Damage and Time Element each state:
        • This Additional Coverage will apply when access to such location is limited, restricted or prohibited in excess of 48 hours
    A.  AFM proVision Policy - under both Property Damage and Business Interruption each state:
        • This coverage is subject to the Qualifying Period in the Declarations section of this Policy

Q. Would an employee at a **location** who is affected with the **communicable disease** be considered the "actual presence" of a **communicable disease**?

---

[1] https://www.cdc.gov/coronavirus/2019-ncov/about/index.html

AFM0000288

A. Yes - if it can be confirmed the employee actually has the **communicable disease** and that the presence of the **communicable disease** is the basis for the decision limiting access as noted in sub-sections 1) and 2) under the Advantage Policy or a) and b) under proVision Policy.

Q. How can we determine whether an employee has the **communicable disease**

A. In some jurisdictions, access to medical records is not possible without employee consent. However, the Insured can ask the employee for the necessary medical diagnosis.

Q. If an Insured closes one or more locations because they suspect the presence of the **communicable disease** or does so in an abundance of caution, would that trigger coverage.

A. No. Coverage is only triggered if there is the actual presence of a **communicable disease.**

Q. What deductible would apply in the event of a covered loss?

A. If a coverage-specific deductible is not specified, the largest applicable deductible would apply. For example, if the location deductible is $1,000,000 combined and the All Other Loss deductible is $250,000, the $1,000,000 would apply.

Q. Would an outbreak of a different virus be considered part of the same occurrence?

A. No

Q. Does coverage under Civil or Military Authority apply?

A. No
The Advantage form states:
"This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to the insured location provided such order is the direct result of physical damage of the type insured at the insured location or within five statute miles/eight kilometres of it…."

The proVision form states:
"This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability if an order of civil or military authority prohibits access to a **location** provided such order is the direct result of physical damage of the type insured at a **location** or within five (5) statute miles of it…"

A virus will typically not cause physical damage. Under either policy, the presence of a communicable disease does not constitute physical damage and is not of the type insured against as a virus falls within the definition of **contamination,** which is excluded.

Q. Does coverage under Contingent Time Element Extended (Advantage) or Supply Chain (ProVision) or Ingress/Egress apply?

A. No
These coverages require physical loss or damage to property of the type insured under either policy. The presence of a communicable disease does not constitute physical damage and is not of the type insured against as a virus falls within the definition of **contamination,** which is excluded.

Q. Is there any activity to consider prior to confirming coverage or issuing a payment?

A. Yes - keep in mind that most policies issued have a specific limit for this coverage and an annual aggregate applies. Check with the Claims Manager Written as well as the DSGA Written prior to confirming coverage and prior to issuing any payment to determine the status of the annual aggregate.

While the FM Global Advantage offers some of the broadest property coverage available, there are still events for which there may be no coverage. The Advantage and AFM policies insure against physical damage and require that there be insured physical loss or damage to property before its coverages become available. The Communicable Disease coverage provides for a specific trigger of coverage under these Additional Coverages. If there is a report of loss, FM Global stands ready to provide all the coverage available under the terms and conditions of its policies.

**EXPERT WITNESS REPORT**

Joseph Lewnard, PhD

19 July, 2021

**SCOPE OF ENGAGEMENT**

I was engaged by Levin Sitcoff P.C. in the case Monarch Casino & Resort, Inc. v. Affiliated FM Insurance Company, No 1:20-cv-001470-RMR (D.Colo. 2020), which is currently pending in the District of Colorado. I was asked to give opinions within my area of expertise, epidemiology, on the following questions:

1. *From a statistical standpoint, whether ≥1 individual(s) with SARS-CoV-2 infection was/were on site at the Monarch Casino, Black Hawk, Colorado ("Monarch") and the Atlantis Casino, Reno, Las Vegas ("Atlantis") during February-March of 2020, before COVID-19 related closures took effect?*

2. *From a statistical standpoint, whether ≥1 individual(s) with SARS-CoV-2 infection was/were on site at Monarch and Atlantis following re-opening of the casinos in June, 2020?*

I am being compensated $750/hr. for my work on this report and $3,000/day for travel time, if applicable, for deposition and trial testimony.

In answering these questions, my opinions are based on my knowledge, skill, training, education, and materials considered (identified herein). I hold the opinions stated below to a reasonable degree of scientific certainty. The materials I considered in connection with this report are identified in the footnotes herein.

**SUMMARY OF QUALIFICATIONS**

I am a tenure-track Assistant Professor of Epidemiology at the School of Public Health of the University of California, Berkeley, holding secondary affiliations in the Division of Infectious Diseases & Vaccinology and the Center for Computational Biology (College of Engineering). I earned a PhD in Epidemiology of Microbial Diseases from Yale University in 2017 and held appointments as a postdoctoral fellow, and later Research Associate, at Harvard TH Chan School of Public Health in the Center for Communicable Disease Dynamics.

I study the transmission dynamics and control of infectious disease agents. My work has centrally involved the development and application of mathematical and statistical modeling methods to address questions in this area, with a focus on respiratory pathogens including influenza and *Streptococcus pneumoniae*. I have led studies published in pre-eminent scientific and medical journals including, among others, *Nature*, *Science*, *JAMA*, *The BMJ*, and *Proceedings of the National Academy of Sciences*, and my research has received extramural support from the National Institutes of Health (NIH), The Bill & Melinda Gates Foundation, Pfizer, Merck, the Wellcome Trust, the World Health Organization, the US-Israel Binational Science Foundation, and other funders. I serve on the editorial board of the scientific journal *eLife* and have served as a grant reviewer for NIH and other funding agencies. I have received numerous professional accolades including, in 2021, the Emerging Leaders in Health and Medicine fellowship from the National Academy of Medicine and the Early Career Research Excellence Award from the Association of Schools and Programs of Public Health, and in 2019 was named a Kavli Fellow of the US National Academy of Sciences.

Since early 2020 I have devoted substantial research attention to SARS-CoV-2 epidemiology through quantitative, field-based, and laboratory research. Significant recent outputs of this work

listed below include: major studies of COVID-19 epidemiology in India, including the largest (to date) contact tracing study quantifying risk of spread associated with differing types of interactions (A), and assessments of mortality under-reporting (B); a high-profile study of the descriptive epidemiology of the first epidemic wave on the US west coast, based on comprehensive health records of >9 million individuals in a comprehensive care cohort (C); assessments of vaccine effectiveness (D) and causal inference methods for such studies in the context of COVID-19 (E); an observational study of SARS-CoV-2 infection in a high-risk farmworker population (F and G); and (H-J) authoritative reviews summarizing the state of knowledge regarding the scientific and bioethical principles around non-pharmaceutical interventions to mitigate COVID-19 burden, and methods for modeling spread. My full CV is appended. First and last (senior/corresponding) author positions signify the individuals making the greatest contributions to each paper.

A. Laxminarayn R, Wahl B, Dudala SR, Gopal K, Mohan C, Neelima S, Jawahar. Reddy KS, Radhakrishnan J, **Lewnard JA**. Epidemiology and transmission dynamics of COVID-19 in two Indian states. *Science* 2020; doi:10.1126/science.abd7672.

B. Laxminarayan R, Mohan BC, Vinay TG, Kumar KVA, Wahl B, **Lewnard JA**. SARS-CoV-2 infection and mortality during the first epidemic wave in Madurai, South India: a prospective, active surveillance study. *Lancet Infect Dis* 2021 (in press).

C. **Lewnard JA**, Liu VX, Jackson ML, Schmidt MA, Jewell BL, Flores JP, Jentz C, Northrup GR, Mahmud A, Reingold AL, Petersen M, Jewell NP, Young S, Bellows J. Incidence, clinical outcomes, and transmission dynamics of severe coronavirus disease 2019 in California and Washington: prospective cohort study. *BMJ* 2020; doi:10.1136/bmj.m1923.

D. Andrejko K, Pry JM, Myers JF, Jewell NP, Openshaw J, Watt J, Jain S, **Lewnard JA**. Prevention of COVID-19 by mRNA-based vaccines within the general population of

California. *Clin Infect Dis* 2021 (in press). Pre-print from medRxiv: doi:10.1101/2021.04.08.21255135.

E. **Lewnard JA**, Patel MM, Jewell NP, Verani JR, Kobayashi M, Tenforde MW, Dean NE, Cowling BJ, Lopman BA. Theoretical framework for retrospective studies of the effectiveness of SARS-CoV-2 vaccines. *Epidemiology* 2021; 32:508–17. doi:10.1097/EDE.0000000000001366.

F. **Lewnard JA**, Mora AM, Nkwocha O, Kogut K, Rauch SA, Morga N, Hernandez S, Wong MP, Huen K, Andrejko K, Jewell NP, Parra KL, Holland N, Harris E, Cuevas M, Eskenazi B, CHAMACOS-Project-19 Study Team. Prevalence and clinical profile of SARS-CoV-2 infection among farmworkers: California, June–November, 2020. *Emerg Infect Dis* 2021; doi:10.3201/eid2705.204949

G. Mora AM, **Lewnard JA**, Kogut K, Rauch SA, Morga N, Hernandez S, Wong MP, Huen K, Chang C, Jewell NP, Holland N, Harris E, Cuevas M, Eskenazi B. Risk factors for SARS-CoV-2 infection among farmworkers in Monterey County, California. *JAMA Netw Open* 2021 (in press). Pre-print from *medRxiv*: doi:10.1101/2021.02.01.21250963

H. **Lewnard JA**, Lo NC. Scientific and ethical basis for social-distancing interventions against COVID-19. *Lancet Infect Dis* 2020; doi:10.1016/S1473-3099(20)30190-0.

I. Jewell NP, **Lewnard JA**, Jewell BL. Predictive mathematical models of the COVID-19. Pandemic: underlying principles and value of projections. *JAMA* 2020; doi:10.1001/jama.2020.6585.

J. Jewell NP, **Lewnard JA**, Jewell BL. Caution warranted: using the Institute for Health Metrics and Evaluation (IHME) model for predicting the course of the COVID-19 pandemic. *Ann Intern Med* 2020; doi:10.7326/M20-1565.

**SUMMARY OF OPINIONS**

It is my professional opinion that:

1.  Even under conservative assumptions about the background prevalence of SARS-CoV-2 infection during early 2020, there is greater than 99% probability that ≥1 individual with SARS-CoV-2 infection was present at each of the casinos during February-March of 2020.

2.  Following re-opening of the casinos, with greater than 99% probability, ≥1 individual with SARS-CoV-2 infection was present at each casino during each month of the period from June, 2020 to February, 2021.

**FULL OPINIONS WITH SUPPORT**

**1: First opinion**

*Even under conservative assumptions about the background prevalence of SARS-CoV-2 infection during early 2020, there is greater than 99% probability that ≥1 individual with SARS-CoV-2 infection was present at each of the casinos during February-March of 2020.*

*1a: Methods*

I was provided data on the numbers of staff and carded gaming guests present at each casino, daily, over the period of February 1, 2020 to 3 June, 2021. I am aware that these data likely represent an undercount of the true total number of guests present, as individuals could enter the premises to visit, dine, or make other use of the facilities without registering as carded gaming guests; thus, I interpret the count provided as a lower bound of total guests who were present on-site and note the likelihood of introduction of SARS-CoV-2 infection by guests is thus higher than my estimates indicate.

The quantitative framework of my analysis is as follows: Consider that a proportion $p$ (with $0 < p < 1$) of individuals who may enter a casino, on a given day, are infected with SARS-CoV-2; thus $p$ designates the probability that each individual entering the casino on a given day will introduce infection to the premises, by virtue of being a case, and its complement $1 - p$ is the probability that each individual is not a case and therefore does not introduce SARS-CoV-2 to the premises. The probability that nobody, among a total of $n$ individuals, is infected is the union of each individual not being a case, and may be computed as $(1 - p)^n$. The probability of at least one case, among $n$ individuals, is thus $1 - (1 - p)^n$.

Meaningful COVID-19 epidemiologic data is non-existent for all United States settings prior to late March or early April of 2020, owing to well-documented shortcomings in access to and availability of testing and a lack of high-quality protocols for surveillance and reporting of cases. I therefore considered, as conservative inputs for the prevalence of infection in the community, values of 0.025%, 0.05%, and 0.1%. These values for the instantaneous background prevalence of SARS-CoV-2 infection in the community provided a direct input for the likelihood (*p*) that each guest and staff member would be infected on a given day.

My consideration of this range, as a conservative lower-bound for true prevalence of SARS-CoV-2 infection over the period of February and March, 2020, is informed by the following evidence from the epidemiologic literature: Barret et al. estimated 0.4% prevalence in a general (non-healthcare worker) sub-sample of individuals in New Jersey from March 24-April 7,[1] and Fassett et al. estimated 0.45% prevalence among pregnant women in Southern California;[2] samples of pregnant women have often been used as "sentinels" for epidemiological surveillance in the community during outpatient antenatal care visits. Monitoring asymptomatic travelers repatriated to Greece from the UK, Spain, and Turkey between March 20-25, Lytras estimated prevalence ranging from 3.6-6.3%,[3] roughly 3 orders of magnitude higher than our inputs. In a general population sample in Indiana from April 25-29, Menachemi et al. estimated a prevalence of 1.74%.[4] Last, after successful implementation of mitigation measures, Riley et al. estimated that prevalence of infection in a general population sample in the UK reached 0.13%, closer to (although still substantially higher than) the range I consider.[5] While none of these studies directly measure prevalence in the exact place and time of the communities immediately

---

[1] Barrett et al., *medRxiv* 2020; https://doi.org/10.1101/2020.04.20.20072470.
[2] Fassett et al., *Am J Perinatol* 2020; https://doi.org/10.1055/s-0040-1714060.
[3] Lytras et al., *J Trav Med* 2020; https://doi.org/10.1093/jtm/taaa054.
[4] Menachemi et al., *MMWR* 2020; https://doi.org/10.15585/mmwr.mm6929e1.
[5] Riley et al., *medRxiv* 2020; https://doi.org/10.1101/2020.07.10.20150524.

surrounding these casinos during February-March, 2020, they demonstrate prevalence estimates roughly 10-fold (or more) higher than the range I consider, consistent with the fact that prevalence increased exponentially over the period of the first epidemic wave in the US. The range we consider is thus likely well below true prevalence over the period of interest, particularly around the March peak in cases.

*1b: Results*

**Table 1** presents the likelihood of no SARS-CoV-2 infected guests visiting each casino during the period before closure (February and March, 2020), under the scenarios of background prevalence in the range of 0.025%, 0.05%, and 0.1%. Values in each cell indicate the $\log_{10}$ probability of no infected persons being present; a value of –2 corresponds to a probability of 0.01 (or 1%), and a value of –6 corresponds to a probability of one in one million (0.0001%). Even at the 0.025% lower-bound condition of infection prevalence in the community over this period, the likelihood of evading SARS-CoV-2 introduction by at ≥1 guest is well below 1% at each casino.

As a further supplementary or sensitivity analysis, I considered the likelihood of SARS-CoV-2 introduction under even more stringent assumptions, considering: (1) introduction by guests only, and (2) that no guests would acquire infection over the duration of their visit—i.e., that each guest remains uninfected if they are uninfected upon arrival. Allowing for a 3.7-day average duration of stay (consistent with the average duration of tourist visits to Las Vegas, as reference for casino travel[6]), the probability of no infectious arrivals remains, at greatest, 1% (under a scenario of only 0.025% background prevalence of infection).

---

[6] Las Vegas Sun, 2016; available from https://lasvegassun.com/blogs/kats-report/2016/apr/10/survey-describes-las-vegas-average-tourist/.

Taken together, these findings support the conclusion that, with near certainty, individuals with SARS-CoV-2 infection were present at each casino during February and March, 2020 prior to the closure.

**Second opinion**

*Following re-opening of the casinos, with greater than 99% probability, ≥1 individual with SARS-CoV-2 infection was present at each casino during each month of the period from June, 2020 to February, 2021.*

*2a: Methods*

These analyses of introduction risk following re-opening of the casinos used real-world epidemiologic data to estimate background prevalence of infection in the community within Colorado and Nevada. As studies have not been undertaken in these states or the US at large to monitor prevalence of infection within the population, I estimated prevalence of infection from data on COVID-19 hospitalizations (**Figure 1**). Use of hospitalizations to support such analyses is desirable owing to the lower sensitivity of this measure to changes in testing practices, healthcare seeking, and other factors that may influence reporting completeness for all diagnosed cases (which represent a less-severe spectrum of disease, for which care-seeking and testing practices may thus be expected to differ to a greater extent).[7]

I took the following approach to estimate community prevalence of infection from data on reported COVID-19 hospitalizations: I divided averaged daily confirmed COVID-19 cases in

---

[7] Jewell NP, Lewnard JA, Jewell BL. Caution Warranted: Using the Institute for Health Metrics and Evaluation Model for Predicting the Course of the COVID-19 Pandemic. *Ann Intern Med* 2020; doi: 10.7326/M20-1565.

hospital[8] (a census of all current occupants) by the 12.1-day mean duration of hospital stay among US patients in hospitals where capacity has not been overrun,[9] thereby obtaining an approximation to daily new hospitalized cases. I multiplied this rate by the infection-to-hospitalization ratio estimated in a demographically-comparable high-income population,[10] using 2.9% as the "base case" estimate of the proportion of infections requiring hospitalization and the 95% confidence interval (1.7-4.8%) for upper and lower bounds of this measure, to obtain total new incident infections corresponding to the estimated number of new hospital admissions. To obtain corresponding prevalence values, I multiplied the estimated new incident infections by the 17-day average duration of PCR positivity among cases.[11] PCR positivity is a desirable endpoint for consideration here as the gold standard for diagnosis of SARS-CoV-2 infection. However, to show analyses were not dependent on the choice of this endpoint, I also considered prevalence of culturable SARS-CoV-2 shedding (the duration of which is 7 days,[12] as opposed to 17 days for PCR positivity), which would correspond the stages of infection associated with the greatest risk of onward transmission in the casino environment.

## 2b: Results

**Table 2** presents the ($\log_{10}$) probabilities of no infectious persons being present among the staff or guests of each casino during each month from June, 2020 (when the facilities reopened) to February, 2021; I did not consider subsequent time points in this analysis owing to the fact that increasing uptake of COVID-19 vaccines, particularly in the highest-risk groups, would decouple total infections from total hospitalizations owing to strong vaccine-conferred protection against

---

[8] Daily hospitalizations data are aggregated at a state level by the COVID-19 tracking project (https://covidtracking.com/data/charts/us-currently-hospitalized).
[9] Lewnard JA, Liu VX, Jackson ML, et al. Incidence, clinical outcomes, and transmission dynamics of severe COVID-19 in California and Washington: prospective cohort study. *BMJ* 2020; doi:10.1136/bmj.m1923.
[10] Salje H, Kiem CT, Lefrancq N, et al. Estimating the burden of SARS-CoV-2 in France. *Science* 2020; doi:10.1126/science.abc3517.
[11] He X, Lau EH, Wu P, et al. Temporal dynamics in viral shedding and transmissibility of COVID-19. *Nat Med* 2020; doi:10.1038/s41591-020-0869-5.
[12] He X, Lau EH, Wu P, et al. Temporal dynamics in viral shedding and transmissibility of COVID-19. *Nat Med* 2020; doi:10.1038/s41591-020-0869-5.

hospitalization (causing the approach described above to under-estimate infection prevalence). Within each month, the probability of no PCR-positive individuals (or individuals shedding culturable SARS-CoV-2) being present at each casino is vanishingly small (below one in 1 million, or $10^{-6}$). Numbers in parentheses surrounding point estimates convey 95% confidence intervals based on the range of estimated values of the infection-fatality ratio.

**Table S2** applies the same sensitivity analysis framework considered in the first opinion, addressing introduction of SARS-CoV-2 to the casinos only by guests and assuming that guests who were uninfected upon their initial arrival to the casinos remained uninfected throughout the course of their 3.7-day average stay. Here, again, the likelihood of no introductions remains vanishingly small (below one in 1 thousand, each month, for PCR-positive individuals). The only scenario where the estimated probability exceeds 1% for a particular month is the analysis considering the endpoint of culturable SARS-CoV-2 infection among guests arriving to Monarch Casino in June, 2020; however, this owes in large part to the fact that operations commenced only from 17 June onward, resulting in low guest volumes during that month; the estimated probability of no guests arriving with culturable infection is equal to $10^{-1.4}$, or 4.0%. Thus, the overwhelming weight of evidence (≥96% probability) remains on the side of at least one infected guest arriving during each month, by definitions of either PCR-positive status or culturable virus shedding.

Taken together, these findings support the conclusion that, with near certainty, individuals with SARS-CoV-2 infection were present at each casino during month from reopening of the casinos in June, 2020 to February, 2021.

Analyses as presented here do not address the period of April and May, 2020, when the premises were closed to all individuals with the exception of a limited number of staff members

(**Figure 1**). While such closure (0 guests present), per government mandates, reduced the risk of SARS-CoV-2 introduction over this period, it is relevant to consider the counterfactual risk of virus introduction under a scenario of continued operation at normal capacity. Estimated prevalence of PCR-positive infection and culturable SARS-CoV-2 shedding based on hospitalized COVID-19 case data during the months of April and May, 2020, exceeded base-case estimates used for the analysis considering the pre-closure period of February and March, 2020 (**Figure 1**); thus, with the same number of guests arriving during the months of April and May as during February, 2020, the probability of no virus introductions during the months of April and May, 2020, under a counterfactual scenario of continued operation, is likewise negligibly small (<1%).

**SIGNATURE**

Joseph Lewnard, PhD

19 July 2021

**Table 1: Probabilities (log$_{10}$) of no infectious persons on the casino premises during February, 2020 and March, 2020.**[1]

| Background infection prevalence | Location | | | |
|---|---|---|---|---|
| | *Monarch Casino, Black Hawk, CO* | | *Atlantis Casino, Reno, NV* | |
| | Visit-days (Guest-days)[2] | Probability of no PCR positive persons (log$_{10}$) | Visit-days (Guest-days)[2] | Probability of no PCR positive persons (log$_{10}$) |
| 0.025% prevalence | | −7.6 | | −20.3 |
| 0.05% prevalence | 69,798 (57,857) | −15.2 | 187,157 (130,524) | −40.7 |
| 0.1% prevalence | | −30.3 | | −81.3 |

[1]Guest data through March a limited proportion of the month during which guests were admitted prior to closure (on 18 March at Monarch Casino, Black Hawk, CO and 17 March at Atlantis Casino, Reno, NV).
[2]Values indicate the total calendar days each staff member and guest was present, summed over all staff members and guests.

**Table 2: Probabilities (log$_{10}$) of no infectious persons on the casino premises following re-opening, by month.**

| Month | Location | | | | | |
|---|---|---|---|---|---|---|
| | *Monarch Casino, Black Hawk, CO* | | | *Atlantis Casino, Reno, NV* | | |
| | Visit-days (Guest-days)[1] | Probability of no PCR positive persons (log$_{10}$) | Probability of no persons shedding culturable SARS-CoV-2 (log$_{10}$) | Visit-days (Guest-days)[1] | Probability of no PCR positive persons (log$_{10}$) | Probability of no persons shedding culturable SARS-CoV-2 (log$_{10}$) |
| June, 2020[2] | 17,471 (13,734) | -16.3 (-27.9, -9.9) | -6.7 (-11.5, -4.1) | 83,679 (60,242) | -225.6 (-385.7, -136.1) | -92.7 (-158.3, -56.0) |
| July, 2020 | 39,534 (34,311) | -50.0 (-85.5, -30.2) | -20.6 (-35.1, -12.4) | 97,553 (70,602) | -658.2 (-1129.3, -396.4) | -269.8 (-461.3, -162.8) |
| August, 2020 | 42,629 (36,693) | -42.3 (-72.2, -25.5) | -17.4 (-29.7, -10.5) | 111,354 (81,811) | -699.0 (-1198.8, -421.1) | -286.6 (-489.9, -172.9) |
| September, 2020 | 44,996 (37,413) | -39.4 (-67.2, -23.8) | -16.2 (-27.6, -9.8) | 113,873 (83,868) | -395.9 (-677.3, -238.8) | -162.6 (-277.7, -98.2) |
| October, 2020 | 45,888 (37,592) | -78.6 (-134.3, -47.4) | -32.3 (-55.2, -19.5) | 115,121 (84,000) | -399.8 (-684.0, -241.2) | -164.2 (-280.5, -99.2) |
| November, 2020 | 40,711 (33,184) | -211.9 (-363.1, -127.7) | -86.9 (-148.6, -52.5) | 97,207 (68,652) | -725.1 (-1245.0, -436.5) | -296.9 (-507.9, -179.1) |
| December, 2020 | 45,911 (37,184) | -252.9 (-433.4, -152.4) | -103.7 (-177.3, -62.6) | 99,006 (69,841) | -1273.5 (-2195.8, -764.9) | -519.8 (-890.6, -313.3) |
| January, 2021 | 55,847 (46,980) | -174.1 (-297.7, -105.0) | -71.5 (-122.1, -43.2) | 103,888 (74,817) | -1200.9 (-2068.5, -721.6) | -490.6 (-840.1, -295.7) |
| February, 2021 | 53,226 (44,194) | -94.4 (-161.2, -57.0) | -38.8 (-66.2, -23.4) | 96,866 (70,958) | -540.2 (-926.1, -325.5) | -221.5 (-378.7, -133.1) |

[1]Values indicate the total calendar days each staff member and guest was present, summed over all staff members and guests.
[2]Data through June consider a limited proportion of the month during which guests were admitted (from 17 June onward at Monarch Casino, Black Hawk, CO and from 4 June onward at Atlantis Casino, Reno, NV).



**Figure 1: Prevalence of infection and operating volumes.** Top panels indicate estimates of infection prevalence daily based on reported COVID-19 hospitalizations, including prevalence as measured by individuals expected to test positive for SARS-CoV-2 by PCR and those from whom culturable SARS-CoV-2 shedding would be expected. Center lines indicate primary point estimates, and shaded regions denote the range bounded by 95% confidence intervals. Bottom panels indicate total individuals present daily, with subdivisions for guests (green) and staff (gold).

**Table S1: Probabilities (log$_{10}$) of no infectious guests entering the casino premises during February, 2020 and March, 2020,[1] assuming a 3.7-day average duration of stay for each guest.**

| Background infection prevalence | Location | |
| --- | --- | --- |
| | *Monarch Casino, Black Hawk, CO* | *Atlantis Casino, Reno, NV* |
| 0.025% prevalence | −2.0 | −5.5 |
| 0.05% prevalence | −4.1 | −11.0 |
| 0.1% prevalence | −8.2 | −22.0 |

[1]Guest data through March a limited proportion of the month during which guests were admitted prior to closure (on 18 March at Monarch Casino, Black Hawk, CO and 17 March at Atlantis Casino, Reno, NV).

[2]Values indicate the total calendar days each staff member and guest was present, summed over all staff members and guests.

CONFIDENTIAL: Subject to the Protective Order entered in this case
19 July 2021

**Table S2: Probabilities (log$_{10}$) of no infectious guests entering the casino premises following re-opening, by month, assuming a 3.7-day average duration of stay for each guest.**

| Month | Location | | | |
|---|---|---|---|---|
| | *Monarch Casino, Black Hawk, CO* | | *Atlantis Casino, Reno, NV* | |
| | Probability of no PCR positive guests arriving (log$_{10}$)[1] | Probability of no guests shedding culturable SARS-CoV-2 arriving (log$_{10}$)[1] | Probability of no PCR positive guests arriving (log$_{10}$)[1] | Probability of no guests shedding culturable SARS-CoV-2 arriving (log$_{10}$)[1] |
| June, 2020[2] | -3.4 (-5.8, -2.1) | -1.4 (-2.4, -0.8) | -43.9 (-75.1, -26.5) | -18.0 (-30.8, -10.9) |
| July, 2020 | -11.7 (-20.1, -7.1) | -4.8 (-8.2, -2.9) | -128.8 (-221.0, -77.6) | -52.8 (-90.3, -31.9) |
| August, 2020 | -9.8 (-16.8, -5.9) | -4.1 (-6.9, -2.4) | -138.8 (-238.0, -83.6) | -56.9 (-97.3, -34.3) |
| September, 2020 | -8.8 (-15.1, -5.3) | -3.6 (-6.2, -2.2) | -78.8 (-134.8, -47.5) | -32.4 (-55.3, -19.5) |
| October, 2020 | -17.3 (-29.6, -10.5) | -7.1 (-12.2, -4.3) | -78.8 (-134.8, -47.5) | -32.4 (-55.3, -19.5) |
| November, 2020 | -46.7 (-80.0, -28.1) | -19.2 (-32.7, -11.6) | -138.1 (-237.1, -83.1) | -56.6 (-96.7, -34.1) |
| December, 2020 | -55.2 (-94.6, -33.3) | -22.6 (-38.7, -13.7) | -242.9 (-418.8, -145.9) | -99.1 (-169.8, -59.7) |
| January, 2021 | -39.6 (-67.7, -23.9) | -16.3 (-27.8, -9.8) | -233.9 (-403.0, -140.6) | -95.6 (-163.7, -57.6) |
| February, 2021 | -21.1 (-36.1, -12.8) | -8.7 (-14.8, -5.2) | -106.6 (-182.7, -64.2) | -43.7 (-74.7, -26.4) |

[1]Values indicate the probability of no introductions by unique guests who enter and remain on the premises over an average 3.7-day duration, assuming those who enter uninfected remain uninfected; the number of unique guests is estimated by dividing total guest-days (as reported in **Table 2**) by 3.7.

[2]Data through June consider a limited proportion of the month during which guests were admitted (from 17 June onward at Monarch Casino, Black Hawk, CO and from 4 June onward at Atlantis Casino, Reno, NV).

**Joseph A. Lewnard, PhD**

Division of Epidemiology, School of Public Health
University of California, Berkeley
Berkeley, California, USA
Tel.: +1 (510) 664-4050
E-mail: jlewnard@berkeley.edu

## Appointments

**University of California, Berkeley**
*Assistant Professor*                                                                                    2018–
*Division of Epidemiology, School of Public Health*
*Division of Infectious Diseases & Vaccinology, School of Public Health*
*Center for Computational Biology, College of Engineering*

**Center for Communicable Disease Dynamics, Harvard TH Chan School of Public Health**
*Research associate*                                                                                     2018
*Postdoctoral research fellow*, laboratory of Marc Lipsitch                                               2017–18

## Education

**PhD**, Epidemiology of Microbial Diseases, Yale University                                              2017
**MPhil**, Epidemiology of Microbial Diseases, Yale University                                            2016
**BA**, 1st Class Hons., Geography and Music, McGill University (Canada)                             2013

## Awards and fellowships

Emerging Leaders in Health and Medicine Fellowship, US National Academy of Medicine          2021–24
Early Career Research Excellence Award, Association of Schools and Programs of Public Health  2021
Visiting Fellow, Center for Disease Dynamics, Economics, and Policy                           2020–23
Kavli Fellow, US National Academy of Sciences                                                2019
Emerging Leaders in Biosecurity Fellow, Center for Health Security, Johns Hopkins University  2018
Undergraduate Award, Canadian Association of Geographers                                      2013

## Grants

### Active

Pfizer, Inc. 61775823. Assessing the role of *Streptococcus pneumoniae* in SARS-CoV-2 infection and disease progression (PI).
Total costs for project period: $472,180.
Project period: Nov. 2020–Dec 2021.

National Institute of General Medical Sciences. MIDASNI2020-3 (under U24GM132013-02S2). Transmission and severity of SARS-CoV-2 in India (PI).
Total costs for project period: $98,226.
Project period: Oct 2020–Sep 2021.

National Institute of Allergy and Infectious Diseases. R01-AI14812701A1: Emerging methods and applications for test-negative studies of infectious disease interventions (co-I).
Total costs for project period: $1,777,419.
Project period: Jul 2020–Jun 2024.

US-Israel Binational Science Foundation. Analyzing the causes for mumps re-emergence in vaccinated populations, combining epidemiology with statistical and transmission modeling (co-PI).
Total costs for project period: $320,000
Project period: Oct 2020–Sep 2024

Merck, Inc. Effectiveness and cost effectiveness of MMR3 vaccination for mumps outbreak mitigation (PI).
Total costs for project period: $141,613
Project period: Jun 2020–Dec 2021

Pfizer, Inc. Changes in antimicrobial prescribing for otitis media in pneumococcal conjugate vaccine era (PI).
Total costs for project period: $214,364
Project period: May 2020–Apr 2022

National Institute of Allergy and Infectious Diseases. R01-AI148336: Integrating epidemiologic and environmental approaches to understand and predict *Coccidioides* exposure and coccidioidomycosis emergence (co-I).
Total costs for project period: $3,800,000.
Project period: Dec 2019–Nov 2023

Wellcome Trust. 219741/Z/19/Z. Impact of *Shigella*, rotavirus, and other enteric vaccines on etiology-specific diarrhea, antibiotic use, and exposure of subclinical infections to antibiotics among children in low-resource settings (co-I).
Total costs for sub-award: $55,594
Project period: Feb 2020–Nov 2022

UC Berkeley. Dr. E. Dowdle Fund: Causal inference for susceptibility to recurrent tuberculosis (PI).
Total costs for project period: $140,000
Project period: Jul 2019–Jun 2023

## Completed

Koret Berkeley-Tel Aviv Initiative. Computational methods for integrating sequence and epidemiological data to model transmission of infectious diseases (co-PI).
Total costs for project period: $20,000
Project period: Jan 2020—Dec 2021.

Bill & Melinda Gates Foundation. OPP1190803: Modeling the value of vaccines in reducing the burden of antimicrobial resistance (co-I).
Total costs for sub-award: $158,998
Project period: Dec 2018–Nov 2020

International Symposium on Pneumococci and Pneumococcal Diseases/Pfizer, Inc. Robert Austrian Research Award (PI).
Total costs for project period: $25,000
Project period: Apr 2018–Mar 2020

Innovative Genomics Institute (UC Berkeley). Community-based surveillance of SARS-CoV-2 transmission among California farmworkers (co-PI).
Total costs for project period: $275,000
Project period: Jun 2020–Dec 2020

Berkeley Population Center. Characterizing the early transmission dynamics and clinical spectrum of SARS-CoV-2 in the United States (PI).
Total costs for project period: $15,000
Project period: Jun 2020—Dec 2020.

World Health Organization. Criteria for the assessment of modeling studies in WHO guidelines development (PI).
Total costs for project period: $24,500
Project period: Mar 2019–Dec 2019

CDC California Emerging Infections Program.  Scope of impact for vaccines against Group A Streptococcus in the United States (co-I).
Total costs for sub-award: $14,000
Project period: Jul 2018–Dec 2018

Pfizer, Inc.  Modulation of susceptibility to otitis media by early-life infection (PI).
Total costs for project period: $190,126
Project period: Mar 2017–Oct 2018

# Publications

_Underlined_ names in the list below are mentored students or postdocs; * and † indicate equal authorship status.

## Articles in peer-reviewed journals

### Original research

[50] Andrejko K*, Pry JM*, Myers JF, Jewell NP, Openshaw J, Watt J, Jain S†, **Lewnard JA**†. Prevention of COVID-19 by mRNA-based vaccines within the general population of California. _Clin Infect Dis_ 2021 (in press). Pre-print from _medRxiv_: doi:10.1101/2021.04.08.21255135.

[49] Mora AM*, **Lewnard JA***, Kogut K, Rauch SA, Morga N, Hernandez S, Wong MP, Huen K, Chang C, Jewell NP, Holland N, Harris E, Cuevas M, Eskenazi B. Risk factors for SARS-CoV-2 infection among farmworkers in Monterey County, California. _JAMA Netw Open_ 2021 (in press). Pre-print from _medRxiv_: doi:10.1101/2021.02.01.21250963

[49] Laxminarayan R, Mohan BC, Vinay TG, Kumar KVA, Wahl B, **Lewnard JA**. SARS-CoV-2 infection and mortality during the first epidemic wave in Madurai, South India: a prospective, active surveillance study. _Lancet Infect Dis_ 2021 (in press).

[48] Andrejko K, Whittles LK, **Lewnard JA**. Health economic value of vaccination against group A _Streptococcus_ in the United States. _Clin Infect Dis_ 2021; doi:10.1093/cid/ciab597.

[47] Head JR, Andrejko K, Cheng Q, Collender PA, Phillips S, Boser A, Heaney AK, Hoover CM, Wu SL, Northrup G, Clinck K, Harrison R, **Lewnard JA**, Remais JV. School closures reduced social mixing of children during COVID-19 with implications for transmission risk and school reopening policies. _J Royal Soc Interface_ 2021; doi:10.1098/rsif.2020.0970.

[46] **Lewnard JA**, Patel MM, Jewell NP, Verani JR, Kobayashi M, Tenforde MW, Dean NE, Cowling BJ, Lopman BA. Theoretical framework for retrospective studies of the effectiveness of SARS-CoV-2 vaccines. _Epidemiology_ 2021; 32:508–17. doi:10.1097/EDE.0000000000001366.

[45] Andrejko K, Ratnasiri B, Hausdorff WP, Laxminarayan R, **Lewnard JA**. Antimicrobial resistance in pediatric _Streptococcus pneumoniae_ isolates amid global implementation of pneumococcal conjugate vaccines: a systematic review and meta-regression analysis. _Lancet Microbe_ 2021; doi:10.1016/S2666-5247(21)00064-1.

[44] **Lewnard JA**, Bruxvoort K, Fischer H, Hong V, Grant LR, Jodar L, Gessner BD, Tartof SY. Prevention of COVID-19 among older adults receiving pneumococcal conjugate vaccine suggests interactions between _Streptococcus pneumoniae_ and SARS-CoV-2 in the respiratory tract. _J Infect Dis_ 2021; doi:10.1093/infdis/jiab128.

[43] **Lewnard JA***, Mora AM*, Nkwocha O, Kogut K, Rauch SA, Morga N, Hernandez S, Wong MP, Huen K, Andrejko K, Jewell NP, Parra KL, Holland N, Harris E, Cuevas M, Eskenazi B, CHAMACOS-Project-19 Study Team. Prevalence and clinical profile of SARS-CoV-2 infection among farmworkers in Monterey County, California: June–November, 2020. _Emerg Infect Dis_ 2021; doi:10.3201/eid2705.204949

[42] Fu H, **Lewnard JA**, Frost I, Laxminarayan R, Arinaminpathy N. Estimating the vaccine-avertable burden of multi-drug-resistant tuberculosis: a modelling study. _Nat Commun_ 2021; **12**:424. doi:10.1038/s41467-020-20731-x.

[41] **Lewnard JA**, Givon-Lavi N, Dagan R. Effectiveness of pneumococcal conjugate vaccines against community-acquired alveolar pneumonia attributable to vaccine-serotype _Streptococcus pneumoniae_ among children. _Clin Infect Dis_ 2020; doi:10.1093/cid/ciaa1860.

- Accompanying editorial:Impact of pneumococcal conjugate vaccine on vaccine serotype specific pneumonia. *Clin Infect Dis* 2020; doi:10.1093/cid/ciaa1867.

[40] Cheng Q, Collender PA, Heaney AK, Li X, Dasan R, Li C, **Lewnard JA**, Zelner J, Liang S, Chang HH, Waller LA, Lopman BA, Yang C, Remais JV. Towards a simulation framework for optimizing infectious disease surveillance: an information theoretic approach for surveillance system design. *PLoS Comp Biol* 2020; doi:10.1371/journal.pcbi.1008477.

[39] Lo NC, Nyathi S, Chapman LAC, Rodriguez-Barraquer I, Kushel M, Bibbins-Domingo K, **Lewnard JA**. Influenza, mumps, and varicella outbreaks in United States migrant detention centers. *JAMA* 2020; doi:10.1001/jama.2020.20539.

[38] Laxminarayan R, Wahl B, Dudala SR, Gopal K, Mohan C, Neelima S, Jawahar Reddy KS, Radhakrishnan J, **Lewnard JA**. Epidemiology and transmission dynamics of COVID-19 in two Indian states. *Science* 2020; doi:10.1126/science.abd7672.
- Accompanying editorial: John J, Kang G. Public health during the pandemic in India. *Science* 2020; doi:10.1126/science.abe9707.

[37] Northrup GR, Qian L, Bruxvoort K, Marx FM, Whittles LK, **Lewnard JA**. Inference of naturally-acquired immunity using a self-matched negative control design. *Epidemiology* 2020; doi:10.1097/EDE.0000000000001305.

[36] **Lewnard JA**. Uses of pathogen detection data to estimate vaccine direct effects in case-control studies. *J Roy Soc Interface* 2020;**17**:20200161. doi:10.1098/rsif.2020.0161.

[35] **Lewnard JA**, Rogawski McQuade ET, Platts-Mills JA, Kotloff KL, Laxminarayan R. Incidence and etiology of clinically-attended, antibiotic-treated diarrhea among children under five years of age in low- and middle-income countries: evidence from the Global Enteric Multcenter Study. *PLoS Negl Trop Dis* 2020;**14**:e0008520. doi:10.1371/journal.pntd.0008520.

[34] Bennett A, Pollock L, Bar-Zeev N, **Lewnard JA**, Jere KC, Lopman, BA, Iturriza-Gomara M, Pitzer VE, Cunliffe NA. Community transmission of rotavirus infection in a vaccinated population in Malawi: a prospective household cohort study. *Lancet Infect Dis* 2020; doi:10.1016/S1473-3099(20)30597-1.
- Accompanying editorial: Mwenyenkulu TE, Ntenda PAM. Effectiveness of rotavirus vaccine in preventing transmission of rotavirus from children to household contacts in Malawi. *Lancet Infect Dis* 2020; doi:10.1016/S1473-3099(20)30683-6.

[33] **Lewnard JA**, Liu VX, Jackson ML, Schmidt MA, Jewell BL, Flores JP, Jentz C, Northrup GR, Mahmud A, Reingold AL, Petersen M, Jewell NP, Young S, Bellows J. Incidence, clinical outcomes, and transmission dynamics of severe coronavirus disease 2019 in California and Washington: prospective cohort study. *BMJ* 2020;**369**:m1923. doi:10.1136/bmj.m1923.
- Accompanying editorial: Anesi GL, Halpern SD, Delgado MK. Covid-19 related hospital admissions in the United States: needs and outcomes. *BMJ* 2020; **369**:m2082. doi:10.1136/bmj.m2082.

[32] **Lewnard JA**, King LM, Fleming-Dutra KE, Link-Gelles R, Van Beneden CA. Incidence of pharyngitis, sinusitis, acute otitis media, and outpatient antibiotic prescribing preventable by vaccination against group A *Streptococcus* in the United States. *Clin Infect Dis* 2020; doi:10.1093/cid/ciaa529.
- Accompanying editorial: Tanz RR, Shulman ST. Antimicrobial stewardship: a potentially important benefit of a group A *Streptococcus* vaccine in areas with low rates of acute rheumatic fever. *Clin Infect Dis* 2020; doi:10.1093/cid/ciaa533.

[31] **Lewnard JA**, Lo NC, Arinaminpathy N, Frost I, Laxminarayan R. Childhood vaccines and antibiotic use in low and middle income countries. *Nature* 2020; **581**:94–99. doi:10.1038/s41586-020-2238-4.
- Accompanying editorial: Dempsey LA. Vaccines versus antibiotics. *Nature Immunol* 2020; **21**: 596. doi:10.1038/s41590-020-0701-x.

[30] **Lewnard JA**, Whittles LK, Rick AM, Martin JM. Naturally-acquired protection against upper respiratory symptoms involving group A *Streptococcus* in a longitudinal cohort study. *Clin Infect Dis* 2020; doi:10.1093/cid/ciaa044.

[29] Wohl S, Metsky HC, Schaffner SF, Piantadosi A, Burns M, **Lewnard JA**, Chak B, Krasilnikova LA, Siddle KJ, Matranga CB, Bankamp B, Hennigan S, Sabina B, Byrne EH, McNall RJ, Shah RR, Qu J, Park DJ, Gharib S, Fitzgerald S, Barreira P, Fleming S, Lett S, Rota PA, Madoff LC, MacInnis BL, Yozwiak NL, Smole S, Grad YH,

Sabeti PC. Combining genomics and epidemiology to track mumps virus transmission in the United States. *PLoS Biol* 2020; doi:10.1371/journal.pbio.3000611.

[28] Head JR, Collender PA, **Lewnard JA**, Skaff NK, Peng Y, Ohringer A, Cheng Q, Baker J, Li C, Liang S, Yang C, Hubbard A, Lopman BA, Remais JV. Early evidence of inactivated enterovirus 71 vaccine impact against hand, foot, and mouth disease in a major center of ongoing transmission in China, 2011–2018: a longitudinal surveillance study. *Clin Infect Dis* 2020; doi:10.1093/cid/ciz1188.

[27] Chua H, Feng S, **Lewnard JA**, Sullivan SG, Blyth CC, Lipsitch M, Cowling BJ. The use of test-negative controls to monitor vaccine effectiveness: a systematic review of methodology. *Epidemiology* 2020; **31**:43–64. doi:10.1097/EDE.0000000000001116.

[26] **Lewnard JA**, Givon-Lavi N, Dagan R. Dose-specific effectiveness of 7- and 13-valent pneumococcal conjugate vaccines against vaccine-serotype *Streptococcus pneumoniae* colonization in children. *Clin Infect Dis* 2019; doi:10.1093/cid/ciz1164

[25] Pitzer VE, Bennett AI, Bar-Zeev N, Jere KC, Lopman BA, **Lewnard JA**, Parashar UD, Cunliffe NA. Evaluating strategies to improve rotavirus vaccine impact during the second year of life in Malawi. *Sci Transl Med* 2019; **11**(505):eaav6419. doi:10.1126/scitranslmed.aav6419.

[24] **Lewnard JA**, Givon-Lavi N, Dagan R. Interaction with nontypeable *Haemophilus influenzae* alters progression of *Streptococcus pneumoniae* serotypes from colonization to upper respiratory tract diseases in children in a site-specific manner. *J Infect Dis* 2019; **220**:1367–76. doi:10.1093/infdis/jiz312.

[23] **Lewnard JA**, Lopman BA, Parashar UD, Bennett A, Bar-Zeev N, Cunliffe NA, Samuel P, Guerrero ML, Ruiz-Palacios GM, Kang G, Pitzer VE. Heterogeneous susceptibility to rotavirus infection and gastroenteritis in two birth cohort studies: parameter estimation and epidemiological implications. *PLoS Comp Biol* 2019; **15**(7)e1007014. doi:10.1371/journal.pcbi.1007014.

[22] **Lewnard JA**, Tedijanto C, Cowling BJ, Lipsitch M. Measurement of vaccine direct effects under the test-negative design. *Am J Epidemiol* 2018; **187**:2686–97. doi:10.1093/aje/kwy163.

[21] **Lewnard JA**\*, Tähtinen PA\*, Laine MK, Lindholm L, Jalava J, Huovinen P, Lipsitch M, Ruohola A. Impact of antimicrobial treatment for acute otitis media on carriage dynamics of penicillin-susceptible and penicillin–non-susceptible *Streptococcus pneumoniae*. *J Infect Dis* 2018; **218**:1356–66. doi:10.1093/infdis/jiy343. (\**contributed equally*)
   - Accompanying editorial: Flasche S, Atkins KE. Balancing benefits and risks of antibiotic use. *J Infect Dis* 2018; **218**: 1351–3. doi:10.1093/infdis/jiy344.

[20] Hubbard TP, Billings G, Dörr T, Sit B, Warr AR, Kuehl CJ, Kim M, Delgado F, Mekalanos JJ, **Lewnard JA**, Waldor MK. A live vaccine rapidly protects against cholera in an infant rabbit model. *Sci Transl Med* 2018; **10**:eeap8423. doi:10.1126/scitranslmed.aap8423
   - Accompanying editorial: Hall RH. Curbing cholera. *Sci Transl Med* 2018; **10**:eeat9483. doi:10.1126/scitranslmed.aat9483

[19] **Lewnard JA**, Givon-Lavi N, Tähtinen PA, Dagan R. Pneumococcal phenotype and interaction with nontypeable *Haemophilus influenzae* as determinants of otitis media progression. *Infect Immun* 2018; **86**:e00727-17. doi:10.1128/IAI.00727-17.
   - Accompanying editorial: Pelton SI. Deconstructing progression from pneumococcal colonization to disease. *Infect Immun* 2018; **86**:e00225-18. doi:10.1128/IAI.00225-18.

[18] **Lewnard JA**, Grad Y. Vaccine waning and mumps re-emergence in the United States. *Sci Transl Med* 2018; **10**:eaao5945. doi:10.1126/scitranslmed.aao5945.

[17] Phelps MD, Azman AS, **Lewnard JA**, Antillón M, Simonsen L, Andreasen V, Jensen PKM, Pitzer VE. The importance of thinking beyond the water supply in cholera epidemics: a historical urban case study. *PLoS Negl Trop Dis* 2017; **11**:e0006103. doi.org/10.1371/journal.pntd.0006103.

[16] **Lewnard JA**, Givon-Lavi N, Weinberger DM, Lipsitch M, Dagan R. Pan-serotype reduction in progression of *Streptococcus pneumoniae* to otitis media after rollout of pneumococcal conjugate vaccines. *Clin Infect Dis* 2017; **65**:1853–61. doi:10.1093/cid/cix673.

[15]

**Lewnard JA**, Lopman BA, Parashar UD, Bar-Zeev N, Samuel P, Guerrero ML, Ruiz-Palacios G, Kang G, Pitzer VE. Naturally-acquired immunity against rotavirus infection and gastroenteritis in children: paired re-analyses of birth-cohort studies. *J Infect Dis* 2017; **216**:317–26. doi:10.1093/infdis/jix310.

[14] Kunkel A, **Lewnard JA**, Pitzer VE, Cohen T. Antimicrobial resistance risks of cholera prophylaxis for United Nations peacekeepers. *Antimicrob Agents Chemother* 2017; **61**:e00026-17. doi:10.1128/AAC.00026-17.

[13] Kürüm E, Warren JL, Schuck-Paim C, Lustig R, **Lewnard JA**, Fernandes RM, Fuentes R, Bruhn CAW, Taylor RJ, Simonsen L, Weinberger DM. Bayesian model averaging with change points to assess the impact of vaccination and other public health interventions. *Epidemiology* 2017;**28**:889–97. doi:10.1097/EDE.0000000000000719.
  • Awarded Kenneth Rothman Prize for the best paper published in *Epidemiology* in 2017 (link).

[12] Anwar MY, **Lewnard JA**, Parikh S, Pitzer VE. Time series analysis of malaria in Afghanistan: using ARIMA models to predict future trends in incidence. *Malaria J* 2016; **15**:566. doi:10.1186/s12936-016-1602-1.

[11] **Lewnard JA**, Townsend JP. Climatic and evolutionary drivers of phase shifts in the plague epidemics of colonial India. *Proc Natl Acad Sci U S A* 2016; **113**:14601–8. doi:10.1073/pnas.1604985113.

[10] Pham TTH, Apparicio P, Landry S, **Lewnard JA**. Disentangling the effects of urban form and socio-demographic context on street tree cover: A multi-level analysis from Montreal. *Landscape Urban Plan* 2017; **157**:422–33. doi:10.1016/j.landurbplan.2016.09.001.

[9] **Lewnard JA**, Huppert A, Givon-Lavi N, Pettigrew MM, Regev-Yochay G, Dagan R, Weinberger DM. Density, serotype diversity, and fitness of *Streptococcus pneumoniae* in upper respiratory co-colonization with nontypeable *Haemophilus influenzae*. *J Infect Dis* 2016; **214**:1411–20. doi:10.1093/infdis/jiw381.

[8] **Lewnard JA**, Gonsalves G, Ko AI. Low risk of international Zika virus spread due to the 2016 Olympics in Brazil. *Ann Intern Med* 2016; **165**:286–7. doi:10.7326/M16-1628.

[7] **Lewnard JA**, Antillón M, Gonsalves G, Miller AC, Ko AI, Pitzer VE. Strategies to prevent cholera introduction during international personnel deployments: a computational modeling analysis based on the 2010 Haiti outbreak. *PLoS Med* 2016; **13**:e1001947. doi:10.1371/ journal.pmed.1001947.

[6] **Lewnard JA**, Givon-Lavi N, Huppert A, Pettigrew MM, Regev-Yochay G, Dagan R, Weinberger DM. Epidemiological markers for interactions among *Streptococcus pneumoniae*, *Haemophilus influenzae*, and *Staphylococcus aureus* in upper respiratory tract carriage. *J Infect Dis* 2015; **213**:1596–605. doi:10.1093/infdis/jiv761.

[5] **Lewnard JA**, Jirmanus L, Júnior NN, Machado PR, Glesby MJ, Ko AI, Carvalho EM, Schriefer A, Weinberger DM. Forecasting temporal dynamics of cutaneous leishmaniasis in Northeast Brazil. *PLoS Negl Trop Dis* 2014; **8**:e3283. doi:10.1371/journal.pntd.0003283.

[4] **Lewnard JA**\*, Ndeffo-Mbah ML\*, Alfaro-Murillo JA, Altice FL, Bawo L, Nyenswah TG, Galvani AP. Dynamics and control of Ebola virus transmission in Montserrado, Liberia: a mathematical modelling analysis. *Lancet Infect Dis* 2014; **14**:1189–95. doi:10.1016/S1473-3099(14)70995-8. (\*contributed equally)
  • Accompanying editorial: Fisman D, Tuite AR. Ebola: no time to waste. *Lancet Infect Dis* 2014; **14**:1164–5. doi:10.1016/S1473-3099(14)70851-5.

[3] **Lewnard JA**, Berrang-Ford L, Lwasa S, Bambaiha Namanya D, Patterson KA, Donnelly B, Kulkarni MA, Harper SL, Ogden NH, Carcamo CP, IHACC Research Team. Relative undernourishment and food insecurity associations with *Plasmodium falciparum* among Batwa pygmies in Uganda: evidence from a cross-sectional survey. *Am J Trop Med Hyg* 2014; **91**:39–49. doi:10.4269/ajtmh.13-0422.

[2] **Lewnard JA**, Berrang-Ford L. Internet-based partner selection and risk for unprotected anal intercourse in sexual encounters among men who have sex with men: a meta-analysis of observational studies. *Sex Transm Infect* 2014; **90**:290–6. doi:10.1136/sextrans-2013-051332.

**Reviews (peer-reviewed)**

[3] **Lewnard JA**, Reingold AL. Emerging challenges and opportunities in infectious disease epidemiology. *Am J Epidemiol* 2019; **188**:873–82. doi:10.1093/aje/kwy264

[2]

**Lewnard JA**, Hanage WP. Making sense of differences in pneumococcal serotype replacement. *Lancet Infect Dis* 2019; **19**:e213–20. doi:10.1016/S1473-3099(18)30660-1.

[1] **Lewnard JA**, Cobey S. Immune history and influenza vaccine effectiveness. *Vaccines* 2018; **6**:28. doi:10.3390/vaccines6020028.

**Comments and correspondence (not peer-reviewed)**

[7] Jewell NP, **Lewnard JA**, Jewell BL. Predictive mathematical models of the COVID-19 pandemic: Underlying principles and value of projections. *JAMA* 2020; doi:10.1001/jama.2020.6585.

[6] Jewell NP, **Lewnard JA**, Jewell BL. Caution warranted: Using the Institute for Health Metrics and Evaluation (IHME) model for predicting the course of the COVID-19 pandemic. *Ann Intern Med* 2020; doi:10.7326/M20-1565.

[5] **Lewnard JA**, Lo NC. Scientific and ethical basis for social distancing interventions against COVID-19. *Lancet Infect Dis* 2020; doi:0.1016/S1473-3099(20)30190-0.

[4] Hanage WP, **Lewnard JA**. Pneumococcal conjugate vaccines in different settings – Authors' reply. *Lancet Infect Dis* 2019; **19**:1284. doi:10.1016/S1473-3099(19)30630-9.

[3] **Lewnard JA**, Tedijanto C, Cowling BJ, Lipsitch M. Accounting for unobserved and differential susceptible time at risk in retrospective studies: response to Dean (2019). *Am J Epidemiol* 2019; **188**:807–8. doi:10.1093/aje/kwz018.

[2] **Lewnard JA**. Ebola virus disease: 11,323 deaths later, how far have we come?. *Lancet* 2018; **392**:189–90. doi:10.1016/S0140-6736(18)31443-0.

[1] Rivers C, Alexander K, Bellan S, Del Valle S, Drake JM, Eisenberg JN, Eubank S, Ferrari M, Halloran ME, Galvani AP, Lewis BL, **Lewnard JA**, Lofgren E, Macal M, Marathe M, Ndeffo Mbah ML, Meyers LA, Meza R, Park A, Porco T, Scarpino SV, Shaman J, Vespignani A, Yang W. Ebola: models do more than forecast. *Nature* 2014; **515**:492. doi:10.1038/515492a.

## Submitted manuscripts

[9] Andrejko K, Ratnasiri B, **Lewnard JA**. Association of pneumococcal serotype with susceptibility to antimicrobial drugs: a systematic review and meta-analysis. Submitted.

[8] **Lewnard JA**, Fries LF, Cho I, Chen J, Laxminarayan R. Prevention of antimicrobial prescribing among infants following maternal vaccination against respiratory syncytial virus: secondary analysis of a randomized, placebo-controlled trial. Pre-print from *medRxiv* (awaiting clearance).

[7] **Lewnard JA**, Bruxvoort KJ, Fischer H, Hong VX, Grant LR, Jódar L, Cané A, Gessner BD, Tartof SY. Effectiveness of 13-valent pneumococcal conjugate vaccine against medically-attended lower respiratory tract infection and pneumonia among older adults. Pre-print from *medRxiv*: doi:10.1101/2021.06.30.21259721v1.

[6] Jewell NP, **Lewnard JA**. On the use of the reproduction number for SARS-CoV-2: Estimation, misinterpretations, and relationships with other ecological measures.

[5] Mora AM*, **Lewnard JA**\*, Kogut K, Rauch S, Morga N, Jewell NP, Cuevas M, Eskenazi B. Impact of the COVID-19 pandemic and vaccine hesitancy among farmworkers from Monterey County, California. Pre-print from *medRxiv*: doi:10.1101/2020.12.18.20248518.

[4] Miller AC, Foti NJ, **Lewnard JA**, Jewell NP, Guestrin C, Fox EB. Mobility trends provide a leading indicator of changes in SARS-CoV-2 transmission. Pre-print from *medRxiv*: doi:10.1101/2020.05.07.20094441.

[3] Lo NC, Andrejko K, Sawin VI, Norris SL, **Lewnard JA**. Contribution of mathematical modeling evidence to World Health Organization guidelines: a systematic review.

[2] **Lewnard JA**, Cowley LA. An empirical Bayes method for serotype case-carrier ratios, with an application to Group B streptococcus. Pre-print from *bioRxiv*: doi:10.1101/421412.

[1] Miller AC, Hannah L, Futoma J, Foti NJ, Fox EB, D'Amour A, Sandler M, Saurous RA, **Lewnard JA**. Statistical deconvolution for inference of infection time series. Pre-print from *medRxiv*: doi:10.1101/2020.10.16.20212753

## Science outreach

[1]   **Lewnard JA**. The Olympics won't spread Zika around the world. *The Conversation*, 25 July 2016. http://bit.ly/2au5kr9.

# Teaching

## Students supervised

**University of California, Berkeley**

*PhD committee service*
Laura King (epidemiology), *Primary dissertation supervisor*
Kristin Andrejko (epidemiology), *Primary dissertation supervisor*
Graham Northrup (computational biology), *Dissertation co-supervisor*
Sean Wu (epidemiology), *Dissertation committee member*
Shelley Facente (epidemiology), *Dissertation committee member*
Christopher Hoover (environmental health sciences), *Dissertation committee member*

*MPH capstone theses supervised*
Nicholas Murdock, Tyler Chervo, Karen Click                                                    2021
Lauren Linde                                                                                   2020
Arti Kundu, Drew Wodecki, Whitney Mgbara                                                        2019

*PhD qualifying examinations administered*
Adrienne Mocello (epidemiology), Xing Gao (epidemiology)                                        2021
Jennifer Head (epidemiology), Joanna Vinden (IDV), Cheyenne Butcher (epidemiology)             2020
Nicholas Lo (IDV), Whitney Mgbara (ESPM), Kieran O'Brien (epidemiology), Mary Horton (epidemiology),   2019
Christopher Hoover (epidemiology)

**Harvard TH Chan School of Public Health**

Angel Rollo (undergraduate), *summer research project*                                          2018
Wilma Figueroa (undergraduate), *summer research project*                                       2018
Veronica Wang (undergraduate), *summer research project*                                        2017
Winston Kunkel (undergraduate), *summer research project*                                       2017

## Courses taught

**University of California, Berkeley**

*As primary instructor*
PH253B Epidemiology and control of infectious diseases                                          2019–
PH293 Advanced doctoral seminar in epidemiology                                                 2020–
PH293 First-year doctoral seminar in epidemiology                                               2021–

*As guest instructor*
PH260E Molecular epidemiology of infectious diseases                                            2019–
PH257 Outbreak investigation                                                                    2020–

**Fundaçao Oswaldo Cruz**

International course in molecular epidemiology                                                   2018

**Yale University**

Developing research proposals for the Downs Fellowship in public health, *Primary instructor.*    2015–16
Quantitative methods in infectious disease epidemiology, *Graduate teaching fellow.*    2014–16
Introduction to public health surveillance, *Graduate teaching fellow.*    2016
Introductory statistics, *Head graduate teaching fellow.*    2015

# Presentations

## Engagements at external academic institutions

[14] Harvard TH Chan School of Public Health, October, 2020
[13] University of Texas at Austin, October, 2020
[12] Mathematical Sciences Research Institute. Berkeley, California. August, 2020.
[11] Koret Berkeley-Tel Aviv Initiative in Computational Biology Symposium. Tel Aviv University, Tel Aviv, Israel. June, 2019
[10] University of Bath, Bath, United Kingdom. February, 2019
[9] Imperial College, London, London, United Kingdom, September, 2018
[8] London School of Hygiene and Tropical Medicine, London, United Kingdom, September, 2018
[7] University of California, San Francisco. San Francisco, California. February, 2019
[6] University of Minnesota School of Public Health. Minneapolis, Minnesota. February, 2018
[5] Boston University School of Public Health, Boston, Massachusetts. February, 2018
[4] Rollins School of Public Health, Emory University, Atlanta, Georgia. February, 2018
[3] Langone School of Medicine, New York University, New York, New York. February, 2018
[2] The Broad Institute, Cambridge, Massachusetts. May, 2017
[1] Columbia Mailman School of Public Health, New York, New York. October, 2016

## Scientific conferences

[18] American Society for Microbiology Microbe Conference. June, 2020. *Invited oral presentation; canceled due to COVID-19.*
[17] Vaccines for Enteric Diseases. October, 2019. *Contributed oral presentation.*
[16] Korean-American Kavli Frontiers of Science Symposium. June, 2019. *Poster.*
[15] National Foundation for Infectious Diseases Annual Conference on Vaccinology Research. April, 2019. *Invited oral presentation.*
[14] Bay Area Ecology and Evolution of Infectious Diseases Meeting. March, 2019. *Invited oral presentation.*
[10–13] International Symposium on Pneumococci and Pneumococcal Diseases, Melbourne, Australia. April, 2018. *Contributed oral presentations (4).*
[9] Epidemics 6, Sitges, Spain. December, 2017. *Poster.*
[7–8] Infectious Diseases Society of America IDWeek, San Diego, USA. October, 2017. *Contributed oral presentation, Poster.*
[6] American Society for Microbiology (ASM) Microbe, New Orleans, USA. June, 2017. *Poster.*
[5] Twelfth International Rotavirus Symposium, Melbourne, Australia. September, 2016. *Poster.*
[4] International Symposium on Pneumococci and Pneumococcal Diseases, Glasgow, UK. June, 2016. *Contributed oral presentation.*
[3] Ecology and Evolution of Infectious Diseases, Ithaca, USA. June, 2016. *Poster.*
[2] Vaccines for Enteric Diseases, Edinburgh, UK. July, 2015. *Poster.*
[1] Palestinian-Israeli Collaborative Research Conference, Jerusalem, Israel. May, 2015. *Oral presentation.*

# Service

## Service to profession

### Grant review

| | |
|---|---|
| Ad-hoc member, NIH CSR Biomedical Methods and Research Design study section | 2021 |
| Ad hoc reviewer, UK Medical Research Council | 2021 |
| Ad hoc reviewer, Swiss National Science Foundation | 2020 |
| Ad hoc reviewer, Wellcome Trust, UK | 2019 |

### Editorial service

| | |
|---|---|
| Reviewing Editor, *eLife* | 2020– |
| Guest Editor, *PLoS Negl Trop Dis* | 2019 |

### Manuscript peer review

*AIDS and Behavior, American Journal of Epidemiology, American Journal of Tropical Medicine and Hygiene, Annals of Internal Medicine, BMC Infectious Diseases, The BMJ, BMJ Global Health, Clinical Infectious Diseases, Emerging Infectious Diseases, Epidemics, Epidemiologic Methods, Epidemiology and Infection, Expert Review of Vaccines, Innate Immunity, International Journal of Epidemiology, International Journal of Infectious Diseases, International Journal of STD and AIDS, JAMA, Journal of Infectious Diseases, The Lancet, The Lancet Infectious Diseases, The Lancet Global Health, The Lancet Public Health, mSphere, Nature, Nature Medicine, Pathogens and Global Health, PLoS Biology, PLoS Computational Biology, PLoS Medicine, PLoS Neglected Tropical Diseases, PLoS ONE, Proceedings of the National Academy of Sciences of the USA, Public Health Nutrition, Science, Science Translational Medicine, Scientific Reports, Sexually Transmitted Infections, Vaccine*

### Policy and industry engagements

| | |
|---|---|
| Pfizer Advisory Board. November, 2020. | [10] |
| Pfizer Advisory Board. October, 2020. | [9] |
| Kaiser Permanente Southern California Division of Research. July, 2020–. | [8] |
| Kaiser Permanente. March, 2020–. | [7] |
| Pfizer Advisory Board. December, 2019. | [6] |
| Pfizer Advisory Board. September, 2019. | [5] |
| WHO Advisory Committee on vaccines against antimicrobial resistance. February, 2019—October, 2020. | [4] |
| Merck, Upper Gwynned, Pennsylvania. November, 2018. | [3] |
| Pfizer, Collegeville, Pennsylvania. September, 2017. | [2] |
| Biomedical Advanced Research and Development Authority (Office of the Assistant Secretary of Preparedness and Response, US Dept. Health and Human Services), Washington, DC. November, 2014. | [1] |

## Institutional service

### University of California, Berkeley

*Service to UC Office of the President*

| | |
|---|---|
| Fall 2021 Capacity Planning Group | 2021 |
| Systemwide Testing and Tracing Task Force | 2020 |

*Campus level service*

| | |
|---|---|
| Chancellor's Committee on Public Health and Testing | 2020 |

*Departmental and divisional service*

| | |
|---|---|
| Center for Computational Biology graduate admissions committee | 2021 |
| School of Public Health Committee on Student Affairs | 2020– |
| Epidemiology graduate admissions committee | 2019– |

**Yale Graduate School of Arts and Sciences**

Epidemiology and Public Health Departmental Representative, Yale Graduate Student Assembly     2014–16
Professional ethics facilitator, Yale Graduate School of Arts and Sciences     2015–16

**<u>Prior and Ongoing Cases</u>**

1. Treasure Island, LLC v. Affiliated FM Insurance Company
   Case No. 2:20-cv-00965 (D. Nev. May 2020)
   Expert engagement ongoing

2. Circus Circus, LV, LP v. AIG Specialty Insurance Company
   Case No. 2:20-cv-01240 (D. Nev. Aug. 2020)
   Filed 2 July, 2020
   Expert engagement ongoing

3. In-N-Out Burgers v. Zurich American Insurance Company
   Case No. 8:21-cv-00406-JLS-ADS (California Central District Court)
   Filed 3 March, 2021
   Expert engagement ongoing

4. Cinemark Holdings, Inc. v. Factory Mutual Insurance Company-2
   Case No. 4:21-cv-00011 (E. D. Tex.)
   Filed 22 December, 2020
   Expert engagement ongoing

TO:                          Levin Sitcoff PCV
                             ATTN: Nelson A. Waneka
                             1512 Larimer Street
                             Suite 650
                             Denver, CO 80202

INVOICE NUMBER:              JAL-Monarch-1

INVOICE DATE:                19 July, 2021

PAYABLE TO:                  Joseph A. Lewnard

SEND REMITTANCE TO:          Joseph A. Lewnard
                             1409 Everett Street
                             El Cerrito, California 94530

DESCRIPTION OF SERVICES:

**Term: 3 June, 2021 to 19 July, 2021.**

| Task | Hours (@ $750/hour) | Total |
|---|---|---|
| Obtaining and cleaning/formatting COVID-19 hospitalization data for CO and NV | 2.25 | $1,687.50 |
| Coding and running analysis for pre-closure period | 3.0 | $2,250.00 |
| Coding and running analysis for reopening period | 4.5 | $3,375.00 |
| Coding extension with sensitivity analysis of pre- and post-closure periods with multi-day guest stay | 1.75 | $1,312.50 |
| Figure generation | 2.0 | $1,500.00 |
| Tables generation | 3.75 | $2,812.50 |
| Primary report write-up | 4.5 | $3,375.00 |
| Phone call 19 July, 2021 | 0.25 | $187.50 |
| Final edits and compiling ancillary documents 19 July, 2021 | 1.0 | $750.00 |
| **Total** | **23.0** | **$17,250.00** |

TOTAL AMOUNT DUE:        **$17,250.00**



Member of the FM Global Group

AFM
300 S. Northwest Highway, Suite 100
Park Ridge, IL 60068 USA
T: 847-430-7617F: 847-430-7499
Email: oleksandr.surmach@fmglobal.com

August 11, 2021

Bradley Levin
Attorney
Levin Sitcoff, PC
1512 Larimer Street Suite 650
Denver, CO 80202

Nelson Waneka
Attorney
Levin Sitcoff, PC
1512 Larimer Street Suite 650
Denver, CO 80202

Reference:  Insured:      Monarch Casino & Resort, Inc.
            Location:     Black Hawk Casino, 488 & 470 Main St., Black Hawk, CO 80422
            Policy No:     ES130
            Date of Loss:  March 16, 2020
            Description:   Impact Associated with COVID-19
            Claim ID:      502041

Dear Mr. Levin and Mr. Waneka:

This follows our previous communications with you and your client concerning their notice of impact due to COVID-19. We received our insured's letter and email on 14-Apr-2020 and 15-May-2020. Based on the information provided and subsequent communications, Affiliated FM Insurance Company has completed its investigation. This will provide you with our coverage determination in connection with the above-referenced loss.

This confirms our review of Policy No. ES130 (Policy) with Affiliated FM Insurance Company (AFM), with regard to the captioned loss at Location No. 3 as described in the Policy. The Policy effective period is 01-Oct-2019 to 01-Oct-2020.

Subject to the terms and conditions stated in the Policy, coverage is provided at the referenced location for Communicable Disease - Property Damage subject to a Policy limit of $100,000 annual aggregate and Communicable Disease - Business Interruption subject to a Policy limit of $100,000 annual aggregate and subject to the applicable $50,000 deductible. Additional comments on Policy coverage will be made at a later date should the need arise.

Policy information indicates that any payment associated with the above loss would be made payable to Monarch Casino & Resort, Inc. or as directed by Monarch Casino & Resort, Inc., and will include Wells Fargo (mortgagee) and Wells Fargo Bank N.A. (loss payee).

We are aware that other locations may also meet the requirements of the coverage cited above, however, we are proceeding with the loss analysis/measurement at the Black Hawk Casino location. We are in receipt of the financial documentation provided in the letter and email received on 15-May-2020. Based on this limited information we can confirm that we have been able to measure a loss in excess of the $100,000 Communicable Disease - Business Interruption annual aggregate limit and the applicable $50,000 deductible. We have not received any claimed costs for the Communicable Disease - Property Damage, which is subject to the $100,000 annual aggregate limit.

Please note that we will send the check in the amount of $100,000 to your offices. The check will be made payable to Monarch Casino & Resort, Inc.; Wells Fargo; Wells Fargo Bank N.A.

**EXHIBIT 4**

CONFIDENTIAL

Page2

Should you wish to submit an updated claim, please include (as a minimum) the following information:

1. The amount being claimed for the costs covered under the Communicable Disease - Property Damage coverage. It is also acceptable for the letter to refer to an attached schedule that outlines the amount being claimed.
2. Supporting documentation for the amounts being claimed. This may include but is not limited to, invoices, labor records, production & financial records, etc.

If you wish to include other locations in the loss measure, we would need information to confirm whether other locations met the coverage requirements under the Communicable Disease policy provisions.

We understand this loss was reported providing notice that a claim will be submitted under the various Policy provisions cited in Monarch's 14-Apr-2020 letter. We also note that in the same letter it is stated that Monarch is making a claim under the COMMUNICABLE DISEASES coverages in the Policy. Please note that COVID-19 meets the definition of a communicable disease under the Policy. Other key conditions of the Communicable Disease coverage are the actual not suspected presence of a communicable disease at a location owned, leased or rented by the insured, access to which has been limited, restricted or prohibited for more than 48 hours. Pertinent sections of Affiliated FM Insurance Company Policy No. ES130 provide in part as follows:

### 5. Communicable Disease - Property Damage

If a **described location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **described location** is limited, restricted or prohibited by:

a) An order of an authorized governmental agency regulating or as result of such presence of **communicable disease;** or

b) A decision of an Officer of the Insured as a result of such presence of **communicable disease,**

This Policy covers the reasonable and necessary costs incurred by the Insured at such **described location** for the:

a) Cleanup, removal and disposal of such presence of **communicable disease** from insured property; and

b) Actual costs or fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from such presence of **communicable disease** on insured property.

This Additional Coverage does not cover any costs incurred due to any law or ordinance with which the Insured was legally obligated to comply prior to such presence of **communicable disease.**

This coverage is subject to the Qualifying Period in the Declarations section of this Policy….

\*\*\*

### E. BUSINESS INTERRUPTION COVERAGE EXTENSIONS

### 3. Communicable Disease - Business Interruption

If a **described location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **described location** is limited, restricted or prohibited by:

a) An order of an authorized governmental agency regulating such presence of **communicable disease;** or

**b)**  A decision of an Officer of the Insured as a result of such presence of **communicable disease,**

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability at such **described location** with such presence of **communicable disease.**

This coverage is subject to the Qualifying Period in the Declarations section of this Policy....

Monarch's 14-Apr-2020 letter cites the provision for Emergency Evacuation Expense, which states in part:

### 2.   Emergency Evacuation Expense

This Policy covers the reasonable and necessary costs incurred by the Insured for the emergency evacuation and subsequent return of tenants or lawful occupants when the Insured's management, using reasonable discretion, or a civil authority orders the emergency evacuation of a **described location** as a direct result of immediately impending physical loss or damage of the type insured by this Policy.

Emergency Evacuation Expense Exclusions: As respects Emergency Evacuation Expense, the following additional exclusions apply:

This Policy excludes:

**a)**  The cost to move personal property of tenants or lawful occupants.

**b)**  The cost of temporary or permanent housing or lodging.

**c)**  Loss caused by or resulting from **terrorism,** regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

This coverage is subject to the deductible provisions that would have applied had the physical loss or damage happened.

To obtain coverage under the Emergency Evacuation Expense provision set forth above, the evacuation must occur as a direct result of immediately impending physical loss or damage of the type insured by this Policy. In the letter, Monarch has not reported any evacuation of guests pursuant to an Order as a direct result of immediately impending physical loss or damage of the type insured.

Monarch's 14-Apr-2020 letter cites the provision for multiple Additional Coverages for Property Damage and Business Interruption, which state in part:

### 8.   Decontamination Costs

If insured property is contaminated as a direct result of insured physical damage and there is in force at the time of the loss any law or ordinance regulating **contamination** due to the actual not suspected presence of **contaminant(s),** then this Policy covers, as a direct result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal of such contaminated insured property in a manner to satisfy such law or ordinance. This coverage applies only to that part of insured property so contaminated due to such presence of **contaminant(s)** as a direct result of insured physical damage.

The Company is not liable for the costs required for removing:

**a)** Contaminated uninsured property; or

**b)** The **contaminant** in or on uninsured property;

Whether or not the **contamination** results from insured physical loss or damage.

AFM0001122

\* \* \*

## 25.   Protection and Preservation of Property - Property Damage

This Policy covers the reasonable and necessary costs incurred for:

a) Actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property.

b) Fire department firefighting charges imposed as a result of responding to a fire in, on or exposing the insured property.

c) Restoring and recharging fire protection systems following an insured loss.

d) The water used for fighting a fire in, on or exposing the insured property.

e) Temporary security for a period of time not to exceed 30 consecutive days due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property.

This coverage does not cover costs incurred for actions to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage covered by the Terrorism coverage of this Policy.

This coverage is subject to the deductible provisions that would have applied had the physical loss or damage happened.

\* \* \*

## 13.   Protection and Preservation of Property - Business Interruption

This Policy covers the Business Interruption Coverage loss incurred by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this Policy provided such action is necessary to prevent immediately impending insured physical loss or damage to such insured property.

This Business Interruption Coverage Extension does not cover loss sustained by the Insured to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage covered by Terrorism coverage as provided in this Policy.

This Business Interruption Coverage Extension is subject to the deductible provisions that would have applied had the physical loss or damage happened.

\* \* \*

## 1.   Attraction Property

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability directly resulting from physical loss or damage of the type insured to property of the type insured that attracts business to a **described location** and is within one (1) statute mile of the **described location.**

Attraction Property Exclusion: As respects Attraction Property, the following additional exclusion applies:
This Policy does not insure loss resulting from:
a) Physical loss or damage caused by or resulting from **terrorism,** regardless of any other cause or event, whether or not insured by this Policy, contributing concurrently or in any other sequence to loss.

\* \* \*

## 2.   Civil or Military Authority

This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability if an order of civil or military authority prohibits access to a **location** provided such order is the direct result of physical damage of the type insured at a **location** or within five (5) statute miles of it.

Page 5

Item B. 3. of Property Excluded does not apply to this Business Interruption Coverage Extension.

The Period of Liability for this Business Interruption Coverage Extension will be:

**a)** The period of time starting at the time of such order of civil or military authority, but not to exceed the number of consecutive days shown in the Declarations section of this Policy.

\* \* \*

### 8. Ingress/Egress

This Policy covers the Business Interruption Coverage loss incurred by the Insured due to the necessary interruption of the Insured's business when ingress to or egress from a described location(s) is physically prevented, either partially or totally, as a direct result of physical loss or damage of the type insured to property of the type insured whether or not at a described location.

Item B. 3. of Property Excluded does not apply to this Business Interruption Coverage Extension.

Ingress/Egress Exclusion: As respects Ingress/Egress, the following additional exclusion applies:

This Policy does not insure loss resulting from:

**a)** Physical loss or damage caused by or resulting from terrorism, regardless of any other cause or event, whether or not insured by this Policy, contributing concurrently or in any other sequence to the loss.

\* \* \*

### 13. Expediting Expenses

This Policy covers the reasonable and necessary costs incurred to:

**a)** Temporarily repair or replace; and

**b)** Expedite the permanent repair or replacement of;

Insured property that has sustained insured physical loss or damage.

This coverage does not include expenses payable elsewhere in this Policy including the cost of permanent repair or replacement of damaged property.

\* \* \*

### 15. Soft Costs

This Policy covers soft costs incurred by the Insured during the Period of Liability arising out of the delay in the completion of buildings and additions under construction directly resulting from physical loss or damage of the type insured to insured property under construction at **locations**.

\* \* \*

To obtain coverage under the aforementioned Property Damage and Business Interruption Additional Coverages e.g. Decontamination Costs, Protection and Preservation of Property - Property Damage, Protection and Preservation of Property - Business Interruption, Attraction Property, Civil or Military Authority, Ingress/Egress, Expediting Expense and Soft Costs provisions set forth above, the Insured's property must sustain physical loss or damage of the type insured. In the letter, Monarch has not reported any physical loss or damage of the type insured.

To the extent Monarch cites other Policy provisions in its April 14, 2020 notice letter other than the Communicable Disease provisions, coverage is not available under those due to the absence of physical loss or damage of the type insured. The Policy also excludes coverage for contamination, and a virus such as COVID-19 is a form of contamination as defined in our Policy which is therefore excluded. The relevant provisions, in part, are set forth below:

AFM0001124

## C. <u>EXCLUSIONS</u>

In addition to the exclusions elsewhere in this Policy, the following exclusions apply unless otherwise stated:

**GROUP III:** This Policy excludes:

8. **Contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy. If **contamination** due only to the actual not suspected presence of **contaminant(s)** directly results from other physical damage not excluded by this Policy, then only physical damage caused by such **contamination** may be insured. This exclusion does not apply to radioactive contamination which is excluded elsewhere in this Policy.

The Policy defines contamination under DEFINITIONS of the Policy on Page 42:

**contamination** means any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew.

Consequently, based on the limited information provided at this time, the only coverage that is available under our Policy for losses arising from COVID-19 is found in our Communicable Disease and Professional Fees coverages. As discussed above, to the extent Monarch believes that it has sustained physical loss or damage from causes of loss other than COVID-19, please provide further information so that we may investigate those causes of loss.

Finally, the Policy's Business Interruption Exclusions preclude business interruption loss for any reason other than physical loss or damage insured under the Policy. Pages 23 and 24 of the Policy provides, in relevant part:

## D. BUSINESS INTERRUPTION EXCLUSIONS

In addition to the exclusions elsewhere in this Policy, the following exclusions apply to Business Interruption loss:

This Policy does not insure:

A. Any loss during any idle period, including but not limited to when production, operations or services or delivery or receipt of goods would cease, or would not have taken place or would have been prevented due to:

a) Physical loss or damage not insured by this Policy.

b) Planned or rescheduled shutdown.

c) Strikes or other work stoppage.

d) Any other reason other than physical loss or damage insured under this Policy.

Because COVID-19 does not constitute "physical loss or damage insured under this Policy" as required under this provision, Business Interruption loss due to COVID-19 would also be considered an excluded "idle period".

## 1. <u>Conclusion</u>

Based on the above, we find no liability under the terms and conditions of AFM's Policy No. ES130 for the loss due to the shutdown of the Black Hawk Casino outside of the Communicable Disease and Professional Fees coverages.

Should you have any additional information that should be considered, please contact us within the next 30 days. We are willing to discuss the above provisions and our coverage determination. If we do not hear from you within that timeframe, we will assume you have no questions or additional information and will close our file.

AFM0001125

Page 7

This letter does not waive, nor should it be deemed to have waived, any of Affiliated FM Insurance Company's rights or any of the terms, conditions and provisions of the subject policy of insurance, all of which rights, terms, provisions, and conditions are expressly retained and reserved

Sincerely,

Alex Surmach
Senior Adjuster
AFM

IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE, AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICYHOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICYHOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES.

AFM0001126

**Monarch cover email - please produce this too.**

| | |
|---|---|
| **From:** | "Niedorf, Marcia E." <mniedorf@robinskaplan.com> |
| **To:** | "Willy, Heather R." <hwilly@robinskaplan.com> |
| **Date:** | Wed, 11 Aug 2021 15:02:44 -0500 |

**From:** Surmach, Oleksandr <Oleksandr.Surmach@fmglobal.com>

**Sent:** Wednesday, August 11, 2021 1:53 PM

**To:** Johnson, Scott G. <SJohnson@RobinsKaplan.com>; Hallagan, Stuart <stuart.hallagan@fmglobal.com>

**Cc:** Cook, Brian <brian.cook@fmglobal.com>; Perkins, Randall <randall.perkins@fmglobal.com>; Pazdera, Thomas <thomas.pazdera@fmglobal.com>; Zwayer, Matthew <matthew.zw Oleksandr <Oleksandr.Surmach@fmglobal.com>

**Subject:** RE: [EXTERNAL] Activity in Case 1:20-cv-01470-RMR Monarch Casino & Resort, Inc. v. Affiliated FM Insurance Company Reassigning Judge (Monarch Casino & Resort, Inc.; 50:

All,

Please see the Coverage Determination letter I sent to the insured's counsel. I am beginning the payment process for the USD 100,000 BI final payment right now.

Thank you,

**Oleksandr (Alex) Surmach | Senior Adjuster**
FM Global | 300 South Northwest Highway | Suite 100 | Park Ridge, IL 60068 | +1 847 430 7617 | +1 773 979 1791

**FM** Global

To report a new loss email: newlosschicago@fmglobal.com
Or call: +1 877 NEWLOSS (24 hours, 7 days a week)

AFM0001127